United States District Court
Southern District of Texas
FILED

MAY 0 8 2000

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FELIX CORONEL-CARDENAS,          )
                                 )
v.                               )          C.A. No. B-00-058
                                 )
E.M. TROMINSKI, INS DISTRICT     )
      DIRECTOR                   )
_____)

### PERTINENT DECISIONS OF THE BOARD OF IMMIGRATION APPEALS

Comes Felix Coronel-Cardenas, by and through the undersigned, and submits the following decisions of the Board of Immigration Appeals, cited in support of his Petition for Writ of Habeas Corpus, seeking relief from the decisions of the BIA ordering that he be deported to Mexico.

1.   *Matter of Perez*, I.D. 3389 (BIA 1999);

2.   *Matter of Nolasco*, I.D. 3385 (BIA 1999);

3.   *Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994)

4.   *Matter of Cerna*, 20 I&N Dec. 399 (BIA 1991); and

5.   *Matter of Arai,* 13 I&N Dec. 494 (BIA 1970);

Respectfully Submitted,

Lisa S. Brodyaga
Attorney at Law
402 E. Harrison, 2nd Floor
Harlingen, Texas 78550
(956) 421-3226

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing, without the accompanying decisions, was mailed first class postage prepaid, to Lisa Putnam, SAUSA, P.O. Box 1711, Harlingen, Texas 78551, on April 27, 2000.



2

Case 1:00-cv-00058  Document 4  Filed in TXSD on 05/08/2000  Page 3 of 55

**In re Sergio NOLASCO-Tofino, Respondent**

**File A74 985 878 - New York**

Decided April 15, 1999

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

   For purposes of determining eligibility for suspension of deportation, the period of continuous physical presence ends at the service of the Order to Show Cause and Notice of Hearing (Form I-221) on the alien, irrespective of the date that it was issued.

James J. Kelly, Esquire, Brooklyn, New York, for respondent

Thomas P. McGrath, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, SCIALABBA, and MOSCATO, Board Members. Concurring Opinion: ROSENBERG, Board Member, joined by VILLAGELIU and GUENDELSBERGER, Board Members.

HURWITZ, Board Member:

   In a decision dated June 26, 1997, the Immigration Judge found the respondent deportable and pretermitted his application for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), but granted him the privilege of voluntary departure. The respondent has appealed from the pretermission of his application for suspension of deportation. The appeal will be dismissed.

CM/PDF - www.fawisa.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 4 of 55

## I.  BACKGROUND

The respondent is a 25-year-old male native and citizen of Mexico who entered the United States on or about May 17, 1989.   On March 26, 1996, the Immigration and Naturalization Service issued an Order to Show Cause and Notice of Hearing (Form I-221) and placed the respondent in deportation proceedings.   On July 17, 1996, the respondent appeared at his master calendar hearing and declared his intention to seek suspension of deportation.   On October 9, 1996, the respondent filed an application for that relief.   At the merits hearing of June 26, 1997, however, the Immigration Judge pretermitted the application, observing that the respondent had not acquired 7 years' continuous physical presence in the United States prior to the issuance and service of his Order to Show Cause. Citing our decision in Matter of N-J-B-, Interim Decision 3309 (BIA 1997),[1] the Immigration Judge concluded that the respondent was prima facie ineligible for suspension of deportation.

On appeal, the respondent argues that the pretermission of his application is based on an improper retroactive application of new law.   The respondent maintains that his case is subject to prior law, which requires him to accumulate the requisite 7 years' presence prior to the filing of his application for relief, rather than prior to the issuance of his Order to Show Cause.   The respondent also asserts that the decision of the Immigration Judge is fatally flawed because it relies on Matter of N-J-B-, which had been vacated since the time of the hearing.   Alternatively, the respondent contends that the new law violates due process because it discriminates between classes of aliens without a rational basis.

In response, the Service cites the recent changes in the law and maintains that the respondent is not eligible for suspension of deportation because he has not shown the period of continuous physical presence required by the revised statute.

## II.  ISSUE

The issue in this case is whether the provision for calculating continuous physical presence in section 240A(d) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d) (Supp. II 1996) (the "stop time rule"), applies to applications for suspension of deportation.

---

[1] Our decision in Matter of N-J-B- was subsequently vacated by the Attorney General.   Att'y Gen. Order No. 2093-97 (July 10, 1997).

CVAPDF - www.texis.com

### III.   RECENT DEVELOPMENTS IN THE LAW

At the time the respondent first indicated his interest in suspension of deportation, that relief was governed by section 244(a) of the Act.   Section 244(a) required, inter alia, that an applicant for suspension of deportation be physically present in the United States for a continuous period of at least 7 years immediately preceding the date of application.

On September 30, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), was enacted.   The IIRIRA eliminated the relief of suspension of deportation and substituted a similar remedy, cancellation of removal, at section 240A of the Act.   See IIRIRA §§ 304(a)(3), 110 Stat. at 3009-594; 308(a)(7), 110 Stat. at 3009-615.   It also introduced into the law a provision that closes, or "stops," the period of continuous physical presence upon the service of a charging document on the alien, which is referred to as a "notice to appear."   See section 240A(d)(1) of the Act.   This "stop time" rule applies to notices to appear issued before, on, or after the IIRIRA's enactment date.   See IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

In Matter of N-J-B-, supra, we examined and interpreted section 309(c)(5) of the IIRIRA to determine the scope of its transitional rules.   In that case, we concluded that the stop time rule applies to applications for suspension of deportation that were pending at the time the IIRIRA took effect.   Subsequent to the respondent's appeal, the Attorney General vacated our decision in Matter of N-J-B- and announced that a substitute order would be forthcoming.

Before a new order was issued, however, the President signed into law the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), amended by Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA").   This law revised certain sections of the IIRIRA, including the transitional provisions for suspension of deportation.   See NACARA § 203(a), 111 Stat. at 2196.   It provided that the stop time rule applies to Orders to Show Cause issued before, on, or after the IIRIRA's enactment date.   Id.

### IV.   STATUTORY ELIGIBILITY FOR SUSPENSION OF DEPORTATION

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 6 of 55

For purposes of our review, the respondent's eligibility for
suspension of deportation hinges on which methodology is used to
compute his period of continuous physical presence. Under the
methodology of prior law, the respondent may be eligible for
suspension of deportation because he had acquired the requisite
period prior to the time he tendered his application for suspension
of deportation. Under the methodology of current law, the
respondent is prima facie ineligible for relief because he had not
acquired the requisite period prior to the service of his charging
document. Based on the amended language of the IIRIRA and its
legislative underpinnings in the NACARA, we find that the stop time
rule applies to applications for suspension of deportation.

### A. Revisions Made by the NACARA

As a general matter, persons in deportation or exclusion
proceedings that had begun before April 1, 1997, are not subject to
the changes made by the IIRIRA. IIRIRA § 309(c)(1), 110 Stat. at
3009-625.[2] This general grandfathering provision does not apply,
however, where the statute expressly provides otherwise. Id.

As originally enacted, the IIRIRA contained a single provision that
addressed pending suspension of deportation cases. That provision,
which was entitled "Transitional Rule with Regard to Suspension of
Deportation," read as follows:

> Paragraphs (1) and (2) of section 240A(d) of the
> Immigration and Nationality Act (relating to continuous
> residence or physical presence) shall apply to notices to
> appear issued before, on, or after the date of the
> enactment of this Act.

IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

The NACARA recast that provision as a general rule, complemented
by specific exceptions. This general transitional rule essentially
tracks the IIRIRA's original wording, but substitutes the reference
to "notices to appear" with the following language regarding "orders
to show cause":

---

[2] The April 1, 1997, date is derived from a formula in section
309(a), which provides that the general effective date for this
title of the IIRIRA is the first day of the first month beginning
more than 180 days after the date of the IIRIRA's enactment, which
was September 30, 1996. IIRIRA § 309(a), 110 Stat. at 3009-625.

CVisPDF - www.finebiz.com

> IN GENERAL.—Subject to subparagraphs (B) and (C),
> paragraphs (1) and (2) of section 240A(d) of the
> Immigration and Nationality Act (relating to continuous
> residence or physical presence) shall apply to orders to
> show cause (including those referred to in section
> 242B(a)(1) of the Immigration and Nationality Act, as in
> effect before the title III-A effective date), issued
> before, on, or after the date of the enactment of this Act.

IIRIRA § 309(c)(5)(A), as amended by NACARA § 203(a)(1), 111 Stat.
at 2196.[3]  This language is effective as though included in the
IIRIRA and remains in effect today. NACARA § 203(f), 111 Stat. at
2200.  It is this language that we must interpret.

## B.  Plain Meaning of the IIRIRA's General Transitional Rule

In interpreting the general transitional rule of the IIRIRA, we
look first to the precise language of the statute as it currently
exists.  The paramount index of congressional intent is the plain
meaning of the words used in the statute taken as a whole.  INS v.
Cardoza-Fonseca, 480 U.S. 421, 431 (1987); Matter of Michel, Interim
Decision 3335 (BIA 1998).  Where the language is clear, we must give
effect to the unambiguously expressed intent of Congress.  Chevron,
U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
837, 843 (1984).  On its face, we find the revised language of
section 309(c)(5)(A) of the IIRIRA to be unambiguous.

The IIRIRA, as revised by section 203(a)(5) of the NACARA, contains
"Transitional Rules With Regard to Suspension of Deportation."
Since the IIRIRA removed suspension of deportation from the Act, we
glean from this title that Congress intended these rules to apply to
suspension of deportation applications pending as of the date the
IIRIRA's changes took effect.

---

[3] Subparagraphs (B) and (C) of the transitional rules identify the
cases to which the general rule does not apply:  respectively, cases
in which the Attorney General elects to terminate deportation
proceedings and initiate removal proceedings in their place, and
certain classes of aliens who have been granted temporary protection
from deportation.  Those exceptions are not implicated in this case,
because the respondent remains in deportation proceedings and does
not fall within any of the classes of aliens who qualify for special
treatment under the NACARA.  See IIRIRA § 309(c)(5)(C), as amended.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 8 of 55

Under these transitional rules, the general provision applies the stop time rule of section 240A(d) of the Act to all Orders to Show Cause, irrespective of the date of issuance. We read this language as requiring us to apply the stop time rule of cancellation of removal to all pending applications for suspension of deportation, unless expressly exempted from the general rule.

### C. NACARA's Revision of the General Transitional Rule

While we find the language of the general transitional rule to be unambiguous, we observe that this language is the product of legislative refinement, which itself reflects congressional purpose. Accordingly, we look to the implementing statute to confirm that our reading of the general transitional rule is consistent with the legislative intent underlying it. See Matter of Fuentes-Campos, Interim Decision 3318 (BIA 1997); Matter of W-F-, Interim Decision 3288 (BIA 1996); cf. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285 (1956) ("'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122 (1850)).

In ascertaining the plain meaning of a statutory provision, we construe the language in harmony with the wording and design of the statute as a whole. K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988); Matter of Fuentes-Campos, supra. The introduction or extraction of language sheds light on the congressional intent behind the legislation. Russello v. United States, 464 U.S. 16, 23 (1983); cf. Matter of Grinberg, 20 I&N Dec. 911 (BIA 1994).

The NACARA modified the IIRIRA's transitional rule in two significant ways. First, it amended section 309(c)(5) of the IIRIRA to replace the reference to "notices to appear" with "orders to show cause." In addition, it partitioned section 309(c)(5) into subsections containing the general transitional rule and the particularized exceptions to the general rule.

### 1.   Substitution of Charging Documents

When Congress collapsed deportation and exclusion into removal proceedings, it excised from the Act all references to "order to show cause" and inserted "notice to appear" wherever reference to a

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 9 of 55

charging document was made.[4]  We can reasonably infer from these revisions that Congress chose to remove from the Act a term of art that had been rendered obsolete.

Although Congress eliminated all references to "orders to show cause," it did not direct that proceedings currently being conducted in deportation or exclusion be terminated and reinitiated in removal.  See IIRIRA § 309(c)(2), 110 Stat. at 3009-626 (leaving termination and reinstitution of proceedings to the discretion of the Attorney General).  Rather, Congress allowed existing proceedings to continue uninterrupted and to conclude in their normal course, reserving the new system for proceedings initiated after the IIRIRA took effect.  See IIRIRA § 309(c)(1), 110 Stat. at 3009-625.  Therefore, deportation and removal proceedings temporarily coexist in time.

In its original form, section 309(c)(5) of the IIRIRA provided that all notices to appear, irrespective of the date of issuance, are subject to the stop time rule of the newly created section 240A(d) of the Act.  The transitional rule for suspension of deportation referred to the "notices to appear" and thus created the confusion we sought to resolve in Matter of N-J-B-, supra.

Section 203 of the NACARA clarifies the transitional rule through the substitution of the term "orders to show cause" for "notices to appear."  Read simply, section 309(c)(5)(A) states that the stop time rule applies generally to cases in which an Order to Show Cause has been issued, i.e., deportation cases.  We glean from the extraction of the term "notices to appear" that Congress does not mean to limit the stop time rule to cases brought in or reinstituted in removal proceedings.  To the contrary, we observe the transitional rule to apply broadly and immediately to applications for relief in deportation proceedings, as evidenced by the comprehensive inclusion of Orders to Show Cause "issued before, on, or after" the IIRIRA's effective date.  In fact, given the breadth of this language, we discern a clear legislative intent to apply the stop time rule to all applications for this particular type of

---

[4] As a term of art, "order to show cause" was introduced into the Act fairly recently, when Congress enacted stricter rules regarding deportation proceedings conducted in absentia.  See Immigration Act of 1990, Pub. L. No. 101-649, § 545, 104 Stat. 4978, 5061-62.  Prior to that, orders to show cause were a creature of regulation.  See Understanding the Immigration Act of 1990 10-5 (Stephen Yale-Loehr ed., 1991).

CMPDF - www.loslos.com

.

.

Interim Decision #3385

relief, whether in the form of suspension of deportation or cancellation of removal.

### 2. Recitation of Exceptions

The second significant change in section 309(c)(5) of the IIRIRA is the lengthy articulation of the classes of aliens who are not subject to the stop time rule of 240A(d) of the Act. The concerted effort of Congress to identify, with considerable particularity, those individuals who are exempt from the general rule enhances the comprehensive nature of the general rule and underscores a congressional intent to apply the stop time rule as universally as possible. Cf. 2A Norman J. Singer, Sutherland Statutory Construction § 47.11, at 144-45 (4th ed. 1984) (observing that exceptions may clarify that the general rule applies to all not excepted). The carefully articulated exceptions to the general transitional rule reinforce our conclusion that Congress intended to apply the general rule as broadly as possible and therefore apply the stop time rule as comprehensively as possible to applications for like relief.

The NACARA is framed, not as a technical correction to the IIRIRA, but as a clarification of it. See NACARA, tit. II, 111 Stat. at 2193; see also Almendarez-Torres v. United States, 118 S. Ct. 1219, 1226 (1998) (noting that the title of a statute and heading of a section may be used to interpret the statute). The NACARA further developed the transitional provisions of the IIRIRA and, through the modifications discussed herein, better articulated the inclusion of applications for suspension of deportation in the stop time rule. Thus, in addition to finding the language of the general rule to be clear on its face, we also find that Congress intended the language to be read in this manner.

### D. Legislative History of the NACARA

We are satisfied that the plain meaning of section 309(c)(5) of the IIRIRA, as revised, gives effect to the stop time rule in all suspension of deportation cases. We are also satisfied that our reading conforms to the construction of the statute as a whole. We therefore need not resort to legislative history to interpret the language at issue. Chevron, U.S.A. v. National Resource Defense Council, Inc., supra.

