UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED
JUL 05 2000
Michael N. Milby
Clerk of Court

| | |
|---|---|
| FELIX CORONEL-CARDENAS, | |
| Petitioner, | No. CA B-00-058 |
| v. | |
| E.M. TROMINSKI, | |
| Respondent. | |

PETITIONER'S MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED POINTS AND AUTHORITIES
AND REQUEST FOR ORAL ARGUMENT THEREON

Lisa S. Brodyaga, Esq.
Counsel For Petitioner
17891 Landrum Park Rd.
San Benito, Texas 78586
(956) 421-3226

July 5, 2000

## I. JURISDICTION AND NATURE OF THE PROCEEDINGS

Before the Court are Mr. Coronel's Petition for Writ of Habeas Corpus, with Exhibits, and supporting Points and Authorities; Respondents' Return and Brief in Opposition thereto, (cited herein as (INS:_)), together with the Certified Administrative Record, (cited as (AR:__)); and the instant motion. The case at bar, like the others in this series,[1] presents issues of first impression. Petitioner challenges two final orders of deportation, for which judicial review in the Circuit Court of Appeals is unavailable.[2]

Insofar as it challenges the March 9, 2000 order, Mr. Coronel's petition, like the others in this series, falls under the "transitional" rules of §309(c)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act, ("IIRIRA"), and is controlled by recent Fifth Circuit precedent holding that IIRIRA §309(c)(4)(G) deprives it of jurisdiction over *all* cases within its scope, but that a remedy exists in Habeas Corpus.[3] *Lerma de Garcia v. INS*, 141 F.3d 215 (5th Cir. 1998), reh. denied; *Requena, supra*. INS' claim, (INS:3), that IIRIRA §309(c)(4) divests this Court of

---

[1] Mr. Coronel, like Mr. Agado, in C.A. B-99-160, and Mr. Vargas, in B-00-100, sought suspension of deportation pursuant to 8 U.S.C. §1254(a)(2), and a waiver of deportation under 8 U.S.C. §1182(c). His case differs from series headed by *Cantu-Salinas v. Trominski*, CA B-97-183, in that it presents an additional point of law; one of first impression. In all other aspects it belongs to the *Cantu* series, and the jurisdictional questions, including the scope of review, are governed by *Requena-Rodriguez v. Pasquarell*, 190 F.3d 299 (5th Cir. 1999). Here, as in *Requena*, Petitioner asserts that the BIA's finding that he is statutorily ineligible for relief derives from an error of law, and is cognizable in Habeas Corpus. In addition, he asserts a Due Process violation, also appropriately raised in Habeas Corpus. *Id*.

[2] The denial of a motion to reopen deportation proceedings is an order of deportation, and as such, is subject to judicial review. *See, Giova v. Rosenberg,* 379 U.S. 18 (1964).

[3] Mr. Coronel is subject to §309(c)(4)(G), since he was ordered deported because of a controlled substance conviction.

jurisdiction was rejected by the Fifth Circuit in *Requena, supra*.

Insofar as Mr. Coronel challenges the June 3, 1993 denial of his motion to reconsider, he would note that his motion to reopen to apply for suspension of deportation was filed on June 30, 1993, within the statutory period for seeking review of the denial of the motion to reconsider. Since the motion to reopen was filed in reliance on *Pierre v. INS*, 932 F.2d 418 (5th Cir. 1991), [4] this Court also has jurisdiction over the 1993 decision of the BIA, under *U.S. ex rel Marcello v. INS*, 634 F.2d 964, 971 (5th Cir. 1981) (habeas jurisdiction under 28 U.S.C. §2241 exists to review deportation order where there was no "deliberate bypass" of direct review by the court of appeals). [5] Furthermore, the Due Process claim raised therein, and ignored by the BIA in its decision of June 3, 1993, was also raised in Mr. Coronel's later motion to reopen, and likewise ignored in the BIA's March 9, 2000, decision.