We are cognizant, however, that section 240A(d)(1) of the Act, which contains the stop time rule, makes no explicit reference to

8

.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 11 of 55

"orders to show cause" or deportation cases.[5]  This omission is not
problematic to our reading of the transitional rule when we consider
the design of the statute "as a whole."  K Mart Corp. v. Cartier,
Inc., supra; Matter of Punu, Interim Decision 3364 (BIA 1998).  The
transitional rules in the IIRIRA are designed to fit expiring
constructions and terms of art into a new legal framework and
necessarily will resort to the vocabulary of the old law to direct
affected parties to the provisions of the new.  See IIRIRA
§ 309(d)(2), 110 Stat. at 3009–627 (providing that for purposes of
carrying out the Act, any reference to an order of removal includes
reference to an order of deportation); see also United States v.
Pantin, 155 F.3d 91 (2d Cir. 1998), cert. denied, 119 S. Ct. 835
(1999);    United States v. Ventura-Candelario, 981 F. Supp. 868
(S.D.N.Y. 1997), aff'd, 164 F.3d 620 (1998), cert. denied, 119
S. Ct. 1073 (1999).  Given the inherent nature of all transitional
rules, we can readily deduce that Congress simply sought to avoid
reinserting terminology that had been purposefully removed and
rendered superfluous vis-à-vis all other provisions of the Act.  Cf.
1A Singer, supra, § 20.21 (4th ed. 1986) (stating that better
legislative drafting dictates that temporary provisions not be
placed in the body of the permanent law).

Nonetheless, insofar as the omission might be considered to create
an ambiguity in the statute, we look to the legislative history of
the NACARA to further demonstrate the congressional intent behind
the general transitional rule and the revisions made by the NACARA.
See INS v. Cardoza-Fonseca, supra, at 432 n.12 (holding that the
court may look to the legislative history to determine whether there
is "clearly expressed legislative intention" that conflicts with the
language used).

---

[5]  Section 240A(d)(1) of the Act provides:

> For purposes of this section, any period of continuous
> residence or continuous physical presence in the United
> States shall be deemed to end when the alien is
> served a notice to appear under section 239(a) or when the
> alien has committed an offense referred to in section
> 212(a)(2) that renders the alien inadmissible to the
> United States under section 212(a)(2) or removable from
> the United States under section 237(a)(2) or 237(a)(4),
> whichever is earliest.

9

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 12 of 55

The NACARA was passed as part of an appropriations package. <u>See</u> District of Columbia Appropriations Act, 1998, Pub. L. No. 105-100, 111 Stat. 2160 (1997). Prior to the addition of the NACARA, that package contained no immigration provisions, and even after its addition, the pertinent committee report made no reference to the NACARA or its provisions. <u>See</u> S. Rep. No. 105-75 (1997), <u>available in</u> 1997 WL 583231.

When the Senate passed the bill containing the NACARA, however, the Senate directed the Appropriations Committee, under a unanimous-consent agreement, to prepare an explanatory statement on the bill. <u>See</u> 143 Cong. Rec. S12658, <u>available in</u> 1997 WL 712581. Significantly, this statement was prepared before either the House or the Senate had signed the bill and thus preceded its enrollment and presentation to the President. <u>See</u> 2A Singer, <u>supra</u>, § 48.04, at 300-02 (stating that the history of legislative events up to the point of enactment may be used to interpret a statute). The explanatory statement asserts its authority at the outset: "The language and allocations set forth in Senate Report 105-75 should be complied with unless specifically addressed to the contrary in the accompanying bill <u>and statement.</u>" 143 Cong. Rec. S12658 (emphasis added). In the absence of any competing or conflicting record, we are satisfied that this explanatory statement represents the most authoritative articulation of congressional intent available to us. <u>Cf.</u> 2A Singer, <u>supra</u>, §§ 48.04, 48.14, at 300-02, 334-35 (stating that committee reports are extensively used as sources of legislative history and that committee member statements are afforded the same weight as formal committee reports).

The explanatory statement contains a section-by-section explanation of the NACARA, as contained in Title II of the bill. The relevant portion of that statement provides in its entirety as follows:

> Section 203 modifies certain transition rules established by IIRIRA with regard to suspension of deportation and cancellation of removal. <u>The changes state that the "stop time" rule established by that Act in section 240A of the INA shall apply generally to individuals in deportation proceedings before April 1, 1997, with certain exceptions.</u> They also state that the rule shall not apply to certain applicants for suspension of deportation. . . . The exception includes certain Salvadorans and Guatemalans who were members of the ABC class or applied for asylum by April 1, 1990 and derivatives as specified in the statute, as well as applicants from the former Soviet Union and Eastern Europe who came here by December 31, 1990 and

10

Case 1:00-cv-00058    Document 4    Filed in TXSD on 05/08/2000    Page 13 of 55

applied for asylum by December 31, 1991 and derivatives as
specified in the statute.  Section 203 also makes clear
that in order to obtain cancellation these individuals have
to meet the standards laid out in that section, rather than
the ones laid out in section 240A of the INA.  Finally, the
section provides for temporary reductions in visas
available under the "diversity" and "other workers"
immigration categories, with the reduction in the latter to
take effect after those in the backlog have received visas.

143 Cong. Rec. S12660 (emphasis added).  This statement reflects an
express intention to apply the stop time rule of section 240A of the
Act to deportation cases, not just to removal cases, and to apply
that rule generally as of the effective date of the IIRIRA.

   When the NACARA was first presented to the House, the Senate
Appropriations Committee prepared an explanatory memorandum on the
NACARA language specifically.  That memorandum contained a section-
by-section analysis of the bill, which referred to our decision in
Matter of N-J-B- by name and endorsed it, explaining as follows:

   Section 203(a) amends the transition rule governing
   eligibility for suspension of deportation for those who
   were in exclusion or deportation proceedings as of April 1,
   1997, the effective date of IIRIRA.  Under the rules in
   effect before then, [an] otherwise eligible person could
   qualify for suspension of deportation if he or she had been
   continuously physically present in the United States for
   seven years, regardless of whether or when the Immigration
   and Naturalization Service had initiated deportation
   proceedings against the person through the issuance of an
   order to show cause ("OSC") to that person.  As a result,
   people were able to accrue time toward the seven-year
   continuous physical presence requirement after they already
   had been placed in deportation proceedings.

   IIRIRA changed that rule to bar additional time for
   accruing after receipt of a "notice to appear," the new
   document the Act created to begin "removal" proceedings,
   the repatriation mechanism IIRIRA substituted for
   deportation and exclusion proceedings.  Over a strong
   dissent, a majority of the Board of Immigration Appeals in
   Mater of N-J-B [sic] interpreted IIRIRA Section 309(c)(5)
   to apply not only prospectively in removal cases initiated
   by means of this new document but also retroactively to
   those who were in exclusion or deportation proceedings

11

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 14 of 55

initiated by an order to show cause. On July 10, 1997
Attorney General Reno vacated and took under review the
BIA's decision in <u>Matter of N-J-B-</u>.

<u>Section 203(a) generally codifies the majority decision in
Matter of N-J-B [sic] by stating explicitly that orders to
show cause have the same "stop time" effect as notices to
appear</u>. Excepted from retroactive application of the "stop
time" rule are (1) those whose cases are terminated and
reinitiated pursuant to IIRIRA Section 309(c)(3); and (2)
those who, based on their special circumstances, are
eligible for relief from repatriation under this Act, as
described below.

143 Cong. Rec. S12265, S12266, <u>available in</u> 1997 WL 693186 (emphasis
added). The language of section 203(a) of the NACARA, as presented
to the House, is the same language that was ultimately enacted.

   Although the committee report may itself contain no language about
the congressional intent behind the NACARA, these statements
reflect, in no uncertain terms, a clear intent by Congress to apply
the stop time rule to all but discrete sets of cases. These
statements also reflect congressional awareness of the issue raised
in <u>Matter of N-J-B-</u>, <u>supra</u>, and an intention to resolve that issue
through the NACARA's revisions. Thus, we find the legislative
history of the NACARA consistent with our interpretation of the
transitional rules.

### E.  Application of the Stop Time Rule

   Accordingly, having considered the language of section 309(c)(5)
of the IIRIRA, its construction, and its legislative history, we
conclude that section 309(c)(5)(A), as amended by the NACARA,
includes applications for suspension of deportation. Therefore, we
also conclude that the stop time rule of section 240A of the Act
applies to suspension of deportation applications generally, and
that only those applications that fall within the ambit of sections
309(c)(5)(B) and (C) of the IIRIRA, as amended, are exempt.[6]

---

[6] We are aware that the respondent asserts it would be improper to
"retroactively" apply the provisions of the IIRIRA to his case.
However, whether or not the statute has a retroactive effect, the
outcome is the same since Congress has clearly directed this result.
See <u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994); <u>United</u>
(continued...)

## V. CONSTITUTIONALITY OF CLASS EXEMPTIONS

The respondent argues that the class exceptions made in the NACARA improperly and unconstitutionally draw distinctions between groups of aliens. As a general matter, this Board is without jurisdiction to entertain such constitutional arguments. See Matter of Fuentes-Campos, supra; Matter of C-, 20 I&N Dec. 529 (BIA 1992). Thus, the propriety of these class exemptions cannot come before us.

## VI. CONCLUSION

The respondent was served with an Order to Show Cause before he had acquired 7 years of continuous physical presence in the United States. Under the transitional provisions of the IIRIRA, as amended by the NACARA, the respondent's period of continuous physical presence concluded when he was served with a charging document. Accordingly, he is unable to satisfy the eligibility requirements for suspension of deportation, and his application for that relief is properly pretermitted.

ORDER: The appeal is dismissed.

FURTHER ORDER: Pursuant to the Immigration Judge's order and in accordance with our decision in Matter of Chouliaris, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the Immigration Judge's order.


CONCURRING OPINION: Lory Diana Rosenberg, Board Member, in which Gustavo D. Villageliu, and John Guendelsberger, Board Members, joined

I respectfully concur. On the whole, I believe that the majority's reading of the statute is reasonable and that the result they reach here is correct. I write separately, however, because I am concerned that this decision be placed in the proper context and not be read to unduly restrict eligibility for suspension of deportation.

---

(...continued)
States v. Hemme, 476 U.S. 588 (1986).

13

Interim Decision #3385

First, I must qualify my endorsement of the majority's interpretation of the language of the transitional rules regarding suspension of deportation as set forth in section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627, ("IIRIRA"), as amended by the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997) ("NACARA"). I do not agree that the statutory language is plain on its face, as there is an inherent ambiguity between section 309(c)(5) of the IIRIRA, as revised, and section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), which is created by the inconsistent terminology used in those provisions.

As the majority has discussed, one provision speaks exclusively in terms of deportation proceedings, the other in terms of removal proceedings. The incongruity in terminology introduces sufficient ambiguity to preclude any "plain" reading of the statute, and I necessarily would resort to principles of statutory construction to interpret the transitional rules. Cf. INS v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987). Therefore, while the majority's conclusion that section 240A(d)(1) of the Immigration and Nationality Act applies generally to all pending deportation cases is not unreasonable, I am less confident than the majority that the statutory language conveys Congress' intent as clearly as our opinion suggests.

Second, I note that this decision is limited to the question of determining the application of what the majority refers to as the "stop time rule" to circumstances in which 7 years was not accrued prior to the service of the Order to Show Cause. The respondent, having entered in May of 1989, was approximately 2 months shy of the requisite 7 years' continuous physical presence when he was served with an Order to Show Cause in March of 1996. Our decision goes no further than to say that, because he failed to acquire those 7 years before the service of the Order to Show Cause, the IIRIRA's transitional rules for suspension of deportation deem him ineligible for that form of relief. We conclude no more than that the IIRIRA dictates that section 240A(d)(1) applies in this instance.

We have not fully considered the operation of section 240A(d)(1) of the Act for all purposes. In particular, we do not here determine what occurs once a charging document seeking the respondent's removal is issued, and the service of that document brings the accrual of a period of physical presence accumulated

14

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 17 of 55

prior to its service to a close.[1]  Specifically, today's decision
does not address whether a respondent might begin anew to accrue
time toward future eligibility for relief, <u>following</u> the service of
a charging document.  I emphasize that the Act, the IIRIRA, and the
NACARA all are silent on this score, as is our ruling today.

   Third, I am concerned lest enthusiasm for settling on a "universal"
application of a "stop time" rule that cuts off eligibility for
discretionary relief cause us to lose sight of the flexibility of
the transitional rules or erroneously assume that such a rule
compels unjust results.  The result reached by applying the
principles of statutory construction to support the majority's
reading is not unreasonable and is supported by legislative history,
and I therefore do not take issue with the result that we have
reached.  Nonetheless, looking at the current language of the IIRIRA
and the remedial changes made by the NACARA, I discern a legislative
goal of simplicity, not stringency.

   While Congress may have crafted a one-rule-fits-all scheme, it
neither dictated its use nor required its stringent application in
every case.  To the contrary, Congress gave the Attorney General
wide latitude in the handling of transitional cases, granting her
the discretion both to apply new procedures to certain pending
deportation proceedings, and to terminate certain other pending
proceedings and reinitiate them under the IIRIRA provisions
applicable to removal proceedings initiated after April 1, 1997.
<u>See</u> IIRIRA §§ 309(c)(2), (3), 110 Stat. at 3009-626, <u>as amended by</u>
NACARA § 203(a)(2), 111 Stat. at 2198; <u>see also</u> 8 C.F.R. § 240.16
(1998) (providing that the Attorney General shall have the sole
discretion to apply new removal procedures or to terminate certain
cases and initiate removal proceedings); <u>cf. also, e.g.,</u>
<u>Romero-Morales v. INS</u>, 25 F.3d 125, 128 (2d Cir. 1994) (finding that
the statute and regulations afforded considerable room for the
exercise of discretion consistent with equitable and humanitarian
concerns).

   These transitional provisions reflect that Congress was aware of
the potential inequities that might be created by the broad

---

[1] Sections 309(c)(2) and (3) of the IIRIRA suggest that the service
of an Order to Show Cause is not always the determinative factor in
calculating the period of continuous physical presence.  <u>See</u> IIRIRA
§§ 309(c)(2), (3), 110 Stat. at 3009-626.  Consequently, the
majority's reference to the "stop time rule" should not preclude
examining the actual language of section 309(c)(5) of the IIRIRA, as
amended by Congress in the NACARA.  As Abraham Lincoln once said,
"If you call a tail a leg, how many legs has a dog? Five? No;
calling a tail a leg don't make it a leg."  <u>Bartlett's Familiar</u>
<u>Quotations</u> 458 (Morley ed. 1951).

CHMPDF - www.fiorio.com

Interim Decision #3385

application of the "stop time" rule, and provided the Attorney General a generous grant of discretion through which to ameliorate such harsh consequences. In fact, the effect of the exercise of such discretion would be to assess physical presence from the date of entry through service of the Notice to Appear for such reinitiated proceedings. I therefore emphasize that our decision in no way limits or detracts from the statutory failsafe of the Attorney General's discretion to reinitiate proceedings under section 240A of the Act, as provided under section 309(c)(3) of the IIRIRA. <u>See</u> 8 C.F.R. § 240.16.

Interim Decision #3389

## In re Cristobal PEREZ, Respondent

### File A91 875 147 - Huntsville

Decided May 12, 1999

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Pursuant to section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), continuous residence or physical presence for cancellation of removal purposes is deemed to end on the date that a qualifying offense has been committed.

(2) The period of continuous residence required for relief under section 240A(a) commences when the alien has been admitted in any status, which includes admission as a temporary resident.

(3) An offense described in section 240A(d)(1) is deemed to end continuous residence or physical presence for cancellation of removal purposes as of the date of its commission, even if the offense was committed prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546.

Isaias D. Torres, Esquire, Houston, Texas, for respondent

John W. McPhail, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc:  DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, and SCIALABBA, Board Members.  Dissenting Opinion: GUENDELSBERGER, Board Member, joined by SCHMIDT, Chairman; VILLAGELIU and ROSENBERG, Board Members.