Jurisdiction under 28 U.S.C. §2241 covers errors of statutory construction, as well as constitutional claims. *Requena-Rodriguez, supra*, ("This jurisdiction is broad enough to encompass Requena's retroactivity claim and his equal protection claim - both of which would have been cognizable even at the lowest pre-IIRIRA ebb of immigration habeas jurisdiction").

## II. LEGAL STANDARDS TO BE APPLIED
### A. SUMMARY JUDGMENT

---

[4] *Pierre* held that where a motion to reopen or reconsider filed within the statutory period to seek judicial review of a BIA decision was denied by the BIA, the Court could review both decisions. It was overruled by *Stone v. INS*, 115 S.Ct. 1537 (1995).

[5] Although later overruled, the existence of *Pierre*, at that time, shows that there was no "deliberate by-pass" of review of the 1993 decision within the meaning of *Marcello*.

2

As noted in *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999):

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Under this standard, all fact questions must be viewed in the light most favorable to the non-moving party, and questions of law are reviewed de novo." Horton v. City of Houston, 179 F.3d 188, 191 (5th Cir.1999).

In the case at bar, there are no disputed issues of material fact. *See*, Respondents' Return. Since the Petition presents purely legal issues, they must be determined *de novo*. *Id.*

### B. SCOPE OF *DE NOVO* REVIEW

As summarized in *State of Texas v. DHHS*, 61 F.3d 438 (5th Cir. 1995) substantial deference is due to an agency's interpretation of an ambiguous statute, where the ambiguity arises from a statutory void, left by Congress for the agency to fill:

> Under such circumstances, judicial review is quite limited. See Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991) ("When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policymaking authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited."). In the seminal case of Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court held that:
>
>> [t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by

3

ClibPDF - www.fastio.com

> Congress.... Sometimes the legislative delegation to any agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency....

Where the ambiguity is *not* the result of explicit or implicit delegation of "policymaking authority," and involves a point of law on which the agency has no special expertise, agency construction of a statute, even one it is charged with administering, is not entitled to any particular deference. *Microcomputer Technology Institute v. Riley*, 139 F.3d 1044, 1051 (5th Cir. 1998):

> Such deference, [on issues of retroactivity] like deference to any other agency policy decision, seems, at first blush, to be within Chevron's concept of the administrative state: Where Congress has delegated policymaking power, expert and politically accountable agencies, rather than generalist and unaccountable judges, should fill statutory interstices. See Chevron, 467 U.S. at 844-45, 865-66...
>
> Retroactivity, however, involves no policy considerations, but concerns only the application of settled policy under particular circumstances. It does not call any agency expertise into play; rather, it is a legal concept involving settled principles of law and is no more subject to deference than is an agency's interpretation of, say, a statute of limitations.

The decision herein does not even *purport* to interpret the statutes at issue. It simply applies a precedent decision based on (former) 8 U.S.C. §1254(a)(1), with no attempt to determine how the analysis is impacted by the different language of 8 U.S.C. §1254(a)(2). Consequently, the Board's decision herein does not involve a "permissible" construction of a policymaking gap, left by Congress for the agency to fill, and is not entitled to deference.

4

Moreover, the statute is not even ambiguous. Rather, the plain language of (new) 8 U.S.C. §1229b(d) and (prior) §1254(a)(2) mandate a conclusion that the BIA's decision is in error.

### III. THE BIA ERRED IN CONCLUDING THAT MR. CORONEL IS STATUTORILY INELIGIBLE FOR RELIEF UNDER (PRIOR) 8 U.S.C. §1254(a)(2).

Mr. Coronel first urges that the BIA erred, as a matter of law, in concluding that he was ineligible for suspension of deportation under (prior) 8 U.S.C. §1254(a)(2). This issue is currently before the Court in two other cases, to wit, *Agado v. Trominski,* No. C.A. B-99-160, and *Vargas-Lazarit v. Trominski*, No. C.A. B-00-100.