FILPPU, Board Member:

1

Interim Decision #3389

We have jurisdiction over this timely appeal pursuant to 8 C.F.R. § 3.1(b) (1999). The respondent has appealed the Immigration Judge's October 29, 1997, oral decision finding that he is removable on the basis of his conviction for a controlled substance violation pursuant to section 237(a)(2)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(B)(i) (Supp. II 1996), and pretermitting his application for cancellation of removal pursuant to section 240A(a) of the Act, 8 U.S.C. § 1229b(a) (Supp. II 1996). Removability is not an issue on appeal. The respondent contends that the Immigration Judge erred in finding him statutorily ineligible to apply for cancellation of removal on the ground that the required period of continuous residence was terminated when he committed the controlled substance offense. Our review is de novo with regard to the issue on appeal. Matter of Burbano, 20 I&N Dec. 872 (BIA 1994). The appeal will be dismissed.

## I.  ISSUE PRESENTED

The issue in this case is whether the "stop-time" rule of section 240A(d)(1) of the Act operates to terminate the period of continuous residence required for cancellation of removal under section 240A(a) as of the date that the respondent committed his offense.

## II.  FACTUAL BACKGROUND

In removal proceedings commenced on September 26, 1997, the respondent admitted, through his counsel, each of the factual allegations in the Notice to Appear (Form I-862). Specifically, the respondent stated that he is a native and citizen of El Salvador, that he was first admitted as a temporary resident on September 21, 1989, and that his status was subsequently adjusted to that of a lawful permanent resident on December 7, 1990. The respondent further admitted that he was convicted on July 11, 1997, in the 184th District Court of Harris County, Texas, of possession of cocaine, and that this offense was committed on or about August 4, 1992.[1] The respondent conceded that he was removable as charged

---

[1] We note that the dates provided by the Immigration and Naturalization Service in its brief on appeal for each of these events are inexplicably inconsistent with those alleged by the Service on the continuation page (Form I-831) to the Notice to

(continued...)

CVMPDF - www.fesiia.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 21 of 55

under section 237(a)(2)(B)(i) of the Act on the basis of this conviction.

### III.  **THE RESPONDENT'S RETROACTIVITY ARGUMENT**

The respondent's position on appeal is that the presumption against the retroactive effect of statutes stated by the Supreme Court in Landgraf v. USI Film Products, 511 U.S. 244 (1994), is applicable in this case.  The respondent contends that, because he committed his drug offense prior to the passage of section 240A of the Act, that section's rules limiting eligibility for relief from removal should not be applied to him.  See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, § 304(a)(3), 110 Stat. 3009-546, 3009-595 ("IIRIRA") (codified at 8 U.S.C. § 1229b).

We first note that the relief of cancellation of removal is both discretionary and prospective in nature.  Section 240A of the Act therefore does not impair a substantive right to relief that was in place prior to its enactment.  When assessing statutory eligibility or discretionary merit for a grant of cancellation of removal, we must necessarily look at a variety of antecedent events, including events that are both favorable and unfavorable to the alien.  An alien's past criminal conduct may well impact on the operation of the statute.  But it does so only to the extent of defining the Attorney General's present authority to grant discretionary relief to removable aliens, or of informing as to the exercise of discretion.  We therefore do not find that applying Section 240A would have an impermissible "retroactive effect" as contemplated in Landgraf.

In any event, where Congress has expressly prescribed the reach of the new legislation, there is no need to resort to the judicial default rules set forth in Landgraf.  We find that Congress has provided specific direction on the scope of applicability of the section 240A rules governing the relief of cancellation of removal.  The effective date provisions of the legislation implementing the new procedures provide, with certain exceptions not applicable here,

---

[1](...continued)
Appear (Form I-862).  For the purposes of this decision, we have used the dates alleged on the Form I-831, which were admitted to by the respondent at his October 29, 1997, hearing.

CNMPDF - www.fastio.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 22 of 55

that section 240A applies to aliens unless they are currently in deportation or exclusion proceedings.  See IIRIRA §§ 304(c)(2), 110 Stat. at 3009-597; 309(c)(1), 110 Stat. at 3009-625.  The respondent is not in deportation or exclusion proceedings.  He is in removal proceedings commenced after the April 1, 1997, effective date that the IIRIRA established for such proceedings.  Consequently, the section 240A rules apply.

## IV.  THE STATUTORY REQUIREMENTS FOR RELIEF UNDER SECTION 240A(a)

Since the respondent's eligibility for relief is controlled by the rules stated in section 240A of the Act, we must address whether the Immigration Judge properly applied these rules when he pretermitted the respondent's application for section 240A(a) cancellation of removal.

Section 240A(a) provides that a lawful permanent resident may seek cancellation of removal if the statutory prerequisites for that relief have been satisfied.  The prerequisites for section 240A(a) relief are that the alien

   (1) has been an alien lawfully admitted for permanent residence for not less than 5 years,

   (2) has resided in the United States continuously for 7 years after having been admitted in any status, and

   (3) has not been convicted of any aggravated felony.

The respondent was admitted for permanent residence on December 7, 1990, and therefore meets the first requirement of the statute.[2]  We will not address the question whether the respondent meets the third requirement for relief because there is no documentary evidence relating to the respondent's conviction in the record.  Therefore,

---

[2] In its brief on appeal, the Service misreads the statute as requiring continuous residence in the United States for a period of 5 years as a lawful permanent resident prior to the commission of a criminal offense. Section 240A(a)(1), requiring admission for permanent residence for not less than 5 years, does not state a requirement for continuous residence or physical presence and therefore does not trigger the application of section 240A(d)(1). The continuous residence requirement of section 240A(a)(2) is the provision at issue here.

4

CDsPDF - www.texisc.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 23 of 55

we confine our inquiry to the remaining issue of whether the
Immigration Judge correctly determined that the respondent had not
satisfied the second requirement of 7 years of continuous residence
after having been admitted in any status. The respondent <u>committed</u>
his criminal offense before he accrued 7 years of residence.
However, he was <u>convicted</u> of that offense nearly 8 years after his
admission as a temporary resident.

### V. UNDER THE NATURAL AND STRAIGHTFORWARD READING OF SECTION 240A(d)(1), TIME CEASES TO ACCRUE ON THE DATE AN OFFENSE IS COMMITTED

The commencement of the period of continuous residence is defined
in section 240A(a)(2) of the Act as the date when the respondent has
been "admitted in any status." For the purpose of triggering the
accrual of the 7 years of continuous residence required under
section 240A(a)(2), we interpret admission in "any status" to
include admission as a temporary resident. The respondent was first
admitted in "any status," and continuous residence thus began to
accrue, when he was admitted as a temporary resident on
September 21, 1989.

The termination of continuous residence is defined by the special
rule at section 240A(d)(1), which provides as follows:

> For purposes of this section, any period of continuous
> residence or continuous physical presence in the United
> States shall be deemed to end when the alien is served a
> notice to appear under section 239(a) or when the alien <u>has</u>
> <u>committed</u> an offense referred to in section 212(a)(2) that
> renders the alien inadmissible to the United States under
> section 212(a)(2) or removable from the United States under
> section 237(a)(2) or 237(a)(4), whichever is earliest.
> (Emphasis added.)

Applying section 240A(d)(1) of the Act, the Immigration Judge
determined that the respondent's period of continuous residence
ended on August 4, 1992, the date he committed his offense, and that
he consequently had less than the required 7 years of continuous
residence. We find that the Immigration Judge was correct in
applying the commission date as the date that continuous residence
terminated.

The natural and straightforward reading of section 240(A)(d)(1)
indicates that continuous residence or physical presence is deemed

5

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 24 of 55

to end at the point when the alien "has committed" one of the designated offenses, i.e., one that is "referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4)." Section 240A(d)(1) of the Act.

The date that criminal misconduct is committed is the critical point in time when calculating the statutorily required period of time under section 240A(d)(1). The subsequent "renders" clause does not impose a separate temporal requirement. Rather, it is a restrictive clause which modifies the word "offense" by limiting and defining the types of offenses which cut off the accrual of further time as of the date of their commission. Thus, it implicitly requires that the steps necessary to "render" an alien inadmissible or removable shall have occurred before the offense qualifies for section 240A(d)(1) purposes. However, the statute does not identify the date that the final step for inadmissibility or removability occurs as the date that the further accrual of time terminates. To the contrary, it clearly defines the terminating point to be the time when "the alien has committed [the] offense."

In the instant case, the respondent was ultimately "rendered" deportable under section 237(a)(2)(B)(i) by his conviction for an offense that is referred to in section 212(a)(2)(A)(i)(II) of the Act, 8 U.S.C. § 1182(a)(2)(A)(i)(II) (1994 & Supp. II 1996). Hence, his conviction placed his offense within those specified in section 240A(d)(1) for purposes of terminating continuous residence. However, once it was determined that the offense was one of those qualifying offenses, the statute set the date when the offense was "committed" as the point in time when his continuous residence ended.

It would strain our reading of section 240A(d)(1) to interpret the statute as permitting any date to be used for calculating the period of continuous residence or presence other than the date the offense was committed. In determining Congress' intent, we should not read a statute in a tortuous manner in search of ambiguity when the natural and straightforward reading leads to no anomalous or absurd result.

In any event, to the extent that a strained reading of section 240A(d)(1) suggests ambiguity when it is read in isolation, we find that it is readily resolved when interpreted in the context of section 240A as a whole, and by a common sense reading of the statute. Any possible ambiguity disappears by simply recognizing that the word "renders" is implicitly modified by a single word,

6

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 25 of 55

such as "subsequently," or "ultimately," in those situations where the commission of the crime does not itself render an alien immediately removable. Thus, in a case such as the one now before us, time stops accruing "when the alien has committed an offense that [subsequently] renders the alien inadmissible . . . or removable."

## VI.   SECTION 240A(d)(1) MUST BE INTERPRETED IN THE CONTEXT OF SECTION 240A AS A WHOLE

Assigning the phrase "has committed" its ordinary and natural meaning gains support when those words are viewed in the context of the structure of section 240A as a whole.  The Supreme Court has noted that if an ambiguity is perceived when a provision is read in isolation, it is often clarified when it is interpreted in the context of the remainder of the statutory scheme.  Bailey v. United States, 516 U.S. 137, 146 (1995).

Reviewing the text of section 240A as a whole, it is apparent that when Congress intends a conviction to control eligibility for cancellation of removal, it has expressly said so.  For example, cancellation of removal for a lawful permanent resident is conditioned on the fact that the alien "has not been convicted of any aggravated felony."  Section 240A(a)(3) of the Act (emphasis added).  Cancellation of removal for an alien who is not a permanent resident also requires that the alien "has not been convicted of an offense under section 212(a)(2), 237(a)(2), or 237(a)(3)."  Section 240A(b)(1)(C) of the Act (emphasis added).  Congress again used the word "convicted" in its special rule for a battered spouse or child, conditioning relief on a showing that the alien "has not been convicted of an aggravated felony."  Section 240A(b)(2)(D) of the Act (emphasis added).

It is significant that Congress did not use the word "convicted" in section 240A(d)(1) of the Act.  Rather, it chose the word "committed" for the rule governing the calculation of continuous residence and physical presence.  Congress used the separate terms "convicted" and "committed" within section 240A itself, so we must assume that it intended each term to have a "particular, nonsuperfluous meaning."  Bailey v. United States, supra, at 146.

Further, this distinction between the commission and the conviction of offenses occurs repeatedly throughout the Act.  The difference in these terms continues to be evident in the amendments to the Act made by the IIRIRA, and by other amendments, both before and after

7

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 26 of 55

the enactment of the IIRIRA, which were made by the Antiterrorism
and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110
Stat. 1214 ("AEDPA"), and the Nicaraguan and Central American Relief
Act of 1997, Pub. L. No. 105-100, tit. II, 111 Stat. 2193, <u>amended
by</u> Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA").[3]

For example, conviction of a crime involving moral turpitude
committed within a statutorily defined period has long been a ground
for deportation. The current provision is found in section
237(a)(2)(A)(i) of the Act and provides, in part, that an alien who
"is convicted of a crime involving moral turpitude committed within
five years . . . after the date of admission" is deportable.
Similar statutory provisions were formerly found at section
241(a)(2)(A)(i)(I) of the Act, 8 U.S.C. § 1251(a)(2)(A)(i)(I)
(1994), section 241(a)(4) of the Act, 8 U.S.C. § 1251(a)(4) (1988),
and section 19(a) of the Immigration Act of February 5, 1917, 39
Stat. 874. It is well established that this ground of deportation
arises from the <u>commission</u> of the offense within the 5-year period
irrespective of whether or not the <u>conviction</u> for the offense occurs
within the 5 years. <u>See</u> <u>Matter of A-</u>, 6 I&N Dec. 684, 687 (BIA
1955); <u>Matter of Yanez-Jaquez</u>, 13 I&N Dec. 449, 451 (BIA 1970).

In view of the distinctions which Congress has made between the
commission of an offense and a conviction under the immigration
laws, we find it appropriate to heed Congress' choice in construing
the language of the statute.

**VII. THE LEGISLATIVE HISTORY DOES NOT COMPEL A CONTRARY READING**

It is appropriate to look to legislative history for guidance in
discerning legislative intent. In this case, the legislative
history seemingly points to an intent that is contrary to the
natural and straightforward reading of the statute. However, it is
far too limited to use as a basis for concluding that the words of
the statute do not mean what they say. We find only one sentence
that is pertinent to the issue at hand. The Joint Explanatory
Statement of the Committee of Conference includes the statement that

---

[3] <u>See, e.g.</u>, sections 101(f), 212(a)(2)(A), (B), (E), 237(a)(2),
238, 241(b)(3) of the Act, 8 U.S.C. §§ 1101(f), 1182(a)(2)(A), (B),
(E), 1227(a)(2), 1228, 1231(b)(3) (1994 & Supp. II 1996); <u>see also</u>
AEDPA §§ 435, 110 Stat. at 1274-75; 440(a), (d), (e)(7), (f), 110
Stat. at 1276-78; IIRIRA §§ 203(c), 110 Stat. at 566; 301(a), 101
Stat. at 575; 304; 309(c)(4)(G), 110 Stat. at 3009-626.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 27 of 55

"[s]ection 240A(d) provides that the period of continuous residence or physical presence ends when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240), or when the alien is <u>convicted</u> of an offense that renders the alien deportable from the United States, whichever is earliest." <u>See</u> H.R. Conf. Rep. No. 104-828, at 214, <u>available in</u> 1996 WL 563320, at *474 (emphasis added).

This sentence refers only to offenses that render an alien "deportable" without mentioning those relating to inadmissibility that are also included in the section 240A(d)(1) cutoff rule. This one sentence appears to be an incorrect and incomplete summary of section 240A(d)(1). There is no analysis or discussion from which to conclude that Congress did not intend to give effect to the term "committed" that it actually used in the statute to curtail continuous residence or physical presence.

Given the conflict between the use of the word "committed" in the statute and the use of the word "convicted" in the legislative history, we must assume that one of these documents was drafted in error. An error in a 54-page summary of a 197-page conference report is understandable and is an example of why the Supreme Court cautions that legislative history is often unreliable, particularly when it is sparse. <u>See</u> <u>Board of Education of Westside Community Schools v. Mergens</u>, 496 U.S. 226, 238, 242 (1990). It is the statute, not the legislative history, that was passed by Congress and signed into law by the President. As stated by the Supreme Court, "Without a clearer indication of congressional intent than provided by the extremely sketchy legislative history . . . the best evidence of what Congress wanted is found in the statute itself . . . ." <u>Bread Political Action Committee v. Federal Election Committee</u>, 455 U.S. 577, 584 (1982). We would need more persuasive legislative history than this single sentence to reject the express language of the statute.