In denying Mr. Coronel's motion to reopen to apply for suspension of deportation, the BIA relied on two precedent decisions: *In re Nolasco,* I.D. 3385 (BIA 1999), applying the "stop-time rule" of (new) 8 U.S.C. §1229b(d) to applications for suspension of deportation under (former) 8 U.S.C. §1254(a)(1), and *Matter of Perez*, Int. Dec. 3389 (BIA 1999), holding that 8 U.S.C. §1229b(d) applies to offenses committed prior to its enactment.

However, neither of these decisions addresses the issues presented herein. Even assuming, *arguendo*, that the other problems of construction are overcome,[6] and that *Nolasco* correctly holds that (new) 8 U.S.C. §1229b(d) applies to applications for suspension of deportation under (former) §1254(a)(1), a very different result is produced when §1229b(d) is applied to §1254(a)(2), the section involved herein. (Former) §1254(a)(1) requires that the applicant demonstrate seven years of continuous physical presence

---

[6] Including, most notably, the fact that, by its terms, (new) 8 U.S.C. §1229b(d) applies only to applications made under that section, to wit, applications for cancellation of removal. To date, the BIA has not addressed this issue.

5

"immediately preceding" the application. Moreover, it rarely involves deportability resulting from criminal convictions. By contrast, (former) §1254(a)(2) requires a showing of ten years continuous physical presence "immediately following" the assumption of the status constituting grounds for deportation. Frequently, as here, this is a **conviction** for a deportable offense.

(New) 8 U.S.C. §1229b(d), the so-called "stop-time rule," provides, in relevant part, as follows (emphasis added):

> **For purposes of this section**, [8 U.S.C. §1229b], **any period of... continuous physical presence in the United States shall be deemed to end** when the alien is served a notice to appear under section 239(a) [(new) 8 U.S.C. 1229(a)] or **when the alien has committed an offense referred to in section 212(a)(2)** [8 U.S.C. §1182(a)(2)] that renders the alien... removable from the United States under section 237(a)(2) [8 U.S.C. 1227(a)(2)] ... **whichever is earliest.**

In *Nolasco*, (as in virtually all suspension applications under §1254(a)(1)), no criminal offense was involved. Consequently, the "earliest" of the events described in §1229b(d) was the service of the charging document. Therefore, the applicant in *Nolasco* needed seven years physical presence prior to filing the application, but the time stopped running with the service of the OSC.[7]

By contrast, applicants for suspension under §1254(a)(2) must show ten years physical presence **after the conviction** for a deportable offense. Under §1229b(d), accrual of physical presence terminates

---

[7] This construction essentially reads the term "immediately" out of 8 U.S.C. §1254. Applications for suspension of deportation can only be made to the Immigration Court, and cannot be filed prior to the service of the OSC. By definition, therefore, there will be a "gap" between the point where time ceases to accrue, and when the application is filed.

6

with the "earliest" of the events described therein. In the case of an applicant deportable for a specified conviction, this would be the **commission** of the offense. In other words, the accrual of physical presence (for purposes of §1254(a)(1)) terminates before it commences, (for purposes of §1254(a)(1)).

A holding that, for purposes of §1254(a)(2), physical presence continues to accrue when the offense is committed, and ceases only when the OSC is served, contravenes the clear mandate of §1229b(d), (by ignoring the phrase, "whichever is earliest"). It would also render (prior) §1254(a)(2) inoperative: by definition, no one could accrue ten of years physical presence **following** a given conviction, if the clock stopped running when the offense was committed!

Nor is this result affected by the amendments made by the Nicaraguan Adjustment and Central American Relief Act, ("NACARA"), adding the issuance of Orders to Show Cause to the issuance of Notices to Appear, as events which would terminate the accumulation of physical presence. Here, assuming that §1229b(d) applies at all, the pertinent event terminating the accumulation of physical presence would still be the commission of the offense, not the issuance of the OSC, while by statute, the physical presence needed for relief commenced only with the subsequent conviction.[8]

*Matter of Perez, supra*, is equally inapposite. It simply holds that (new) 8 U.S.C. §1229b(d) means what it says, to wit, that **for purposes of that section,** to wit, for purposes of applications for cancellation of removal under (new) 8 U.S.C. §1229b, physical presence ceases to occur with the commission of the act on which deportability is based, or issuance of the charging document,

---

[8] This construction does not render the stop-time rule surplusage. Time would cease to run when an offense was committed *for purposes of an application under 8 U.S.C. §1254(a)(1)*.