## VIII.   IN ENACTING SECTION 240A(d)(1), CONGRESS DEPARTED FROM THE LANGUAGE OF FORMER SECTION 244(a)

We likewise find nothing in our past precedent which requires us to interpret section 240A(d)(1) in a manner that is contrary to an ordinary construction of the language of the statute. In <u>Matter of P-</u>, 6 I&N Dec. 788 (BIA 1955), we interpreted language in former section 244(a) of the Act, 8 U.S.C. § 1254(a) (1952), which provided a rule governing the calculation of the period of continuous physical presence required to establish eligibility for suspension

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 28 of 55

of deportation in cases where the alien was deportable under certain criminal and other specified grounds.  That language bears some similarity to section 240A(d)(1) to the limited extent that it references the "commission" of an act.  The relevant language of former section 244(a) provided that, in order to be eligible for relief, an alien who was deportable under one of the designated grounds must have been "physically present in the United States for a continuous period of not less than ten years immediately following <u>the commission of an act, or the assumption of a status, constituting a ground for deportation</u>."  (Emphasis added.)

Under that statutory scheme, the Board concluded that the commission of the crime "did not become 'a ground for deportation' until he was convicted of that act and sentenced therefor" and held that the 10-year period must be measured from the date of the alien's conviction and sentence.  <u>Matter of P-</u>, <u>supra</u>, at 790; <u>see also</u> <u>Matter of Lozada</u>, 19 I&N Dec. 637 (BIA 1988).

However, suspension of deportation under section 244(a) is not available to aliens, such as the respondent, who are in removal proceedings.  Aliens in removal proceedings may seek the relief of cancellation of removal pursuant to section 240A(b) of the Act, under the rules enacted by the IIRIRA, as amended by section 203(a)(1) of the NACARA, 111 Stat. at 2196-98.

Congress has shown its familiarity with the language of former section 244(a) by carrying it forward in the "special rule" applicable to certain NACARA-eligible aliens.  It is significant that Congress did not choose that language to measure the time requirements under the general cancellation of removal rules that apply to all other aliens.  The language employed in section 240A(d)(1) is meaningfully different from that at issue in <u>Matter of P-</u>.  When Congress replaces long-standing language with new language, it is reasonable to give that new language an ordinary and natural construction.  It is not appropriate to give it a strained reading, simply because of the reading given to analogous, but meaningfully different language in prior law.

Moreover, as a general matter, we note that the classes of aliens who had been subject to the 10-year physical presence rule of former section 244(a) that was at issue in <u>Matter of P-</u>, <u>supra</u>, will largely be ineligible, by virtue of their criminal or other specified misconduct, to seek relief under the analogous cancellation of removal provisions in section 240A(b) pertaining to nonpermanent residents.  <u>See</u> sections 240A(b)(1)(C), (c)(4) of the Act, <u>as amended</u>.

10

CPDF - www.fasiol.com

Congress has only carried the old rule forward into removal proceedings for a limited category of aliens described in section 309(c)(5)(C)(i) of the IIRIRA, as amended by section 203(a)(1) of the NACARA, who are eligible to seek "special rule" cancellation of removal despite their inadmissibility or deportability under the specified criminal and other grounds. See IIRIRA § 309(f)(1)(B), as amended by NACARA § 203(b), 111 Stat. at 2198-99. For NACARA-eligible aliens seeking "special rule" cancellation of removal, our decision in Matter of P-, interpreting language that has been carried forward in the "special rule" provision at section 309(f)(1)(B)(iii), may have continuing relevance. Id.

However, all other aliens are subject to the general rules for cancellation of removal. For non-NACARA aliens the period of continuous residence or physical presence required for cancellation of removal is set forth in sections 240A(a)(2), (b)(1)(A), and (2)(B) of the Act. Congress has directed that the requisite time period is to be calculated under the rule defined in section 240A(d)(1). When structuring that rule, Congress chose not to employ the "assumption of status" and "constituting" a ground for deportation language that had been in place for decades for purposes of calculating the accrual of time for certain suspension of deportation cases.

We therefore conclude that Matter of P-, supra, is inapposite to non-NACARA cancellation of removal cases. Those cases are controlled by the section 240A(d)(1) rule for calculating the period of continuous residence or physical presence required for cancellation of removal.

In sum, neither the scant legislative history nor prior precedent compels us to read the statute in a manner that is contrary to the words used by Congress. As explained earlier, however, we find support within the statute itself for giving full effect to the natural reading of the "has committed" language.

## IX.   OTHER CONSTRUCTIONS LEAD TO ANOMALIES

We have considered alternative constructions of the statute, but we find them unsatisfactory. The most obvious alternatives involve: (a) substituting the date of conviction in place of the date of commission of the crime as the cutoff point, which would be consistent with the language in the legislative history; or (b) reading the statutory language to cut off the accrual of time at

11

Interim Decision #3389

the point when the alien finally becomes inadmissible or removable, as the dissent of Board Member Guendelsberger suggests.

An approach which substitutes a requirement that the alien has been convicted for the "has committed" language in section 240A(d)(1) admittedly offers the attraction of ease of application in those cases where an alien's inadmissibility or deportability is dependent on the existence of a conviction. However, such an interpretation would be unworkable in calculating the continuous period in those cases where some act other than a conviction renders an alien inadmissible or deportable.

For example, some grounds of inadmissibility may be established without a conviction, such as inadmissibility under section 212(a)(2)(A)(i)(I), for crimes involving moral turpitude, and under section 212(a)(2)(A)(i)(II), for controlled substances offenses. Inadmissibility under these provisions may be established by a conviction, but it may also be established by the admission to the commission of, or the admission to acts which constitute the essential elements of, one of those offenses.

Requiring a conviction would allow an alien who is rendered inadmissible by his or her admissions to continue to accrue time, until served with a notice to appear, despite having committed an offense that has rendered him or her inadmissible. Such an approach is contrary to the language of section 240A(d)(1).

We could, of course, substitute the concepts of "admits having committed" or "admits to acts constituting the essential elements of" a crime of moral turpitude in place of the "has committed" language chosen by Congress. This would be consistent with looking to the date of conviction in cases where a conviction is needed, but it would require substituting a variety of concepts for the "has committed" language that Congress actually used. Moreover, this would mean that the controlling date is effectively the date that the alien is finally rendered inadmissible or deportable, either by virtue of a conviction or the required admissions of having committed a crime. This brings us to the dissent's proposal, which specifically focuses on the date the alien is rendered inadmissible or removable.

The dissent's proposed reading is that time ceases to accrue when the alien is rendered inadmissible or removable. The use of such a date as the cutoff date, however, would leave no role for the "has committed" language to play in section 240A(d)(1). The statute would read as if the "has committed" language were not present. But

12

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 31 of 55

the statutory language focuses on "when the alien has committed an offense." It does <u>not</u> direct the inquiry to the date "when the alien . . . [is rendered] . . . inadmissible . . . or removable."

The Supreme Court has consistently expressed a deep reluctance to interpret a statutory provision in a way that makes other language within the same statute superfluous. <u>See, e.g.</u>, <u>Freytag v. Comm'r</u>, 501 U.S. 868, 877 (1991); <u>International Union, UAW v. Johnson Controls, Inc.</u>, 499 U.S. 187, 201 (1991); <u>Pennsylvania Dep't of Pub. Welfare v. Davenport</u>, 495 U.S. 552, 562 (1990). We simply cannot agree with a construction of the statutory language here that effectively turns the "has committed" phrase into surplusage.[4]

Despite its ease of administration in the large number of cases where a conviction is needed for removability, a construction of the statute that relies on the date of conviction in a case such as the one before us must either ignore (as the dissent's reading in effect would do) or give multiple meanings to the "has committed" language selected by Congress for the rule governing how continuous residence and physical presence are to be calculated. An approach which substitutes various events for the "has committed" language in the statute, or which relegates that language to needless surplusage, is simply not sensible.[5]

## X.  CONCLUSION

We find that the only sensible construction of the statute is to give the words used their natural and straightforward meaning. There is insufficient legislative history here to conclude that Congress did not intend to give effect to the "has committed" language in section 240A(d)(1). We will not accord greater weight

---

[4] The last sentence of former section 212(c), 8 U.S.C. § 1182(c) (1994), as amended by section 440(d) of the AEDPA, 110 Stat. at 1217, and section 306(d) of the IIRIRA, 110 Stat. at 3009-612, did not use the word "when" and was not concerned with marking a point in time for measuring or ending the accrual of residence or physical presence. Contrary to the dissent's argument, we do not see the relevant language of former section 212(c) performing a "similar function" to the language of section 240A(d)(1).

[5] We see no "lingering ambiguities" here to which the rule of lenity might otherwise apply. <u>See</u> <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 449 (1987).

13

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 32 of 55

Interim Decision #3389

to a single sentence of legislative history, which incompletely
addresses the issue of termination of time, than we accord to the
language of the statute itself.

The language chosen by Congress directs that an alien cease
accruing the time required to establish eligibility for the relief
of cancellation of removal at the point where he or she abuses the
hospitality of this country by committing one of the designated
offenses, so long as the offense subsequently renders the alien
inadmissible or removable. Adhering to the direct command of the
statutory language has not been shown to lead to any anomalous or
absurd results in removal cases. And, importantly, it allows us to
apply the statute in various situations, aside from those where a
conviction is needed for removability, without being forced to
contort the ordinary meaning of the provision as written and without
making any language superfluous.

Accordingly, this respondent's period of continuous residence is
deemed to have ended on the date he committed his controlled
substance violation. The commission of that offense was prior to
his attainment of the required 7 years of continuous residence.
Therefore, he is statutorily ineligible for section 240A(a)
cancellation of removal. Accordingly, we find that the Immigration
Judge's pretermission of his application for cancellation of removal
was proper.

ORDER: The appeal is dismissed.

Board Member Anthony C. Moscato did not participate in the decision
in this case.


DISSENTING OPINION: John W. Guendelsberger, Board Member, in which
Paul W. Schmidt, Chairman; Gustavo D. Villageliu and Lory D.
Rosenberg, Board Members, joined

I respectfully dissent.

The respondent, a permanent resident alien, was found removable
under section 237(a)(2)(B)(i) of the Immigration and Nationality
Act, 8 U.S.C. § 1227(a)(2)(B)(i) (Supp. II 1996), on the basis of
his conviction for a controlled substance violation. He has applied
for cancellation of removal under section 240A(a) of the Act, 8
U.S.C. § 1229(b)(a)(Supp. II 1996), in order to retain his status as

CVAPDF - www.fenrio.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 33 of 55

a lawful resident of the United States.  The respondent is otherwise
eligible for cancellation of removal if he can show that he has 7
years of continuous residence in the United States after having been
admitted in any status.[1]  Section 240A(a)(2) of the Act.  The
question presented here is whether the termination provision in
section 240A(d) ended the qualifying period of residence as of the
date of the respondent's conviction or the date of the crime.[2]  The
majority concludes that the "natural reading" of section 240A(d)
establishes that Congress intended to end the qualifying period of
residence as of the date the offense was committed.  I cannot agree.

The "natural" and grammatically correct reading of the statute,
clear legislative history directly on point, and basic principles of
statutory construction all call for an interpretation of section
240A(d)(1) that would terminate the period of continuous residence
at the time a respondent is rendered inadmissible or removable.  In
this case, the respondent was rendered removable upon conviction for
the controlled substance violation.  At that point, he had accrued
7 years of continuous residence.  I therefore disagree with the
majority's determination that the respondent is ineligible for
cancellation of removal under section 240A(a).

## I.   SECTION 240A(d)(1) ENDS ACCRUAL OF CONTINUOUS RESIDENCE WHEN A RESPONDENT IS RENDERED INADMISSIBLE OR REMOVABLE FOR HAVING COMMITTED ONE OF THE DESIGNATED OFFENSES

Section 240A(d)(1) addresses termination of continuous residence
in the following terms:

---

[1]  There is no dispute that the respondent is otherwise eligible for
cancellation of removal under section 240A(a).  He has been admitted
for permanent residence for more than the required 5 years and has
not been convicted of an aggravated felony.  See sections
240A(a)(1), (3) of the Act.

[2]  The respondent was first admitted as a temporary resident on
September 21, 1989.  He was convicted of possession of cocaine in
July 1997.  The offense date was in August 1992.  If section
240A(d)(1) ends continuous residence on the date of conviction, the
respondent accrued the required 7 years of continuous residence.  If
continuous residence ends on the date of commission of the offense,
the respondent lacks the required 7 years.

15

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 34 of 55

> For purposes of this section, any period of continuous
> residence or continuous physical presence in the United
> States shall be deemed to end when the alien is served a
> notice to appear under section 239(a) or when the alien has
> committed an offense referred to in section 212(a)(2) that
> renders the alien inadmissible to the United States under
> section 212(a)(2) or removable from the United States under
> section 237(a)(2) or 237(a)(4), whichever is earliest.

Boiled down to its essentials,[3] the critical language in section
240A(d)(1) for purposes of the issue presented in this case reads as
follows:

> [A]ny period of continuous residence . . . shall be deemed
> to end **WHEN** the alien has committed an offense [referred to
> in section 212(a)(2)] <u>that renders the alien . . .</u>
> <u>removable from the United States under section 237(a)(2)</u>
> . . . .

The final clause, "<u>that renders the alien . . . removable</u>," is a
subordinate clause which modifies the direct object, "offense." The
"<u>that renders</u>" clause is attached to, and is an integral part of,
the main clause beginning with the word "when." It answers the
question of when the commission of particular offenses, those
"referred to in section 212(a)(2)," ends accrual of residence time.
The subordinate clause attached to the main clause indicates that
termination occurs WHEN "the alien has committed an offense . . .
<u>that renders the alien removable from the United States</u>." The
"when" clause does not end with the direct object, "an offense," or
the descriptive phrase attached to it. It is limited by the "<u>that</u>
<u>renders</u>" clause which modifies "an offense" and describes an
additional factor which must have occurred before accrual of
residence ends.

The majority asserts that the "that renders" clause merely defines
the <u>types of offenses</u> which cut off the accrual of time. But the
<u>types of offenses</u> which cut off the accrual of time are earlier
described as those offenses "referred to in section 212(a)(2)." It
is not the type of offense which is regulated by the "<u>that renders</u>"

---

[3]  There is no question that the respondent had accrued 7 years of
continuous residence prior to the service of the notice to appear.
Because the respondent is charged with a ground of removability, the
reference to inadmissibility under section 212(a) has also been
extracted.

CutePDF - www.fwsku.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 35 of 55

clause, but the impact of the offense, i.e., inadmissibility or deportability. The "that renders" clause is, of course, descriptive; it completes the description of when an offense which has been committed will terminate the accrual of residence.

The majority suggests that its reading of the statute may be better understood if the word "subsequently" or "ultimately" is inserted before the word "renders." See Matter of Perez, Interim Decision 3389, at 6 (BIA 1999). Notably, Congress did not choose to include such a modifier, and as an administrative body, we are not free to add language or rewrite provisions in order to achieve a particular meaning or result. Nor would such additional language necessarily achieve the result suggested by the majority. The subordinate "that renders" clause would still modify the "when" clause, as it now does. The suggested language would also make no sense in those cases in which commission of an offense is the same event that renders the alien inadmissible or removable, as in the case of an alien charged with having engaged in prostitution or commercialized vice. See section 212(a)(2)(D) of the Act, 8 U.S.C. § 1182(a)(2)(D) (1994 & Supp. II 1996). In such situations, there would be no "subsequent" event.

## II.   THE MAJORITY DISTORTS THE SIGNIFICANCE AND MEANING OF THE "COMMITTED AN OFFENSE" LANGUAGE

The majority queries why Congress would have used the "has committed an offense" language had it meant to allow accrual of residence until occurrence of some event after the date of commission. Part of the answer is that section 212(a)(2), the universe of offenses which may eventually result in termination of accrual of residence, contains a variety of descriptions of the conduct which will render a respondent inadmissible or removable. Some provisions require a criminal conviction.[4]  Some require only admission of acts constituting a criminal offense.[5]  For some other

---

[4]  See, e.g., section 212(a)(2)(B) of the Act (conviction for two or more moral turpitude offenses).