7

whichever first occurs, and that its provisions apply to offenses committed prior to enactment. It does not purport to analyze the effect, if any, of (new) 8 U.S.C. §1229b(d) on applications for suspension of deportation under (former) 8 U.S.C. §1254(a)(2).

In later cases involving this issue, (see, e.g., *Vargas-Lazarit v. Trominski,* No. B-00-100), the BIA also cited *In re Mendoza-Sandino,* I.D. 3426 (BIA 2000), holding that, in the context of an application for suspension of deportation under §1254(a)(1), continuous physical presence, once terminated, cannot re-accrue. Assuming *arguendo*, that for purposes of §1254(a)(1), *Mendoza-Sandino* is correct, it would contravene the plain language of §1254(a)(2) to extend it to applications brought thereunder.

If physical presence could not "re-accrue," following the occurrence of an event described in (new) §1229b(d), no-one would ever qualify for relief under §1254(a)(2). By definition, the commission of an offense always precedes the conviction for that offense, but time under §1254(a)(2) only commences to run with the conviction. Therefore, the application herein of §1229b(d), as construed in *Mendoza-Sandino*, would "defeat the statutory scheme [and] create an absurd result," within the meaning of *White v. INS,* 75 F.3d 213, 216 (5th Cir. 1996) (a statute will be applied according to its plain meaning, unless such application "would defeat the statutory scheme or create an absurd result").

This result is also consistent with the policy considerations underlying (prior) 8 U.S.C. §1254(a)(2), and §1229b(d). In the early years following enactment of §1254(a)(2), there was a great deal of litigation as to whether the ten years of physical presence and good moral character ran from the *first* event which caused the applicant to be deportable, or from the *last* such event. The controversy was ultimately settled in favor of the *last* event

8

causing the immigrant to be deportable, on the grounds that the whole point of the statute was to give the immigrant a second chance, once ten years of good moral character had been shown. *Matter of Wong,* 13 I&N Dec. 427 (BIA 1969). There are also sound policy results, applicable in §1254(a)(2) cases, but not in most applications under §1254(a)(1), why the time passed after an immigrant was placed in deportation proceedings should count towards the ten years. In many such instances, individuals with strong family ties to the United States became deportable for relatively minor offenses, and were ordered deported, but, because of the hardship which their removal would cause to their families, were permitted by INS to remain for many years thereafter.[9] The BIA itself noted in *Matter of Peña-Diaz,* 20 I&N Dec. 841 (BIA 1994) that this continued presence, with INS' acquiescence, creates certain expectations that the immigrant may remain, assuming continued good behavior, and that these expectations are cognizable as a form of hardship for purposes of suspension of deportation under (prior) 8 U.S.C. §1254(a)(2). These considerations find no equivalent in the seven year suspension provided by §1254(a)(1).

In its decision herein, like those in the related cases, the BIA made no attempt to analyze the interaction of (new) 8 U.S.C. §1229b(d) with (prior) §1254(a)(2). Similarly, Respondent made no attempt in the Return and Brief in Opposition to Petition For Habeas Corpus to refute the "plain language" argument, which was laid out in Mr. Colonel's Petition, at ¶¶ 8 - 14. This silence must be taken as an admission of the merit of this claim.

---

[9] The case of Eleodoro Agado-Flores, No. B-99-160, illustrates this phenomenon. Mr. Agado became a lawful permanent resident in 1972. He was convicted of possessing a small amount of marijuana in 1975, and was ordered deported in 1976. In 1993, he filed a motion to reopen to apply for suspension of deportation, which motion remained pending until 1999, when the BIA denied it, on the same basis as given herein. During all this time, Mr. Agado has remained in the United States, with the permission of INS.