[5]   See, e.g., section 212(a)(2)(A) of the Act (admits having committed or admits committing acts which constitute the essential elements of a crime involving moral turpitude or controlled substance violation).

CVAPDF - www.texto.com

Interim Decision #3389

provisions the mere commission of an offense suffices to render an alien inadmissible.[6]

Congress, having selected section 212(a)(2) grounds as the core of relevant offenses for purposes of section 240A(d), could not describe those offenses in terms of "convictions under section 212(a)(2)" because that would leave out all of those grounds which render an alien inadmissible without need for a conviction. The phrase "committed an offense referred to in section 212(a)(2)" is a shorthand description which sweeps broadly enough to encompass all the various acts, short of conviction, described in the section 212(a)(2) grounds for inadmissibility.

The majority suggests that the "has committed" language would be superfluous were the "that renders" clause read to govern when accrual of residence terminates. But the "has committed" language is no more superfluous as used in section 240A(d) than it was in the last sentence of former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994), <u>as amended</u>. The language performs a similar function in both statutes: it describes a category of offenses which may, upon occurrence of a later event, result in a cutoff of eligibility for benefits. Former section 212(c) contained the following bar to eligibility:

> an alien who is deportable by reason of <u>having committed a criminal offense</u> covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i). (Emphasis added).[7]

Although most grounds of deportation listed in the section 212(c) bar to relief required a conviction, section 241(a)(2)(B)(ii) of the Act, 8 U.S.C. § 1251(a)(2)(B)(ii) (1994), also rendered deportable

---

[6]  <u>See, e.g.</u>, section 212(a)(2)(D) of the Act (engaged in or is coming to the United States to engage in prostitution or commercialized vice).

[7]  This limitation on section 212(c) relief was added by section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1217 ("AEDPA"), as amended by section 306(d) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-612 ("IIRIRA").

18

CZ4PDF - www.fasoo.com

"[a]ny alien who is, or at any time after entry has been, a drug abuser or addict." Thus there was a need for the "committed any criminal offense" catchall in describing the grounds covered, rather than "convicted of" or some other terminology.

Notably, mere commission of an offense was not enough to bar relief under former section 212(c). But that did not make the section 212(c) "having committed" language superfluous. The term was part and parcel of the description of those categories of aliens who would be rendered ineligible for relief upon occurrence of a subsequent event, in the case of section 212(c), a finding of deportability. See Matter of Fortiz, Interim Decision 3340 (BIA 1998) (holding that for an alien to be barred from eligibility for a waiver under section 212(c) as one who "is deportable" by reason of having committed a criminal offense covered by one of the criminal deportation grounds there enumerated, he or she must have been charged with, and found deportable on, such grounds); Matter of Fuentes-Campos, Interim Decision 3318 (BIA 1997). Likewise, the term "has committed" in section 240A(d) describes the categories of criminal acts which subject an alien to the stop-time rule and directs that time ends when the alien is rendered inadmissible or removable. The majority's purported concern over superfluous language is therefore simply unfounded.

Another provision using the point of "commission" to describe the grounds covered is former section 244(a)(2) of the Act, 8 U.S.C. § 1254(a)(2) (1994), which precludes suspension of deportation for persons deportable under former sections 241(a)(2), (3), or (4) who have not been

> physically present in the United States for a continuous
> period of not less than 10 years immediately following the
> commission of an act, or the assumption of a status,
> constituting a ground for deportation.   (Emphasis added.)

In construing section 244(a)(2), this Board ruled that it was not the "commission of the act," but the fact of deportability for having committed such an offense, that was the crucial point in time. Matter of Lozada, 19 I&N Dec. 637 (BIA 1988); Matter of P-, 6 I&N Dec. 788 (BIA 1955).

The statute in Matter of P- defined the event that triggered the commencement, rather than the termination, of the required period. The respondent in Matter of P- would have accrued the requisite 10 years if measured from the date of commission of the crime, but would not if the operative date was the date he was convicted. The

19

Interim Decision #3389

Board found that the commission of the crime "did not become 'a ground for deportation' until he was convicted of that act and sentenced therefor" and accordingly ruled that the 10-year period must be measured from the date of his conviction and sentence. Matter of P-, supra, at 790.

Matter of P- was followed in Matter of Lozada, supra, where the Board applied the same language that was at issue in Matter of P- and concluded that "it is the conviction, not the commission of the offense, that renders the alien deportable." Matter of Lozada, supra, at 640. Notably, the language used by the Board, "renders the alien deportable," is the same language selected by the drafters of section 240A(d), i.e., the cutoff occurs "when the alien has committed an offense . . . that renders the alien inadmissible . . . or removable." (Emphasis added.) This choice of language strongly suggests that the drafters' intentions as to the workings of the termination provision in section 240A(d) were consistent with the Board's explanation in Lozada of the operation of the termination provision in section 244(a).

When Congress replaced the section 212(c) waiver and section 244(a) suspension of deportation with cancellation of removal in sections 240A(a) and (b), it considerably revised the criminal bars to eligibility. It retained, however, the "committed an offense" formula from former section 212(c) to describe the types of grounds which would affect timing. As in former section 212(c), it is the point at which the respondent is rendered inadmissible or removable that is crucial in terms of timing in section 240A(d).

### III.   LEGISLATIVE HISTORY AND BASIC PRINCIPLES OF STATUTORY CONSTRUCTION INDICATE THAT THE ACCRUAL OF TIME ENDS WHEN THE RESPONDENT IS RENDERED INADMISSIBLE OR REMOVABLE

On rare occasions, legislative history affords insight into the intent of the framers. Remarkably, in this case, we have an instance of legislative history directly on point. The Joint Explanatory Statement of the Committee of Conference clearly states: "Section 240A(d) provides that the period of continuous residence or physical presence ends when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240), or when the alien is convicted of an offense that renders the alien deportable from the United States, whichever is earliest." See H.R. Conf. Rep. No. 104-828, at 214, available in 1996 WL 563320, at *474 (emphasis added). The legislative history

20

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 39 of 55

makes no mention of the date that the alien has <u>committed</u> the offense.

The majority declares the legislative history incomplete and, therefore, incorrect. The legislative history may be technically incomplete, because it does not address inadmissibility and those few grounds of inadmissibility which do not require a conviction in order that the respondent be rendered inadmissible, e.g., admission of commission of a moral turpitude crime under section 212(a)(2)(A) or engagement in prostitution under section 212(a)(2)(D). But the reference in the legislative history is to offenses which render the alien deportable (now removable), and all of the covered offenses in section 237(a)(2) (i.e., those which are referred to in section 212(a)(2)) require a conviction before the alien is considered removable.[8] Thus the legislative history's reference to "conviction" is an accurate reflection of the statute's effect in removal cases, i.e., for all the applicable removal grounds the alien is rendered removable upon conviction of a designated offense. While the legislative history may be technically incomplete, that does not make it incorrect, as the majority asserts, insofar as the expression of the general rule of interpretation to be applied to those offenses for which a conviction is required in the ground for inadmissibility or removal. In that sense the legislative history affords important guidance, if not a clear resolution, of the question of when, by and large, termination of residence occurs.

As discussed above, the guidance afforded in the legislative history of section 240A(d) is consistent with the approach used to bar relief in the predecessor provisions to cancellation of removal and in the Board's prior interpretation of similar statutory language in former section 244(a)(2). Other provisions barring relief for those involved in criminal activity generally resort to the date of conviction as the crucial factor in terminating eligibility. <u>See, e.g.</u>, sections 240A(a)(3), (b)(1)(C) of the Act.

---

[8] Under the terms of section 240A(d), only those section 237(a)(2) offenses which overlap with offenses described in section 212(a)(2) operate to terminate accrual of time. These section 237(a)(2) offenses are convictions for moral turpitude crimes (section 237(a)(2)(A)) and for controlled substance violations (section 237(a)(2)(B)(i)). The bars for aggravated felony convictions, firearms convictions, and other offenses described in section 237(a)(2) do not overlap with offenses described in section 212(a)(2).

CUtePDF - www.fasiw.com

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 40 of 55

The majority's "anomalies" argument is premised on the proposition that we propose to substitute "conviction" for "commission" in the statute. No such proposal has been made. Nor is that what the statute says. The statute refers to the point at which the alien is rendered inadmissible or removable. Thus the "anomalies" argument is built upon a false premise and fails.

The majority's statement that requiring a conviction would allow an alien who is <u>rendered inadmissible</u> by his or her admissions to continue to accrue time until served with a notice to appear is simply wrong. If the alien is rendered inadmissible under the terms of section 212(a)(2) by admission of an offense, the accrual of residence would cease with the date of the admission of the offense. <u>See, e.g.</u>, section 212(a)(2)(D) of the Act (inadmissible if engaged in or coming to the United States to engage in prostitution or commercialized vice).

The termination of residence time upon the occurrence of the event which renders the alien inadmissible or removable is the historical approach and a common sense approach which eases administration of the law. Under this approach, as a practical matter, it is generally the date of conviction which will become the crucial point to be identified. The date of conviction is normally easy to pinpoint. Under the majority approach, in every case involving section 240A(d), the adjudicator will have to identify the date of commission of the offense. Just when a crime was "committed" will, in some cases, be uncertain or indeterminate. In cases involving conspiracies to commit an offense, for example, there will be considerable difficulty in identifying the offense date. Thus, ease of administration also augers in favor of a reading which recognizes that accrual of time ends when the alien is rendered inadmissible or removable.

The respondent's offense is one "referred to in section 212(a)(2)" at subparagraph (A)(i)(II), which pertains to controlled substance violations. However, with certain exceptions not applicable in this case, an alien who has committed a controlled substance violation is not inadmissible under section 212(a)(2) until he has been

CutePDF - www.tevisa.com

Case 1:00-cv-00058    Document 4    Filed in TXSD on 05/08/2000    Page 41 of 55

convicted.[9]  Similarly, an alien is not removable under subparagraph (B)(i) of section 237(a)(2) without a conviction.

Any lingering doubts as to the appropriate construction of section 240A(d), after examining legislative history and other aids to construction, should be resolved by the rule of lenity, a principle of statutory interpretation deeply imbedded in immigration law. This rule requires that when a limitation on relief from removal is ambiguous, it must be afforded the narrower meaning, the meaning in which fewer activities bar the alien from eligibility.  The reason for this rule in the immigration area is that, given the drastic consequences of deportation or removal, Congress must speak clearly and definitely before we apply a bar to relief from removal.  See INS v. Errico, 385 U.S. 214, 225 (1966) (construing section 241(f) of the Act, 8 U.S.C. § 1251(f)(1964), and indicating that doubts as to the correct construction of the statute affording relief from deportation should be resolved in the alien's favor); see also INS v. Cardoza-Fonseca, 480 U.S. 421, 449 (1987) (noting the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948) (stating that any doubts regarding the construction of the Act are to be resolved in the alien's favor); Matter of Tiwari, 19 I&N Dec. 875 (BIA 1989).  Here, the rule of lenity also points toward the interpretation which terminates the period of continuous residence when the respondent is rendered inadmissible or deportable.

## IV.  CONCLUSION

A common sense reading, clear legislative history, ease of administration, and our prior interpretation of similar statutory language indicate that section 240A(d) terminates accrual of time toward the continuous residence requirement when the respondent is rendered inadmissible or removable for commission of an offense described in section 212(a)(2).  The respondent accrued more than the requisite 7 years of continuous residence between his admission as a temporary resident on September 21, 1989, and his conviction on

---

[9]  See generally section 212(a)(2)(A)(i) of the Act; Matter of J-, 2 I&N Dec. 285 (BIA 1945).  We also note that the record does not include evidence that the respondent is a drug trafficker under section 212(a)(2)(C), which may render a respondent inadmissible without a conviction.

23

Interim Decision #3389

July 11, 1997, which rendered him removable.  Accordingly, I would
sustain his appeal and remand the record to the Immigration Judge
for consideration of the respondent's application for cancellation
of removal under section 240A(a).

24

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 43 of 55

## MATTER OF PENA-DIAZ

In Deportation Proceedings

A-30568827

*Decided by Board August 4, 1994*

(1) When an alien becomes eligible for a new form of relief from deportation due to the Immigration and Naturalization Service's intentional lack of enforcement of a final order of deportation, it is appropriate to consider this factor in deciding whether or not the proceedings should be reopened in the exercise of discretion and whether the alien has established statutory eligibility for the relief sought upon reopening.

(2) In granting the respondent's motion to reopen deportation proceedings, consideration and weight were accorded to the Service's affirmative permission for the respondent to remain in the United States, its failure to show any intent to effect his deportation if the motion were denied, and its inconsistent actions in granting the respondent's request for deferred action status and subsequently opposing his motion to reopen proceedings.

CHARGE:

Order: Act of 1952—Sec. 241(a)(11) [8 U.S.C. § 1251(a)(11)]—Convicted of controlled substance violation

ON BEHALF OF RESPONDENT:
Thelma O. Garcia, Esquire
301 East Madison Street
Harlingen, Texas 78550

ON BEHALF OF SERVICE:
Grace A. Sease
General Attorney

BY: Dunne, Acting Chairman; Vacca, Board Member. Concurring and Dissenting Opinion: Heilman, Board Member. Concurring Opinion: Holmes, Alternate Board Member.

In a decision dated September 2, 1992, an immigration judge denied the respondent's motion to reopen in order to apply for suspension of deportation under section 244(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(2) (Supp. IV 1992). The respondent timely appealed from that decision and requested oral argument. The appeal will be sustained, the proceedings will be reopened, and the record will be remanded. The request for oral argument is denied.

The respondent is a 45-year-old native and citizen of Mexico who entered the United States as a lawful permanent resident on May 5,

---

factual issue regarding her husband's written withdrawal of support for the petition. The respondent argues that it is not clear what was intended by the statement, and that in particular it is not clear whether her husband intended to withdraw the petition itself. We find no merit to these contentions. There is no ambiguity in the husband's statement, "It is my intention at this time to withdraw my support of the joint petition in behalf of Maria Rodriguez (sic) Mendes." A joint petition under section 216(c)(1) of the Act requires two petitioners, and it is clear as a factual matter that the respondent's husband withdrew his support from his portion of the joint petition. The question of whether that withdrawal of support results in withdrawal of the joint petition itself is precisely the question of law we have addressed here. It does not depend on the personal intention of the petitioning spouse.

Finally, the respondent suggests that the Service prevailed upon her husband to withdraw the petition against his will. This suggestion even seems to have influenced the immigration judge's decision, which states that the respondent's husband was "prevailed upon" to sign a statement. However, the respondent has offered no evidence whatsoever at the hearing or on appeal to support this allegation. As this claim is entirely unsubstantiated, we need not address it here.

Accordingly, the appeal by the Service will be sustained, and this matter will be remanded to the immigration judge in order to afford the parties the opportunity to proceed in a manner consistent with this opinion, including the filing of a waiver request before the Service, if the respondent so chooses. In this regard, we note that when a respondent in deportation proceedings has not filed an application for a waiver under section 216(c)(4) of the Act and is prima facie eligible for such relief, the proceedings should be continued in order to grant the respondent a reasonable opportunity to file the application before the regional service center director and for the center director to decide the application. *See* 8 C.F.R. §§ 216.5(c), 242.13 (1994); *cf.* section 216(d)(2)(C) of the Act. If the application is denied by the center director, then it may be submitted to the immigration judge for review pursuant to 8 C.F.R. § 216.5(f) (1994).

ORDER: The appeal by the Immigration and Naturalization Service is sustained.

FURTHER ORDER: The decision of the immigration judge terminating these proceedings is vacated.

FURTHER ORDER: The record is remanded to the immigration judge for further proceedings consistent with this opinion and the entry of a new decision.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 44 of 55

1972. On March 26, 1976, the respondent was convicted of possession of approximately 95 pounds of marijuana with intent to distribute and sentenced to a term of 3 years' incarceration and a special parole term of 2 years, with all but 3 months of the sentence suspended. The court further recommended that the respondent not be deported as a result of his conviction.