9

## IV. DENIAL OF DUE PROCESS

In his Petition, at ¶¶ 3-4, 15, Mr. Coronel also sought review of the Board's decision of June 3, 1993, denying his motion to reconsider the decision of the BIA of February 7, 1991.[10] In his initial appeal, his motion to reconsider, and again in his motion to reopen, he asserted that Due Process was violated by the manner in which the Immigration Judge induced him to waive his right to counsel *at the initial hearing*, by off-the-record representation that he was eligible for relief from deportation, and would be given another hearing on the merits of his application for such relief, but on discovering that he was not yet eligible, the Judge failed to give him an opportunity to retract his waiver of counsel. As argued in his initial appeal, (AR:138) (emphasis added):

> The most fundamental reason why the Respondent was denied a fair hearing relates to the issue of counsel. Respondent had not previously been served with a copy of the legal aid list. He had been led to believe that he would have a second hearing, with counsel, on his application for relief from deportation.
>
> **For that reason, and that reason alone, he waived counsel at the hearing in question.**

This claim was documented with affidavits from himself and his wife. (AR:142-143,145-146). By way of corroboration, he presented the affidavit of an attorney who frequently appeared in immigration court at that time, (AR:155-156), confirming, for purposes of an unrelated case, that such off-the-record discussions were common.

---

[10] A motion to reconsider urges that the BIA's prior decision was incorrect. *See, Matter of Cerna*, 20 I&N Dec. 399, 402 (BIA 1991) ("When we reconsider a decision, we are in effect placing ourselves back in time and considering the case as though a decision in the case on the record before us had never been entered"). Therefore, the decision denying reconsideration cannot, logically, be reviewed without reference to the original decision.

10

In denying his appeal, and motion to remand, the BIA discussed the supporting affidavit, and dismissed it, precisely because it involved a different Immigration Judge. However, the BIA did not mention the affidavits of Mr. Coronel and his wife. Rather, the Board proceeded as if the off-the-record representations discussed therein had never occurred, but made no finding to that effect. (AR:109). The BIA then analyzed the case as if the issue related solely to the denial of a continuance, without ever discussing the claim that Mr. Coronel's right to Due Process had been violated by the manner in which his waiver of counsel was obtained. (AR:110).

Mr. Coronel sought reconsideration, reiterating his claim that his waiver of counsel was improperly obtained. (AR:99-100):

> ... Before going on the record, the Immigration Judge led Mr. Coronel to believe that he would be eligible for some form of relief from deportation; that he would be given an application to fill out, and that a hearing would later be held on the application ...
>
> Believing that this meant that he did not need an attorney for the preliminary proceedings, Mr. Coronel agreed to waive counsel, and proceed with the hearing unrepresented. ...
>
> However, when they were on the record, the Judge apparently discovered that Mr. Coronel was still a few weeks short of having completed seven years as a lawful permanent resident, and reneged on his pre-hearing representation that Mr. Coronel would be given an application, and another hearing, at which time he could bring counsel. Rather, the Judge proceeded with the hearing, and ordered Mr. Coronel deported. ...
>
> Mr. Coronel was left with no option, other than to reserve appeal. ... The appeal was timely filed, and in due time, a brief was filed. A Motion To Reopen was also filed, requesting leave to apply for relief under Section 212(c) of the Act.
>
> The Brief on appeal and in support of the motion to reopen were filed simultaneously, and documentation was

11

>   included demonstrating that Mr. Coronel had been misled
>   by the Judge, and essentially tricked into waiving his
>   right to counsel.

In denying the motion to reconsider, the Board ignored this claim, focusing instead on the question of whether Mr. Coronel had made our a *prima facie* case for §212(c) relief, and whether the Judge erred in not granting a continuance. (AR:82-85). The same claim, in almost exactly the same terms, was raised in Petitioner's motion to reopen, (AR:5-6). And in denying that motion, the BIA gave this claim exactly the same consideration as before. None. (AR:2-3).