On June 25, 1976, the Immigration and Naturalization Service issued an Order to Show Cause and Notice of Hearing (Form I-221) charging the respondent with deportability under section 241(a)(11) of the Act, 8 U.S.C. § 1251(a)(11) (1976), as an alien who had been convicted of a controlled substance violation. In a hearing conducted on January 4, 1977, the respondent admitted the charges and, being ineligible for relief from deportation, was ordered deported from the United States to Mexico.

On January 5, 1977, the respondent requested a stay of deportation on the basis of the presence of his family members in the Brownsville, Texas, area, including his wife and two United States citizen children; his steady employment in that area as a machinist; and his presence in the United States as a lawful permanent resident since 1972. The Service apparently granted the respondent's request for a stay on April 7, 1977, effective until January 5, 1978. On July 7, 1978, the respondent applied for another stay of deportation, although it is not clear from the record whether this request was granted or denied. The respondent again applied for a stay of deportation on January 8, 1979, and this request was granted until January 8, 1980. On January 17 of that year, the respondent was placed in deferred action status. A condition of such status was that the respondent report in person to the district director each year. The record reflects that the respondent largely complied with this condition at least through 1989.

Apparently in an effort to travel to Matamoros, Mexico, to visit his parents, the respondent applied for a new Alien Registration Receipt Card (Form I-151) in January 1983. This request was denied on the ground that the respondent was no longer a lawful permanent resident. On March 13, 1984, the respondent filed a motion to reopen his deportation proceedings for the purpose of applying for relief under section 212(c) of the Act, 8 U.S.C. § 1182(c) (1982). An immigration judge replied to the respondent's motion on March 19, 1984, indicating his belief that the respondent was ineligible to apply for a waiver of inadmissibility under that provision, but reserving judgment on the issue until the Service could file a brief in opposition to the motion. For reasons not apparent from the record, no decision was taken on the motion until after the respondent had inquired about its status in February 1986, when another immigration judge denied it for lack of statutory eligibility on March 13, 1986.

According to the Service's brief in opposition to the instant appeal, the respondent's deferred action status was lifted on March 23, 1984, as a result of his motion to reopen filed earlier that month. As noted above, however, the respondent continued to report yearly as required by the district director, and no affirmative action was taken to effect his deportation until late 1987 or early 1988, when, according to the Service's brief, the respondent was ordered to report for deportation on February 25, 1988. The respondent apparently applied for reinstatement of deferred action status on February 16, 1988, a request which was denied on February 25, 1988.

On March 22, 1988, the respondent moved to reopen his deportation proceedings, this time for the purpose of applying for suspension of deportation under section 244(a)(2) of the Act. In support of motion to reopen, the respondent submitted documentation to establish his continuous physical presence in the United States and his good moral character for the 10 years preceding the application, as well as to support his claim that his deportation would cause "exceptional and extremely unusual hardship" to himself, his lawful permanent resident alien spouse, and his three United States citizen children.

On June 14, 1988, the immigration judge denied the respondent's motion to reopen on the ground that the respondent's "equities," i.e., the basis for his claim of exceptional and extremely unusual hardship, had accrued in the 11 years since the court's deportation order. Believing that the respondent had ignored the order of deportation, the immigration judge refused to allow the respondent to benefit from his indifference or disregard of the law. Finally, noting the interest in bringing litigation to an end, the immigration judge concluded that the respondent's order of deportation should have been carried out long ago and denied the motion to reopen, presumably in the exercise discretion.

On June 9, 1992, the respondent again moved to reopen to apply for suspension of deportation under section 244(a)(2) of the Act. In this motion, the respondent pointed out that he had not "ignored the court's order of deportation," but rather had remained in the United States with the permission of the Service. The respondent claimed in this regard that his prior counsel had not submitted the evidence of his deferred action status and requested that the immigration judge adjudicate the motion in this light.

On June 30, 1992, the immigration judge denied the respondent's third motion to reopen for the reasons set forth in his preceding denial. Finding that the evidence that the respondent sought to offer of his deferred action status was not previously unavailable, the immigration judge found the respondent's motion to be frivolous and filed solely

for the purpose of delaying the 1977 deportation order. The immigration judge accordingly denied the motion, set aside all stays of deportation, and ordered that the 1977 order of deportation be considered in full force and effect.

In a fourth and final motion filed on September 1, 1992, the respondent again requested reopening of the proceedings in order to apply for suspension of deportation. This motion is essentially identical to his third motion to reopen. In like manner, the immigration judge's denial of the ultimate motion is also based on the same reasoning as his earlier denial, but emphasizes his finding that the motion was frivolous and filed solely for the purpose of delay. The respondent timely appealed from that decision.

On appeal, the respondent argues that the immigration judge erred in not considering the evidence that he submitted regarding his permission to remain in the United States. In addition, the respondent points to the following factors in alleging hardship to himself and his family if he is deported: his long-term residence and property ownership in the United States; the fact that his conviction occurred 18 years ago and that he has been law-abiding during those years; the fact that he has remained in this country with permission from the Service; and, finally, the presence of all of his immediate family in this country, including a United States citizen child with a heart condition.

The Service, in opposition to the respondent's appeal, characterizes the same as "frivolous" and argues that public policy favors that this ongoing litigation be brought to a close.

It is true that several grounds exist for denying a motion to reopen, and that an alien requesting such action bears a "heavy burden." *See INS v. Doherty,* 502 U.S. 314, (1992); *INS v. Abudu,* 485 U.S. 94 (1988); *Matter of Coelho,* 20 I&N Dec. 464 (BIA 1992). In this case, however, we believe the respondent has presented sufficient evidence to establish that he warrants a hearing on his application for suspension of deportation.

In reaching this conclusion, we first note that it is unclear whether the immigration judge ever took into consideration the fact that the respondent remained in this country with permission from the Service. As the immigration judge's perception that the respondent ignored a valid deportation order provides the basis for the first denial of the respondent's request for reopening, and because the subsequent denials adopt the reasoning of the first, we believe this significant factor may have been overlooked.

Second, it is clear from the record that the respondent has established the necessary physical presence in the United States and his good moral character for the qualifying period. The remaining questions, therefore, are whether the respondent has established a

prima facie showing of the requisite "exceptional and extremely unusual hardship" under section 244(a)(2) of the Act and whether reopening is warranted in the exercise of discretion.

After careful review of the record, we shall answer both these questions in the affirmative. The respondent has spent almost half of his life in this country, has been steadily employed, and owns real property. In addition, the members of respondent's immediate family are well established here as members of our society, and we are mindful that one of his United States citizen children has a congenital heart defect for which she is undergoing treatment. We would also note that the evidence of record in support of the instant motion is voluminous and includes affidavits from the respondent's employer as well as friends, neighbors, and local law enforcement officials. Final, although the respondent's drug-related conviction is his sole transgression, it nevertheless renders him ineligible for any other form of relief from deportation and further precludes him from again legally immigrating to the United States, no matter how distant in time it may become. We would note in passing that, at least one time in the past, the Service itself viewed the respondent's equities as sufficient to warrant an administrative grant of deferred action status. Moreover, these equities have dramatically increased on account of the Service's actions.

In this regard, the respondent understandably claims that he will suffer further hardship due to his long-term deferred action status which, ironically, was accorded to him by the same agency now seeking his immediate deportation. We would not unhesitatingly agree with the respondent that this fact constitutes "hardship" in the respondent's case as that term has previously been interpreted by this Board and the federal courts. However, we do believe that the impact of the Service's actions in the past warrants some examination in the instant case.

As noted above, the reasons for the Service's grant of deferred action status to the respondent in 1980 presumably arose from the humanitarian concerns in his case. This being so, we are somewhat at a loss to understand why the respondent should now face such determined opposition to his motion to reopen, since the Service is itself accountable for the respondent's accumulation of even further equities in the United States.

While the respondent's case presents compelling circumstances, our receipt of motions to reopen by other aliens who have become eligible for additional forms of relief after the entry of a final order of deportation is increasing. In this respect, we first note the general rule that aliens should not be rewarded for time spent pursuing frivolous appeals and that motions to reopen made in this context are properly

Case 1:00-cv-00058  Document 4  Filed in TXSD on 05/08/2000  Page 45 of 55

Interim Decision #3225

denied as a matter of discretion. See, e.g., INS v. Rios-Pineda, 471 U.S. 444 (1985); Matter of Barocio, 19 I&N Dec. 255 (BIA 1985); Matter of Lam, 14 I&N Dec. 98 (BIA 1972). The cases we are referring to, however, involve aliens who have remained in the United States after the issuance of a final order of deportation, with no apparent effort on the part of the Service to remove them from this country. It therefore seems reasonable that, when an alien's eligibility for a new form of relief from deportation arises due to the Service's deliberate failure to enforce a final deportation order, it is equally appropriate to consider this factor in deciding whether or not the proceedings should be reopened in the exercise of discretion. In a case such as the respondent's, where the Service has affirmatively permitted the alien to remain, the equities in the alien's favor become particularly strong.

Our inquiry, however, does not end here. Before a motion or any form of discretionary relief may be granted, an alien must first establish statutory eligibility therefor; only then does the issue of the proper exercise of discretion present itself. INS v. Abudu, supra. In this respect, we further find that the Service's decision not to enforce an outstanding order of deportation could have an effect on the hardship determination in some cases, in addition to being a positive factor in the exercise of discretion. If the denial of a motion will likely result in an alien simply being left in limbo with no further action taken to remove him or her from the United States, that state of continuing uncertainty in life may be a matter appropriate to be considered in evaluating whether the denial of the motion will result in hardship.

In sum, in the context of a motion to reopen for suspension of deportation, we may consider the actions of the Service with respect to its enforcement or intentional lack of enforcement of a final order of deportation in deciding whether an alien has established a prima facie case of "extreme hardship" as required under that provision. See Matter of Coelho, supra. If such hardship is found to exist, we shall also consider the Service's actions in deciding whether such a motion should be granted in the exercise of discretion. In cases such as the respondent's, in which the Service has affirmatively permitted the alien to remain, the equities may well favor a subsequent request to reopen proceedings. On the other hand, aliens who intentionally flout lawful orders of deportation or who obtain their eligibility for additional forms of relief due to dilatory tactics will likely not be found to merit the favorable exercise of discretion required for reopening of deportation proceedings. INS v. Rios-Pineda, supra; Matter of Barocio, supra.

Turning to the facts of the instant case, we conclude that the respondent has made a sufficient prima facie showing of exceptional and extremely unusual hardship and has established that the reopening

of his deportation proceedings is warranted as a matter of discretion. See Matter of Anderson, 16 I&N Dec. 596 (BIA 1978). In this respect, we find that the Service's affirmative permission for the respondent to remain and its failure to show any intent to effect his deportation if the instant motion is denied contribute to the respondent's other allegations of hardship. In addition, we conclude that the Service's inconsistent actions in granting the respondent's request for deferred action status and subsequently opposing his motion to reopen are properly considered as favorable factors in the exercise of our discretion. Weighing all of the factors presented, we conclude that the motion to reopen should be granted.

We caution that this decision is not a determination that `` respondent merits suspension of deportation as a matter of law or discretion; that decision will rest with the immigration judge after ... respondent has had an opportunity to present all of the evidence and arguments in favor of his application for relief from deportation that he may wish to make. The following orders shall accordingly be entered.

ORDER: The appeal is sustained and the deportation proceedings are reopened.

FURTHER ORDER: The record is remanded to the immigration judge for further proceedings.

CONCURRING IN PART AND DISSENTING IN PART:
Michael J. Heilman, Board Member

I respectfully concur in part and dissent in part.

It appears to me that the majority may be sowing a bit of confusi in its blending of two completely distinct issues: the Immigration a Naturalization Service's apparent affirmative decision to allow ... otherwise deportable alien to remain in the United States, and whether the alien has established "exceptional and extremely unusual hardship" for purposes of section 244(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(2) (Supp. IV 1992). In particular, the following passage in the majority opinion seems to hold that the Service's decision to grant "deferred action" status or to grant extended stays of deportation enhances the claim of hardship:

In sum, in the context of a motion to reopen for suspension of deportation under section 244 of the Act, we may consider the actions of the Service with respect to its enforcement or intentional lack of enforcement of a final order of deportation in deciding whether an alien has established a prima facie case of "extreme hardship" as required under that provision. See Matter of Coelho, supra. If such hardship is found to exist, we shall also consider the Service's actions in deciding whether such a motion should be granted in the exercise of discretion.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 47 of 55

The first sentence appears to state that the "actions of the Service" are relevant to whether the applicant for suspension has established extreme hardship. The second sentence seems to hold that the Service's actions are relevant to the exercise of discretion in granting the motion to remand. These are separate issues. I prefer not to leave the impression that the Service's decision to allow a deportable alien to remain in the United States somehow increases hardship. This does not appear to me to be logical. It is certainly true that extending one's physical presence in the United States could lead to circumstances that would make it harder to eventually leave. I fail to see, though, how the Service's ill-advised or well-advised decision to let someone remain affects the quality or quantity of hardship that person might experience upon deportation. This becomes clear if we examine the case of two individuals who have both remained in the United States for 20 years, the first as a beneficiary, in part, of "affirmative" Service actions, the other not. Assuming identical circumstances, how is it that the recipient of Service largesse has had his hardship increased over that of his similarly situated counterpart? Yet, this is the apparent conclusion of the majority, when it states:

In this respect, we find that the Service's affirmative permission for the respondent to remain and its failure to show any intent to effect his deportation if the instant motion is denied contribute to the respondent's other allegations of hardship.

If the majority believes that the Service's "permission to remain" contributes to his hardship, this can only mean that this permission has increased his hardship. The cause and effect relationship eludes me. The Service has not become an agent of hardship because it has done the respondent a favor. Hardship is either inherent in the respondent's circumstances or it is not, and it hardly matters what reason the Service had in allowing him to remain, whether the product of indifference or sympathy. If the hardship accrued during the extra time the respondent remained in the United States because the Service failed to deport him due to since-regretted kindness, this is entirely fortuitous. The same amount of hardship might have accrued if the respondent had evaded deportation, or had simply been ignored, the latter situation being the altogether more common case. If, for instance, the respondent had had two more children born to him during this time, he might say that he would not have fathered them if the Service had not allowed him to remain. An individual who had ignored an order to depart might also have had two children and also claim this fact as evidence of extra hardship. In either case, it is first necessary to establish that the birth of two extra children will increase the hardship of deportation.

I would agree with the majority that in exercising our discretion as

to whether to reopen we can consider the Service's role in the respondent's continued presence. But this issue only arises after we have considered the statutory issue of hardship. Surely in considering the Service's opposition to this motion, it is fair to consider the manner by which the respondent accrued his extra presence. We have, in other cases, considered as an adverse factor in exercising our discretion, whether, for example, a respondent has been ordered to report for deportation and has absconded or failed to comply with that request. The situation in this case is rather the other side of the coin, where, upon his request, the respondent was told he could remain, and so he can arguably present a somewhat more laudatory explanation for why he did not leave when ordered deported.

While I can agree that reopening is warranted on the basis of information contained in the motion to reopen, I would not agree that the degree of hardship has been increased by the Service's actions, and I do not join in that portion of the majority opinion.

CONCURRING OPINION: David B. Holmes, Alternate Board Member

I respectfully concur.

I concur in the majority opinion, but would add the following comment. In evaluating the level of hardship that may result from the enforced departure of an individual from the United States, it is my view that normal human expectations may well be a factor to be considered. If a person has been in this country for 20 years and has accumulated equities while hiding from the authorities, that person likely understands that his or her continued presence here could easily hang by a very slender thread. If another person has remained here 20 years accumulating identical equities while his or her presence openly known and tolerated by the Immigration and Naturalization Service, he or she reasonably could have a whole different degree of expectation regarding the future. To my mind, it is likely that the emotional hardship resulting from an enforced departure from this country would be far greater in the latter case than in the former. While this consideration ultimately may or may not be significant in a given case, I would not foreclose its inclusion as a relevant factor to be considered in evaluating whether or not an alien's enforced departure would result in an "extreme hardship."