Petitioner was substantially prejudiced by the Board's refusal to address his complaint that his right to counsel had been violated. Had the case been remanded, either on the basis of his motion to reconsider, or in response to his motion to reopen, he would have been entitled to a hearing on the merits of his applications for both §212(c) relief, and suspension of deportation. His equities were such that he would, in all probability, have been granted relief under one or the other of those provisions. [11]

Furthermore, given that he was sentenced under a state

---

[11] As found by the First Circuit in *Goncalves v. Reno*, 144 F.3d 110, 128 (1st Cir. 1998), from fiscal years 1989 through 1994, "over half of all applications for § 212(c) relief were granted by the agency." The record demonstrates that Petitioner had "outstanding equities" in the context of his family ties. He also had significant equities in terms of property and employment in the U.S., hardship to his wife, family, and himself, and, apart from a 1987 DWI conviction, his otherwise clean record. Further, the amount of marijuana involved was small, (between four ounces and five pounds), and his conviction was for simple possession. He had a good reputation in the community, and performed well on probation. *See,* Exhibit "F" in support of Petition for Writ of Habeas Corpus. These facts would have warranted a grant of §212(c) relief. *See, e.g., In re Arreguin*, 21 I&N Dec. 38 (BIA 1995); *Diaz-Resendez v. INS*, 960 F.2d 493 (5th Cir. 1992). *See also, Matter of Peña-Diaz*, 20 I&N Dec. 841 (BIA 1994), for a similar case in which suspension of deportation was granted under 8 U.S.C. §1254(a)(2).

12

"rehabilitative" statute, had he been given an opportunity to obtain counsel, he could have contested deportability, as later recognized in *In re Manrique*, 21 I&N Dec. 58 (BIA 1995).

Given these (uncontested) facts,[12] Petitioner should be afforded a hearing on his applications for relief. Under very similar circumstances, the Seventh Circuit remanded the case, with instructions that the immigrant be permitted to apply for relief on a *nunc pro tunc* basis. *Batanic v. INS*, 12 F3d 612 (7th Cir. 1993) (alien who was denied right to counsel in deportation hearing[13] which followed alien's aggravated felony conviction was entitled to file application for asylum *nunc pro tunc* to date of hearing, even though, before remand, Congress had amended asylum statute to make aliens convicted of aggravated felony ineligible to apply for asylum); *See also, Castillo-Perez v. INS*, 212 F.3d 518 (9th Cir. 2000) (appropriate remedy for ineffective assistance of counsel was a remand to BIA, with instructions to apply the law as it existed at time of alien's hearing before Immigration Judge); *Miranda-Lores v. INS*, 17 F.3d 84 (5th Cir. 1994) (To prevail on claim of ineffective assistance of counsel at deportation proceeding, alien must show ineffective representation and substantial prejudice, which occurred as result of ineffective representation).

### V. PRAYER FOR RELIEF

It is therefore urged that the deportation orders of June 3, 1993 and March 9, 2000, be vacated, and the case be remanded to the BIA for further proceedings on both of Mr. Coronel's applications for

---

[12] In its return, INS challenges only the jurisdiction of the Court, and Petitioner's eligibility for suspension of deportation. None of the facts in the verified petition are contested.

[13] The facts underlying Batanic's claim to denial of the right to counsel were far less compelling than those of Mr. Coronel.

13

relief, to wit, under prior §212(c) of the Act, and for suspension of deportation, under prior 8 U.S.C. §1254(a)(2).

Respectfully Submitted,

*[signature: Lisa S. Brodyaga]*

Lisa S. Brodyaga, Esq.
REFUGIO DEL RIO GRANDE
17891 Landrum Park Road
San Benito, Texas 78586
(956) 421-3226

## CERTIFICATE OF SERVICE

I certify that copies of the foregoing, and proposed Order, (i.e., proposed Report and Recommendation of United States Magistrate Judge), were personally delivered to the office of Cheri Jones, SAUSA, Harlingen, Texas, this 5th day of July, 2000.

*[signature]*
_____