# MATTER OF CERNA

## In Deportation Proceedings

### A-30257519

*Decided by Board October 7, 1991*

(1) An applicant for relief under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1988), must be a lawful permanent resident of the United States and must have a lawful unrelinquished domicile of 7 consecutive years.

(2) Barring a subsequent reversal of a respondent's deportability finding by an appellate court or administratively, an alien's status as a lawful permanent alien ends upon the entry of an administratively final order of deportation.

(3) A respondent who is subject to an administratively final order of deportation cannot successfully move to reopen deportation proceedings to again apply for relief under section 212(c) of the Act as such a respondent is no longer a lawful permanent resident of this country.

(4) Authority from one circuit is not binding in another and the Board declines to follow the holding in *Vargas v. INS*, 938 F.2d 358 (2d Cir. 1991), outside the jurisdiction of the United States Court of Appeals for the Second Circuit.

(5) Motions to reopen and motions to reconsider are separate and distinct motions with different requirements—a motion to reconsider requests that the original decision be reexamined in light of additional legal arguments, a change of law, or an argument or aspect of the case that was overlooked, while a motion to reopen seeks to reopen proceedings so that new evidence can be presented and a new decision entered or different factual record, normally after a further evidentiary hearing.

(6) The Board of Immigration Appeals has not held that a respondent who has been denied relief under section 212(c) of the Act is precluded from having the original decision reconsidered.

(7) The Board is not favorably disposed to the practice of waiting until the conclusion of the administrative appeal process to file a motion that seeks to offer additional evidence regarding the matter previously in issue.

(8) The Board has not held that the existence of outstanding equities creates a right to have the consequences resulting from particularly serious criminal misconduct waived or that such equities compel a grant of discretionary relief; rather, the Board has noted just the opposite (i.e., that the nature of the adverse factor or factors may ultimately be determinative of whether relief under section 212(c) of the Act is granted).

CHARGE:

Order: Act of 1952—Sec. 241(a)(11) [8 U.S.C. § 1251(a)(11)]—Convicted of controlled substance violation

399

Where a petitioner files a visa petition on behalf of a claimed relative whom she has previously failed to identify as such on documents that require the identification of such relatives, the visa petition will be approved only if it is supported by clear and convincing evidence of the bona fide nature of the relationship. Here, the petitioner has conceded that she did not list the beneficiary as her son in the documents she filed in 1947 when she immigrated or in 1956 when she was naturalized. In fact, no such claim was made until some 30 years after she had become a United States citizen. We emphasize further that the notarial certificate she has relied upon must be evaluated in light of the potential for fraud that is present when birth is certified after such a long period of time. In addition, further doubt is cast on the reliability of the certificate by the fact that it was issued on the basis of information which had been provided by the beneficiary. Furthermore, it appears unlikely that the person who issued the certificate had evidence before him that has not been presented by the petitioner in these proceedings. Consequently, we are not persuaded that the certificate is reliable evidence of the claimed relationship in the circumstances of this case. Similarly, those circumstances also diminish the probative value of the other evidence the petitioner has submitted. We conclude that the evidence the petitioner has submitted to establish that the beneficiary is her son is not clear and convincing and, therefore, that she has failed to meet her burden of proof. See *Matter of Brantigan, supra.*

Accordingly, the appeal will be dismissed.

ORDER: The appeal is dismissed.

Interim Decision #3161

ON BEHALF OF RESPONDENT:  Helena Tetzeli, Esquire
2650 S.W. 27th Avenue, 2nd Floor
Miami, Florida 33133

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated March 25, 1987, an immigration judge found the respondent deportable as charged and denied his application for relief from deportation pursuant to section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1982), in the exercise of discretion. The respondent, who had conceded his deportability, appealed solely from the denial of his request for relief under section 212(c). The respondent's appeal was dismissed by this Board on July 26, 1990. On January 23, 1991, the respondent, through new counsel, filed a "Motion to Reconsider and/or Reopen and Remand." The motion will be denied.

We note initially that although styled as both a motion to reconsider and a motion to reopen, the motion before us is, in fact, solely a motion to reopen deportation proceedings. The motion seeks a opportunity to submit evidence that was not previously a matter of record and seeks a further opportunity to pursue a request for relief under section 212(c) of the Act on the supplemented record. There is no argument presented that alleges any specific error in our prior decision in this case. In any event, even if the respondent's submission is viewed in part as a motion to reconsider, we decline to reconsider our July 26, 1990, decision as we find nothing in the motion that would cause us to reevaluate that decision on the factual record that was then before us.

As noted, the respondent is seeking to have his deportation proceedings reopened so that he can present what he submits is new evidence and pursue an application for relief under section 212(c) of the Act. However, the respondent cannot successfully move to reopen proceedings to again apply for relief under section 212(c) as he can no longer establish prima facie eligibility for such relief. An applicant for relief under section 212(c) of the Act must be a lawful permanent resident of the United States and must have a lawful unrelinquished domicile of 7 consecutive years. See section 212(c) of the Act; Gonzales v. INS, 921 F.2d 236, 238 (9th Cir. 1990). This respondent is no longer a lawful permanent resident of this country as his status as such ended upon the entry of the final administrative order of deportation by this Board. See section 101(a)(20) of the Act, 8 U.S.C. § 1101(a)(20) (1988); Rivera v. INS, 810 F.2d 540 (5th Cir. 1987); Matter of Lok, 18 I&N Dec. 101 (BIA 1981), aff'd on other

400

Interim Decision #3161

grounds, 681 F.2d 107 (2d Cir. 1982); see also 8 C.F.R. §§ 3.1(d)(2), 3.37, 242.20, 243.1 (1991). For the reasons enunciated in Matter of Lok, supra, barring a reversal on the merits of the respondent's deportability finding by an appellate court or administratively, the respondent lost his status as a lawful permanent resident on July 26, 1990.[1] Thus, he is no longer statutorily eligible for relief under section 212(c). Gonzales v. INS, supra. Accordingly, the respondent's motion to reopen and remand will be denied.

We note that the United States Court of Appeals for the Second Circuit recently found a decision of this Board denying reopening of deportation proceedings for this same reason to be "arbitrary and capricious." Vargas v. INS, 938 F.2d 358, 361-63 (2d Cir. 1991). The Second Circuit, in reversing our decision and in disagreeing with the Ninth Circuit's analysis in Gonzales v. INS, supra, concluded that a respondent's eligibility for section 212(c) relief, once established, survives a finding of deportability. The court ruled that, even if a respondent no longer is a lawful permanent resident of the United States, he can successfully move to reopen proceedings to again apply for relief under section 212(c) so long as his eligibility for such relief had once been established. Authority from one circuit is not binding in another, however, and we respectfully decline to follow the holding in Vargas v. INS outside the jurisdiction of the Second Circuit for the following reasons. See State of Ga. Dep't of Medical Assist. v. Bowen, 846 F.2d 708, 710 (11th Cir. 1988).

As regards Vargas v. INS, supra, we note that the basis for our conclusion in that case, that a respondent who has lost his lawful permanent resident status is not eligible for relief under section 212(c), was not, as stated by the court, simply supported by one "phrase" in Matter of Lok, supra. Vargas v. INS, supra, at 360. We also would not agree that we "did not present [our] decision [in Vargas] as an interpretation of statutory provisions." Id. at 363. Our decision in that case was based (as is our decision today) on the rationale we set forth in Matter of Lok, which in turn was founded on our interpretation of sections 101(a)(20) and 212(c) of the Act.

Moreover, contrary to the holding in Vargas v. INS, our conclusions in this regard do not result in an "[i]mplicit [a]mendment" of the

---

[1] We would also deem the respondent's lawful domicile in this country to have ended on the same date that his status as a lawful permanent resident ended. See Appendix. However, the precedent decisions of the United States Court of Appeals for the Eleventh Circuit that are controlling in this case hold that the respondent's lawful domicile ended with the issuance of the Order to Show Cause and Notice of Hearing (Form I-221). Bailbe v. INS, 886 F.2d 306 (11th Cir. 1989), cert. denied, 495 U.S. 929 (1990); Marti-Xiques v. INS, 741 F.2d 350 (11th Cir. 1984).

401

regulatory provisions regarding motions to reopen set forth in 8 C.F.R. §§ 3.2 and 3.8 (1991). *Vargas v. INS, supra,* at 361. First, the regulations certainly do not create an express right to have proceedings considered for reopening in order to further pursue applications for relief under section 212(c) of the Act. In fact, as the Supreme Court noted in *INS v. Jong Ha Wang,* 450 U.S. 139 (1981), "The present regulation is framed negatively; it directs the Board not to reopen unless certain showings are made. It does not affirmatively require the Board to reopen proceedings under any particular condition." *Id.* at 144 n.5. Moreover, the controlling regulations are not "effectively amend[ed]" in this context—or in any other—by the application of the *Lok* rule that a motion to reopen deportation proceedings to apply for relief will be denied in the absence of a showing of prima facie eligibility for the relief in question. *Vargas v. INS, supra,* at 361.

Further, in *Vargas v. INS,* the court stated that our "application of the *Lok* rule to motions to *reconsider* Section 212(c) relief has been erratic. *Id.* at 362. (Emphasis added.)" The court also stated that a "motion to reopen or to reconsider is not a request for a *new* decision. Rather, *Id.* In our view, both of these statements inappropriately entwine motions to reopen and motions to reconsider, which "are two separate and distinct motions with different requirements." *Chudshevid v. INS,* 641 F.2d 780, 783 (9th Cir. 1981); *see also Sanchez v. INS,* 707 F.2d 1523, 1529 (D.C. Cir. 1983). We have never held that a respondent who has been denied relief under section 212(c) is precluded from having the original decision *reconsidered.* A motion to reconsider asserts that at the time of the Board's previous decision an error was made. It "questions the Board's decision for alleged errors in appraising the facts and the law." 1 C. Gordon & S. Mailman, *Immigration Law and Procedure* § 3.05[7][a], at 3-61 (rev. ed. 1991). When we reconsider a decision, we are in effect placing ourselves back in time and considering the case as though a decision in the case on the record before us had never been entered. If the respondent was eligible for relief at the time the original decision was entered, then in reconsidering the decision we would treat his status as that which it had been at the time of the initial decision. The very nature of a motion to reconsider is that the original decision was defective in some regard. A motion to reopen proceedings, however, is a fundamentally different motion.[2] *See Sanchez v. INS, supra; Chudshevid v. INS, supra.*

[2] A motion to reconsider "is a request that the Board reexamine its decision in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked, while [a] motion to reopen is usually based upon new evidence or a change in factual circumstances." Hurwitz, *Motions Practice Before the Board of Immigration Appeals,* 20 San Diego L. Rev. 79, 90 (1982) (footnotes omitted).

It does not contest the correctness of (or simply request a reevaluation of) the prior decision on the previous factual record. Rather, a motion to reopen proceedings seeks to reopen proceedings so that new evidence can be presented and so that a new decision can be entered, normally after a further evidentiary hearing. We find nothing either inconsistent or illogical in holding that a respondent can move for reconsideration of a decision, which was entered while he was a lawful permanent resident and which denied relief under section 212(c), based on an argument that that decision was incorrectly entered, while a respondent who has lost his status as a lawful permanent resident cannot thereafter successfully move to reopen proceedings to have a different application for relief under section 212(c) adjudicated o different factual record. Rather, we would find it inconsistent to conclude that an alien who is no longer a lawful permanent resident of the United States could have proceedings reopened to apply for relief only available to lawful permanent residents.

Finally, as regards *Vargas v. INS, supra,* to our knowledge, we have not been "erratic" in our application of the "*Lok* rule" to motions to reopen proceedings to apply for section 212(c) relief. *Id.* at 362. In view of the sheer number of decisions we enter and the difficulty, as a practical matter, of attempting to review every post-*Lok* Board decision involving a motion to reopen proceedings to further pursue an application for relief under section 212(c), we would be hesitant to state that we have never granted a motion to reopen proceedings in such circumstances, just as we would not state that we have never entered an erroneous decision in any other context. The fact that such decisions occur is the reason that provisions for reconsideration exist. We are not aware of any such decisions, however, and note that none was identified in *Vargas v. INS.*

Even were we to apply the Second Circuit's rationale to this case, would deny the respondent's motion. We note initially that we are not favorably disposed to the practice of waiting until the conclusion of the administrative appeal process to file a motion that seeks to offer additional evidence regarding the matter previously in issue. Here, as regards the most significant of the respondent's new equities, we note that his marriage to a United States citizen occurred less than 1 month after the filing of his appeal from the adverse decision of the immigration judge issued on March 25, 1987, and his United States citizen child was born in November 1987. There is no explanation provided for the failure to submit a motion proffering this additional evidence while the respondent's administrative appeal was pending. In any event, wholly aside from its timing, and considering both the previous record and the new matters regarding the respondent's familial and community ties, his business venture, his property ties,

and his completion of parole, we still would not grant this motion in the exercise of discretion. We are particularly sympathetic to the hardship that the respondent's deportation may cause his 4-year-old child and his United States citizen wife (although the significance of the marriage and the possible hardship to the respondent's wife is somewhat diminished by the fact that the marriage occurred after the respondent had been found deportable and his request for discretionary relief had already been denied by the immigration judge). The respondent does have outstanding equities, as is often the case with applicants for relief under section 212(c) of the Act. In describing how we exercise our discretion, we have stated that, absent outstanding or unusual equities, relief under section 212(c) *will* be denied in the exercise of discretion in cases where there are particularly adverse factors present. *Matter of Edwards*, 20 I&N Dec. 191 (BIA 1990). However, we have never held that the existence of such equities creates a right to have the consequences resulting from serious criminal misconduct waived. Nor do such equities compel a grant of discretionary relief. Rather, we have noted just the opposite (i.e., that the nature of the adverse factor or factors may ultimately be determinative of whether relief under section 212(c) is granted). *See Matter of Buscemi*, 19 I&N Dec. 628, 634 (BIA 1988); *Matter of Marin*, 16 I&N Dec. 581, 584-85 (BIA 1978). There are drug offenses of varying degrees of seriousness and in our view this respondent was convicted of a particularly serious drug trafficking offense. His 1984 conviction resulted from his purchase and importation into the United States of half a kilogram of cocaine. He personally bought the cocaine in Bolivia and had his shoes modified to conceal the drugs in order to smuggle them into this country. Moreover, the immigration judge found the respondent's credibility lacking in his testimony regarding the particulars of this crime and regarding his previous criminal record.[3] The respondent can have been under no illusion of the seriousness with

[3] The respondent testified that he had been convicted of possession of marihuana in 1975 and that he pled guilty to a charge of carrying a concealed weapon in 1974 or 1975. As regards this latter matter, he testified as follows: He was driving his mother's car and a friend, who had a gun, "went inside a car to . . . to get some tapes that belonged to him or something like that." They were both arrested. His friend was found not guilty, but the respondent was charged with carrying a concealed weapon because the weapon was in his car. He pled guilty because he knew that he was going to get probation and he wanted to avoid "wasting more time and money" by going to trial. The record indicates that he was adjudicated guilty of possession of marihuana on July 7, 1975, and received a suspended sentence. Some 6 months later, he was placed on probation for carrying a concealed weapon, carrying a firearm without a license, and breaking and entering an automobile. The adjudication of guilt was withheld in this latter case, leaving the respondent without a conviction under Florida law, and his probation was terminated on October 18, 1977.





which drug trafficking is viewed. While drug trafficking crimes of this nature are not unique in the gravity with which we view them, there are few adverse matters we view as more serious. We have never held—and certainly do not hold today—that there are no circumstances under which we might grant relief in the face of adverse matters of the nature present in this case. However, even considering the additional factors asserted in this motion, the case before us is simply not one in which we are satisfied that a favorable exercise of our discretion is warranted. The responsibility for the hardships and difficulties that this respondent and his family may face rest squarely on the respondent's shoulders.

Accordingly, the respondent's "Motion to Reconsider and/or Reopen and Remand" will be denied in the exercise of discretion as well as on grounds of statutory eligibility.

**ORDER:** The respondent's motion to reopen and reconsider is denied.

APPENDIX

We note that a principal mission of the Board of Immigration Appeals is to ensure as uniform an interpretation and application of this country's immigration laws as is possible. At times achieving this goal is beyond our control as our decisions are reviewable in federal court and we ordinarily apply the law of a circuit to the cases that arise within that circuit. We certainly acknowledge the benefit to the adjudication process of having our decisions thus reviewable, particularly in view of the profound nature of the rights often at issue in the cases we review. Moreover, assistance in achieving some measure of uniformity is provided by the "great deference" a court ordinarily must accord our interpretation of the governing statute. *Udall v. Tallman*, 380 U.S. 1, 16 (1965); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447-48 (1987); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984). In this context, however, the history subsequent to our decision in *Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), was rather disheartening.

We recognized in *Matter of Lok* what, in our view, is the inextricable relationship between the issue of when lawful permanent resident status terminates and when lawful unrelinquished domicile ends for section 212(c) purposes (i.e., it would seem to make little sense to conclude that an alien's lawful domicile has ended prior to the point at which he loses his status as a "lawful permanent resident," just as it would seem to make little sense to conclude that lawful domicile continues beyond the point that a final order of deportation has been entered). We recognized that arguments could be made in the deportation context as to various stages at which an alien's status as a

lawful permanent resident could be considered to have "changed" within the meaning of section 101(a)(20) of the Act. For reasons we articulated in *Matter of Lok*, and which we will not reiterate here, we concluded that the most appropriate rule was that an alien's status as a lawful permanent resident ends with an administratively final order of deportation, barring a subsequent reversal on the merits of the finding of deportability by a court or administratively as a result of a motion. Our interpretation of the law established a rather straightforward test in an area of the law which is particularly contorted, even in the context of an Immigration and Nationality Act that in simpler times was characterized as a "never-never land ... where plain words do not always mean what they say." *Yuen Sang Low v. Attorney General*, 479 F.2d 820, 821 (9th Cir.), *cert. denied*, 414 U.S. 1039 (1973).

Subsequent to our decision in *Lok*, various courts of appeals considered the issues we addressed therein (although not always addressing the relationship between the issue of when an alien loses his lawful permanent resident status and when his lawful unrelinquished domicile ends). We recognize that our perspective may be somewhat colored, as it was our decisions under review, but we are not left with the sense in many instances that deference, substantial or otherwise, was accorded our interpretation of the relevant laws and regulations.

Initially, the Second Circuit, in reviewing our decision in the *Lok* case itself, noted its view that the respondent's lawful domicile may have ended "even earlier" than the point specified in our decision (i.e., it "probably" ended when the respondent conceded deportability and "no appeal was taken challenging the finding of deportability"). *Lok v. INS*, 681 F.2d 107, 110 (2d Cir. 1982). The premise underlying this conclusion was that the respondent's order of deportability had "probably" become final at that point. We note, however, that—contrary to this premise—the immigration judge's order of deportability had *not* become administratively final, as the respondent did appeal from the immigration judge's decision. Under the controlling regulations then in effect, if an immigration judge's "order" was appealed, it was not final. 8 C.F.R. § 242.20 (1982). The "order" that

[1] Thus, in some respects, the Second Circuit takes a more restrictive interpretation of the laws in this area than do we, while in others, the court takes a far more expansive interpretation. That is, it would appear that the Second Circuit would cut off a lawful permanent resident's ability to initially establish eligibility for relief under section 212(c) at an earlier point than we would. However, if eligibility has once been established, the court would recognize no finality (other than the "physical deportation" of the alien from the United States) on an alien's right to seek reopening of deportation proceedings to further pursue an application for such relief even beyond the point that a loss of lawful permanent resident status clearly has occurred. See *Vargas v. INS*, 938 F.2d 358, 363 (2d Cir. 1991).

was referred to was "the order" in its entirety, not simply the specific aspect of the order that was challenged on appeal. *See* 8 C.F.R. § 242.18(a), (c) (1982); *see also* 8 C.F.R. §§ 3.1(d)(2); 3.37; 242.20 (1991) (which make clear that it is "the decision" that either is or is not final, rather than its individual components).

Thereafter, the Eleventh Circuit in its first decision in *Marti-Xiques v. INS*, 713 F.2d 1511 (11th Cir. 1983), concluded that a respondent's lawful domicile did not terminate when we rendered a decision dismissing the respondent's appeal from an immigration judge's denial of discretionary relief because the respondent's presence could not be deemed unlawful until the administrative denial of discretionary relief was upheld on appeal. This decision was in turn followed by the Nint' Circuit's decision in *Wall v. INS*, 722 F.2d 1442 (9th Cir. 1984), i which it was held that the respondent's lawful domicile continued pending judicial consideration of his petition for review, but only because that petition challenged the respondent's deportability finding. The Ninth Circuit did not find it determinative whether or not the challenge to the administrative finding of deportability was ultimately successful. Next, on rehearing, the Eleventh Circuit vacated its prior decision in *Marti-Xiques* and held that the date that the Order to Show Cause and Notice of Hearing (Form I-221) is issued is the appropriate point at which to conclude that eligibility for section 212(c) relief is determined. *Marti-Xiques v. INS*, 741 F.2d 350 (11th Cir. 1984). This decision did not specifically address the issue of whether a respondent is deemed to have lost his status as a lawful permanent resident by the mere issuance of the Order to Show Cause or, whether such status is not lost at that point, but lawful domicile ends nonetheless. The Ninth Circuit then held in *Avila-Murrieta v. INS*, 762 F.2d 733 (9th Cir. 1985), that when "an alien concedes his deportability or fails to raise a challenge to an order of deportation, he may no longer be said t harbor a 'lawful intent' to remain in this country even if the INS fails to take immediate steps to expel him beyond our borders." *Id.* at 736. The court did not find it necessary to determine if one's "lawful intent" terminates when proceedings commence or when the deportation order becomes final. *Id.*

The Fifth Circuit was the next to consider the issues raised in *Matter of Lok*. The Fifth Circuit initially ruled that an alien against whom a final administrative order had been entered was nonetheless entitled to claim his lawful permanent resident status for the purpose of filing a motion to reopen deportation proceedings to apply for relief under section 212(c) based in part on its conclusion that the Board decision in *Matter of Lok* would create a "Catch-22" and "essentially make[] the discretionary relief provided by section 212(c) unavailable in the deportation context." *Rivera v. INS*, 791 F.2d 1202, 1205 (5th

Cir. 1986). On reconsideration, however, the Fifth Circuit concluded that our decision in *Lok* was entitled to "great deference" and that our conclusion in that case was a "sensible one." *Rivera v. INS*, 810 F.2d 540, 542 (5th Cir. 1987). In its 1987 decision, the Fifth Circuit noted that the *Lok* rationale did not create the "Catch-22" that it had been concerned about in its initial decision. *Id.* at 541. Finally, in 1989, the Eleventh Circuit reaffirmed its position that the date for determining whether an alien has maintained his lawful domicile for section 212(c) purposes is the date of issuance of the Order to Show Cause. *Ballbe v. INS*, 886 F.2d 306 (11th Cir. 1989), *cert. denied*, 495 U.S. 929 (1990).

Thus, depending upon where a case arises, the point at which a respondent must establish his eligibility for section 212(c) relief can be as early as the date of issuance of the Order to Show Cause (which may be long before the Immigration and Naturalization Service actually commences deportation proceedings by the filing of the Order to Show Cause with the Office of the Immigration Judge) or as late as the date of a circuit court's dismissal of a petition for review, if that petition involves an issue of deportability.

If nothing else is clear, we believe this succession of decisions reflects the accuracy of our original view expressed in *Matter of Lok, supra*, in 1981 that there are "various stages within the deportation process at which the status of an alien 'lawfully admitted for permanent residence' may be considered to have changed within the meaning of section 101(a)(20) of the Act." *Id.* at 105. We also believe that these decisions, considered together, reflect that this is not an issue in which there is an obviously correct or incorrect answer. Perhaps we should take some solace in the fact that at least one circuit views our analysis in *Matter of Lok* as sensible. And, we note that the diversity of opinions here does not create any unmanageable burden on the adjudication process itself—we simply must assure that the right test is applied in the right circuit. At times that can pose a difficulty as a petition for review is not always filed in the same circuit in which the deportation proceeding was held, but this certainly is not a unique circumstance. Situations like this, however, do create a very real problem. The laws that we administer and the cases we adjudicate often affect individuals in the most fundamental ways. We think that all would agree that to the greatest extent possible our immigration laws should be applied in a uniform manner nationwide, particularly where the most significant aspects of the law are in issue. Here, however, we are left with a patchwork application of the law—with the most profound decisions affecting aliens (all of whom in this context have been lawful permanent residents of the United States) tied to the mere happenstance of where their cases arise geographically.

# MATTER OF D-L- & A-M-

## In Exclusion Proceedings

A-29595639
A-29595640

*Decided by Board October 16, 1991*

Applicants for admission to the United States, who were not traveling in transit without visa status, are not excludable under section 212(a)(19) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(19) (1988), where the applicants did not present or intend to present fraudulent visas or travel documents or documents containing willful misrepresentations to an authorized official of the United States Government at the time of their attempted entry. *Matter of Shirdel*, 19 I&N Dec. 33 (BIA 1984), distinguished.

EXCLUDABLE: Act of 1952—Sec. 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Fraud or willful misrepresentation of a material fact (both applicants)

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa (both applicants)

ON BEHALF OF APPLICANTS:
Pro se[1]

ON BEHALF OF SERVICE:
Hans Burgos
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members. Concurring Opinion: Heilman, Board Member.

In a decision dated March 23, 1990, an immigration judge found the applicants excludable as alleged, denied their applications for asylum and withholding of exclusion and deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1988), and ordered them excluded and deported from the United States. The applicants have appealed from

---

[1] The applicants' counsel filed a motion to withdraw as attorney of record. The motion indicates that the applicants no longer wish counsel to represent them. The applicants' last known address is indicated on the certificate of service accompanying the motion. We find the motion to conform to our requirements set forth in *Matter of Rosales*, 19 I&N Dec. 655 (BIA 1988). Accordingly, the motion to withdraw is granted.

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 54 of 55

## MATTER OF ARAI

### In Deportation Proceedings

### A-18483322

*Decided by Board March 4, 1970*

Where adverse factors are present in a given application for adjustment of status under section 245, Immigration and Nationality Act, as amended, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion. [Matter of Ortiz-Prieto, 11 I. & N. Dec. 817, superseded.]

CHARGE:

Order: Act of 1952—Section 241 (a) (2) [8 U.S.C. 1251 (a) (2)]—Visitor remained longer.

ON BEHALF OF RESPONDENT:
Donald L. Ungar, Esquire
517 Washington Street
San Francisco, California 94111
(Brief submitted)

ON BEHALF OF SERVICE:
R. A. Viehaber
Appellate Trial Attorney

In our decision of February 6, 1970, we sustained the respondent's appeal, withdrew the order of the special inquiry officer, and granted respondent adjustment of status under section 245 of the Immigration and Nationality Act. At that time we stated that an opinion in greater detail would be forthcoming in the near future.

In sustaining the respondent's appeal we have, in effect, exercised discretionary power contrary to the manner in which the special inquiry officer exercised it. In so doing, we did not conclude that the special inquiry officer was either arbitrary or capricious in his action or that he abused his discretion in any manner.

The special inquiry officer after finding the respondent to be eligible for the relief, nevertheless, concluded that such should not be granted as a matter of discretion. He based his denial on the criteria set forth in *Matter of Ortiz-Prieto*, 11 I. & N. Dec. 817

(BIA, 1965). We there stated that the extraordinary relief described in section 245 can only be granted in meritorious cases. Having found no outstanding equities in that case, we dismissed the appeal from the special inquiry officer's denial of the relief as a matter of discretion.

We are now of the opinion that the language set forth in *Matter of Ortiz-Prieto, supra*, should be clarified and modified because it is too broad in its impact and probably more demanding than necessary. Accordingly, the language of the instant decision will supersede that contained in *Ortiz-Prieto*.

The respondent is now over 27 years of age. He is single and was admitted to the United States on March 25, 1968, as a visitor for a period of time to expire on April 26, 1968. On April 25, 1968, he filed an application for staus as a temporary worker or trainee. That application was denied on October 4, 1968, and he was thereafter granted voluntary departure to expire on November 28, 1968. He remained beyond that date and is concededly deportable on the charge contained in the order to show cause.

The special inquiry officer in considering the respondent's application for adjustment of status under section 245 was aware that the respondent is a specialty cook in Japanese cuisine and had been accorded a labor certification for such employment. No finding was made by the special inquiry officer that the respondent was other than a bona fide visitor when he first arrived in the United States. Apparently the special inquiry officer considered the respondent's taking of employment before his trainee status had been acted upon as an adverse factor. He then found that the respondent's case presented no unusual equities and based his denial of the application on the ruling contained in *Ortiz-Prieto*.

Section 245 of the Immigration and Nationality Act reposes with the Attorney General and his delegates the discretionary power to grant adjustment of status. Therefore it follows that mere eligibility for that privilege will not automatically result in a grant of the application.

The record in the instant case presents no adverse factors affecting respondent's application. He is a young man, in good health, and of good moral character. His employment is such that a labor certification has been issued. The employment could be of potential benefit to this country. The respondent has no dependents.

It is difficult and probably inadvisable to set up restrictive guide lines for the exercise of discretion. Problems which may arise in applications for adjustment must of necessity be resolved

Case 1:00-cv-00058   Document 4   Filed in TXSD on 05/08/2000   Page 55 of 55

on an individual basis. Where adverse factors are present in a given application, it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally, favorable factors such as family ties, hardship, length of residence in the United States, *etc.*, will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion.

Our decision to sustain the respondent's appeal was based upon the foregoing considerations. We do not deem it necessary for the respondent to establish, in light of the circumstances surrounding his case, any outstanding equities.

## MATTER OF MARIN

### In Deportation Proceedings

### A-14226796

*Decided by Board March 10, 1970*

Respondent's criminal convictions may be used as a ground for his deportation under section 241(a)(4) of the Immigration and Nationality Act even though at the time of the convictions respondent and the sentencing judge were unaware of the recommendation against deportation provisions of section 241(b)(2) of the Act.*

CHARGE:

Order: Act of 1952—Section 241(a)(4) [8 U.S.C. 1251(a)(4)]—Convicted of two crimes after entry: petty theft and burglary.

ON BEHALF OF RESPONDENT:
Joseph S. Hertogs, Esquire
580 Washington Street
San Francisco, California 94111

Donald L. Ungar, Esquire
517 Washington Street
San Francisco, California 94111
(Brief filed)

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney
Stephen M. Suffin
Trial Attorney
(Brief filed)

The special inquiry officer certified his order terminating deportation proceedings. We find the alien deportable.

The question is whether an alien's criminal conviction may be used as a basis for his deportation if he did not know that he could have made a timely application to the sentencing court for a recommendation against deportation pursuant to section 241(b)(2) of the Act, 8 U.S.C. 1251(b)(2). We answer the question in the affirmative.

Section 241(b) states that the law requiring the deportation of an alien convicted of a crime involving moral turpitude shall not apply (1) if the alien obtains a pardon, or (2) if the sentencing court "shall make, at the time of first imposing judgement or

* Affirmed. See 438 F.2d 933 (C.A. 9, 1971).