18

United States District Court
Southern District of Texas
FILED

MAY 0 4 2001

Michael N. Milby
Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FELIX CORONEL-CARDENAS,      )
                             )
v.                           )        C.A. No. B-00-058
                             )
E.M. TROMINSKI, INS DISTRICT )
     DIRECTOR                )
_____)

ADDITIONAL PERTINENT DECISIONS OF THE BIA

Comes Felix Coronel-Cardenas, by and through the undersigned, and submits the following additional decisions of the Board of Immigration Appeals, cited in support of Post-Hearing Memorandum.

6.   *Matter of Arreguin,* 21 I&N Dec. 38 (BIA 1995)

7.   *Matter of Gutierrez,* 16 I&N Dec. 226 (BIA 1977)

8.   *Matter of L-V-K-,* Int. Dec. 3409 (BIA 1999)

9.   *Matter of Lok,* 18 I&N Dec. 101 (BIA 1981)

10.  *Matter of Mendoza-Sandino,* Int. Dec. 3426 (BIA 2000)

11.  *Matter of Rodarte-Espinoza,* 21 I&N Dec. 150 (BIA 1995)

12.  *Matter of Wong,* 13 I&N Dec. 427 (BIA 1969)

Respectfully Submitted,

Lisa S. Brodyaga, Attorney at Law
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
Texas Bar:  03052800
Federal ID: 1178

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing, without the accompanying decisions, was mailed first class postage prepaid, to Heather Phillips. Attorney, OIL, P.O. Box 878 Ben Franklin Sta., Washington, D.C. 20044, on May 4, 2001.



2

**Matter of Catalina ARREGUIN De Rodriguez, Applicant**
**A35 507 157 —Dublin**
**Board of Immigration Appeals**
**14 Immig. Rptr. B1-72; 21 I & N Dec. 38 (I.D. 3247, BIA 1995)**
**Decided May 11, 1995**

**Editorial information: index**

Index: Waiver of Deportability (Favorable and unfavorable equities)

**Editorial information: summary**

## SUMMARY OF ISSUES

WAIVER OF DEPORTABILITY : INA § 212(c); 20 years of lawful residence was an outstanding equity entitled to great weight.

**Editorial information: syllabus**

## BIA SYLLABUS

(1) An alien who has committed a serious drug offense faces a difficult task in establishing that she merits discretionary relief; nevertheless, the applicant met her burden of demonstrating that relief under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (Supp. V 1993), was warranted where this was her only conviction, the sentencing court noted her acceptance of responsibility and ``minor role'' in the offense, there was substantial evidence of efforts toward rehabilitation, and the applicant presented unusual or outstanding equities, including nearly 20 years of lawful residence and two minor dependent United States citizen children.

(2) In considering the factors to be weighed in the exercise of discretion with regard to an application for relief under section 212(c) of the Act, evidence such as community ties, property and business holdings, or special service to the community are to be considered in the applicant's favor; however, the absence of those additional ties in themselves does not negate the weight to be accorded an applicant's long residence in this country.

**Editorial information: cross-ref**

, [c].

**Counsel**

ON BEHALF OF RESPONDENT:
Pro se
ON BEHALF OF SERVICE:
Thomas L. Day
General Attorney, for the Immigration and Naturalization Service

---

Copyright 2000 Matthew Bender & Company, Inc , one of the LEXIS Publishing companies

CSMPDF - www.lexisi.com

**Judges**

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice- Chairman; VACCA, Board Member; HOLMES, Alternate Board Member. Dissenting Opinion: HEILMAN, Board Member.

**Opinion**

**Opinion by**

VACCA, Board Member:

**Opinion**

This is an appeal by the applicant from the decision of an Immigration Judge denying her application for a waiver of inadmissibility under section 212(6) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (Supp. V 1993). The appeal will be sustained.

The applicant is a 41-year-old native and citizén of Mexico. She began residing in the United States in 1970, when she was 17 years old, and was admitted into the United States as an immigrant on December 12, 1975. On September 29, 1993, the applicant was convicted in a United States District Court of importing marijuana in violation of 21 U.S.C. § 952(a) and 960(a)(1) (1988). The 78.45 kilograms of marijuana were found in a camper shell of a pickup truck the applicant was driving across the border. The applicant was arrested upon her attempted entry and, because of the marijuana found in the truck and her subsequent conviction, was placed in exclusion proceedings under sections 212(a)(2)(A)(i)(II) and (C) of the Act, 8 U.S.C. § § 1182(a)(2)(A)(i)(II) and (C) (Supp. V 1993). [1] [1] In these proceedings, the applicant has not contested her excludability, but has applied for a waiver under section 212(c) of the Act.

At the conclusion of the hearing on the merits of the applicant's request for relief from exclusion, the Immigration Judge issued an oral decision finding that relief under section 212(c) of the Act was not warranted in the exercise of discretion, and ordering her exclusion and deportation to Mexico. On appeal, the applicant asserts that the Immigration Judge erred in his evaluation of the equities in her case. She is thus requesting that the decision of the Immigration Judge be vacated and that she be granted relief from exclusion under section 212(c) of the Act.

Section 212(c) of the Act provides:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) ....

In adjudicating an application under section 212(c) of the Act, we balance the adverse factors evidencing the applicant's undesirability as a permanent resident with the social and humane considerations presented in her behalf to determine whether the granting of section 212(c) relief appears to be in the best interests of this country. See Matter of Edwards ; Interim Decision 3134 (BIA 1990); Matter of Buscemi , 19 I &N Dec. 628 (BIA 1988); Matter of Marin , 16 I &N Dec. 581 (BIA 1978). Accordingly, the issue in this case is whether, considering the particular facts presented, relief is warranted in the exercise of discretion. Upon our independent review of the record, we find that relief should be granted. See Matter of Burbano ; Interim Decision 3229 (BIA 1994).

We first address the question of the applicant's rehabilitation. In his oral decision, the Immigration Judge states that the applicant ``must also convince the court that she has rehabilitated.'' This statement

---

BIA & AAU Precedent Decisions                                                                                          2

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

leaves the erroneous impression that an applicant may be barred from relief simply by a failure to demonstrate that she is rehabilitated. A clear showing of reformation is not an absolute prerequisite to a favorable exercise of discretion in every section 212(c) application involving an alien with a criminal record. *See Matter of Edwards, supra* . Section 212(c) applications involving convicted aliens must be evaluated on a case-by-case basis, with rehabilitation a factor to be considered in the exercise of discretion. *Matter of Roberts* ; Interim Decision 3148 (BIA 1991); *Matter of Edwards, supra* . Here, the applicant is currently serving her sentence for the conviction underlying these proceedings. We recognize the difficulties an incarcerated alien faces in demonstrating convincing efforts towards rehabilitation. However, any efforts will be considered, and the applicant is not barred automatically from discretionary relief by her incarceration. Accordingly, in our review of this matter, we have taken into account the following indicators of the applicant's efforts at rehabilitation.

Evidence of the applicant's efforts towards rehabilitation include her apparent acceptance of responsibility for her crime. In this regard, we note that the criminal court reduced the applicant's sentence because of her acceptance of responsibility. This was based on the presentence investigation report prepared for the applicant's sentencing, which states:

> The Defendant made a voluntary post-arrest statement in which she admitted her involvement in the instant offense. On August 2, 1993, she pled guilty and during the subsequent presentence interview, she again admitted responsibility for smuggling the camper shell containing the marijuana into the United States for remuneration.

Likewise, at the hearing the applicant did not disclaim responsibility for the crime and did express remorse for her participation, stating that she was thankful she was caught so that she was unable to carry out the importation.

Despite her current incarceration, the record reflects that the applicant has apparently used her time in prison well in that she has advanced her otherwise meager education by voluntarily pursuing GED studies, for which she received a letter of commendation, has pursued other courses, has had no prison infractions, and has been involved in a church ministry.

In sum, the applicant's acceptance of responsibility for her crime and her achievements while in prison are favorable indicators of efforts at rehabilitation which we take into account in weighing the equities of her application.

The other two major equities to be considered in the applicant's favor are her long residence and her five United States citizen children. The Immigration Judge seems to have found that these did not constitute unusual or outstanding equities. We disagree. Of the applicant's five United States citizen children, two are minors, Fernando, 11 years old, and Myra, 3 years old. The other three are emancipated adults. Due to the applicant's incarceration, the minor children are presently in the custody of the applicant's sister, who is receiving Aid to Families with Dependent Children on their behalf, since she is unable to support them on her salary while also raising her own children. However, the record reflects that they lived with the applicant prior to her arrest. The letters of support submitted by the applicant assert that she is a responsible and caring mother and that her exclusion and deportation would bring great hardship upon the children. Accordingly, we find that the minor children do constitute an outstanding equity, and that the three adult children are additional family ties to the United States to be considered in her favor.

Likewise, we find that the applicant's nearly 20 years of lawful permanent residence in this country constitutes an unusual or outstanding equity. The immigration judge found this not to be so because she ``has little to show for her residence in the United States." There is no doubt that additional community ties, property and business holdings, or special service to the community would be equities in her favor. *See Matter of Marin, supra* . However, the absence of those additional ties in themselves does not negate the weight to be accorded the applicant's long residence in this country, which is otherwise without a criminal record, and during most of which she was employed. We note that the applicant testified that she has paid income taxes and she submitted copies of returns for 1982 to 1986. Accordingly, we consider the

---

BIA & AAU Precedent Decisions                                                                                      3

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

applicant's long residence to be an unusual and outstanding equity in her favor.

We additionally take into account that a letter submitted on behalf of the applicant states that she will be offered full-time employment upon her release. In this regard, we note that the applicant is apparently undecided as to whether the two minor children would accompany her or remain if she were deported; thus, they might remain in the United States if she were deported. We accordingly take into consideration that if the applicant remains in the United States and reenters the work force the children would be able to stop receiving welfare, as they would no longer be dependent on her sister.

The record reflects that during most of her 25 years of residence in this country the applicant has supported herself and her children and, according to the presentence report, has paid rent when living with her sisters. During two periods she resorted to welfare - after she was divorced, from 1977 to 1979, and after her youngest child was born, from 1991 until 1993, when she was arrested. In balance, we consider the applicant's long history of employment to be a favorable equity.

In sum, upon consideration of the applicant's efforts at rehabilitation and the other factors outlined above, we given greater weight to the favorable facts of record than did the immigration judge.

As well as differing with the immigration judge regarding the favorable facts presented by the applicant, we make the following observations regarding the negative facts of record. First, as noted above, the court that convicted the applicant reduced her sentence on account of her acceptance of responsibility, as recommended in the presentence report. In addition, the sentencing court itself further reduced the sentence ``because the defendant played a minor role in the offense.'' The applicant has had no other convictions or arrests, except for the incident discussed below. Thus, while we do not discount the gravity of the applicant's conviction, we take into account the mitigating factors relied upon by the sentencing court, as well as the fact that this is the applicant's only criminal conviction.

With regard to the applicant's immigration history, the Immigration and Naturalization Service presented documentation regarding the applicant's arrest in 1980 on suspicion of smuggling aliens. The applicant was alleged to have picked up a number of undocumented aliens near the border in an attempt to transport them further into the country for gain. The apprehension report states that prosecution was declined, and we note that deportation proceedings were never instituted on the basis of this incident. At the hearing, the applicant admitted that she gave a ride to a family, but denied that she was paid for it or that she was engaged in any wrongdoing. She also testified that the three birth certificates and social security cards mentioned in the report belonged to her three children, and that she always carried them with her.

The Immigration Judge concluded that this incident was a negative factor to be considered in exercising discretion. Just as we will not go behind a record of conviction to determine the guilt or innocence of an alien, so we are hesitant to give substantial weight to an arrest report, absent a conviction or corroborating evidence of the allegations contained therein. Here, the applicant conceded that the arrest took place but admitted to no wrongdoing. Considering that prosecution was declined and that there is no corroboration, from the applicant or otherwise, we give the apprehension report little weight.

An alien who has committed a serious drug offense faces a difficult task in establishing that she merits discretionary relief. Nevertheless, relief under section 212(c) of the Act may be merited based upon the totality of circumstances presented in a particular case. *Matter of Burbano, supra* . Here, we have weighed the negative fact of the applicant's only conviction, the mitigating facts of her minor role and efforts toward rehabilitation, and the favorable facts of record, which include nearly 20 years of lawful residence and two minor dependent children, and we find that relief under section 212(c) of the Act is warranted in this instance.

In granting this waiver we particularly advise the applicant that if she commits another offense leading to exclusion or deportation proceedings, she is not likely to be the beneficiary of such relief again.

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

CVAPDF - www.lexis.com

ORDER: The appeal is sustained.

FURTHER ORDER: The applicant is granted a waiver of inadmissibility under section 212(c) of the Act and is hereby admitted to the United States as a returning lawful permanent resident.

**Dissent by**

HEILMAN, Board Member, dissenting:

**Dissent**

I respectfully dissent.

The respondent's appeal did not specifically identify any errors in the Immigration Judge's decision, and I therefore find no ground on which to exercise our appellate authority to reverse the decision.

This is not an easy or simple case to adjudicate, as we are presented with a serious conviction involving a large quantity of marijuana on the one hand, and substantial equities on the other. Presented with this difficult decision, the Immigration Judge took into consideration the requisite factors set forth in our precedent decisions. The favorable factors the Immigration Judge took into consideration included the respondent's long residence in the United States, her family ties (especially giving weight to her two minor children), evidence of her rehabilitative efforts, and her employment history, although he found the latter diminished by her receipt of public assistance during two periods. By way of adverse factors, the Immigration Judge took into consideration the serious conviction underlying these proceedings, as well as the arrest in 1980 on alien smuggling grounds. Upon weighing these competing factors, the Immigration Judge decided, in the exercise of discretion, that relief was not warranted.

Reasonable minds can easily reach conflicting decisions in a case as close as this one. Nevertheless, it is my opinion that the respondent here did not adequately raise specific objections to the Immigration Judge's decision so as to warrant the re-weighing of the equities engaged in by the majority here. Accordingly, I would not have reversed the decision of the Immigration Judge in this instance.

———

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

# Endnotes

**1 (Popup)**
1.
  Section 212(a)(2)(A)(i)(II) of the Act provides that ``any alien convicted of ... a violation of (or a conspiracy to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), is excludable."
Section 212(a)(2)(C) of the Act provides that ``[a]ny alien who the consular or immigration officer knows or has reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assister, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance, is excludable."

---

BIA & AAU Precedent Decisions                                                                6
Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**Matter of GUTIERREZ**
**In Deportation Proceedings**
**A-31404629**
**Board of Immigration Appeals**
**16 I. & N. Dec. 226 (BIA 1977); Interim Decision #2587**
**May 26, 1977**

## Editorial information: Annotation

Order: The appeal is dismissed, and the respondent is ordered deported to Mexico in accordance with the terms of the immigration judge's decision.

Regardless of the enclosed decision, you may be allowed to stay in the United States because of a recent court ruling if you registered with an American consul for an immigrant visa before January 1, 1977, and entered the United States prior to March 11, 1977. The court ruling relates to the case of Silva v. Levi, 76 C 4268 (N.D. Ill.). Please contact your attorney or authorized representative or an INS office for further information.

Irrespectivamente de la decisio'n que se incluye, usted puede estar autorizado a permancer en los Estados Unidos a causa de una reciente determinacion judicial si usted se registro can un consul Americano para una visa de inmigrante antes del primero de Enero de 1977, y entro' a los Estados Unidos previo al 11 de Marzo de 1977. La determinacio'n judicial se refiere al caso de Silva v. Levi, 76 C 4268 (N.D. Ill.). Favor de comunicarse con su abogado, o su representante autorizado o una oficina del Servicio de Inmigracion y Naturalizacion para mas information.

## Editorial information: charges

Order: Act of 1952 -- Section 241(a)(11) [8 U.S.C. 1251(a)(11)] -- Convicted of any law or regulation relating to the illicit possession or trafficking in marihuana

### syllabus

(1) Where the record showed that the immigration judge took scrupulous care to inform respondent of his right to be represented by counsel and of the availability of Legal Aid counsel at no charge to respondent and the immigration judge offered to adjourn the hearing to enable respondent to obtain counsel but respondent nonetheless desired to go ahead with the hearing, the respondent was sufficiently informed of his right to be represented by counsel at the hearing incompliance with 8 C.F.R. 242.16(a) and 8 C.F.R. 242.10.

(2) Where respondent's statements revealed no confusion or misunderstanding about the nature of the proceedings or of his right to be represented by counsel and there was no evidence that the respondent lacked a clear understanding of his right to be represented, the availability of Legal Aid counsel free of charge, or the consequences of proceeding without counsel, respondent's waiver of counsel was knowingly, intelligently and competently made.

(3) Where respondent's waiver of counsel was an effective and competent waiver, respondent's contention that failure of the immigration judge to appoint counsel at Government expense was a denial of due process, is without merit.

## Counsel

---

BIA & AAU Precedent Decisions                                                                    1

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

ON BEHALF OF RESPONDENT:  Robert Guerra, Esquire Legal Aid Foundation of Los Angeles 5228 Whittier Boulevard Los Angeles, California 90022

**Judges**

BY:  Milhollan, Chairman;  Maniatis, Appleman, and Maguire, Board Members

**Opinion**

**Opinion by**

BY:  Milhollan, Chairman;  Maniatis, Appleman, and Maguire, Board Members

**Opinion**

The lawful permanent resident respondent, a native and citizen of Mexico, was found deportable under section 241(a)(11) of the Immigration and Nationality Act, as an alien convicted of a crime relating to the illicit possession of marihuana, at a hearing before the immigration judge on December 9, 1976.  Upon finding that no relief from deportation was available, the immigration judge ordered the respondent deported to Mexico.  The respondent now appeals the finding of deportability, alleging that his lack of counsel at the hearing resulted in a denial of due process of law.  The appeal will be dismissed.

The respondent was admitted for permanent residence as the spouse of a United States citizen on January 25, 1972.  This marriage apparently ended in divorce.  On March 1, 1976, the respondent was convicted in United States District Court for the Southern District of California upon a plea of not guilty to the offense of possession of 363 pounds of marihuana with intent to distribute.  He was sentenced to imprisonment for a period of one year, and was required to serve a special parole term of five years.  On appeal to the United States Court of Appeals for the Ninth Circuit, this judgment was affirmed on August 5, 1976. On October 22, 1976, the respondent was served with an Order to Show Cause charging him with deportability under section 241(a)(1) of the Act .  At the December 9, 1976 hearing, the respondent waived the right to counsel, despite being advised by the immigration judge of the availability of Legal Services counsel at no charge to the respondent and despite the immigration judge's offer to continue the hearing to allow the respondent to seek legal assistance.  The respondent conceded all the allegations in the Order to Show Cause, but denied deportability.  The immigration judge found him deportable, and found that he was ineligible for any form of discretionary relief.  The immigration judge therefore ordered the respondent deported to Mexico.

On appeal, the respondent, through counsel, contends that the immigration judge failed to advise him of his right to counsel, in violation of 8 C.F.R. 242.16.  He also contends that the waiver of his right to counsel was not voluntary, understanding or competent.  Last, he claims that the failure of the immigration judge to appoint counsel at the Government's expense denied him a fair hearing.  The respondent argues that these deficiencies, taken separately or together, resulted in a denial of his right to procedural due process of law under the Fifth Amendment to the United States Constitution.

A deportation hearing is not a criminal proceeding.  Zakonaite v. Wolf, 226 U.S. 272 (1912).  Therefore, any right to counsel derives not from the Sixth Amendment, but from the Fifth Amendment right to a fair hearing.  Barthold v. INS, 517 F.2d 689 (5 Cir. 1975). 8 C.F.R. 242.10 and 8 C.F.R. 242.16(a) provide that an alien shall have the right to counsel in a deportation proceeding at no expense to the Government, and that the immigration judge shall inform him of that right.

Counsel contends that the immigration judge's conduct at the hearing represented only a `feeble attempt' to inform the respondent of his right to be represented by counsel.  We disagree.  We note first that

---

Copyright 2000 Matthew Bender & Company, Inc , one of the LEXIS Publishing companies

CSMPDF - www.lexis.com

the Order to Show Cause served on the respondent contained a notification of the right to counsel at the deportation hearing. Murgia-Melendrez v. INS, 407 F.2d 207 (9 Cir. 1969). Second, even a cursory reading of the transcript of the hearing reveals that the immigration judge took scrupulous and commendable care to inform the respondent of his right to be represented, the availability of legal counsel from Legal Aid at no charge to the respondent, and his willingness to adjourn if the respondent desired to secure Legal Aid counsel (Tr. p. 1). The respondent, however, expressed his desire to `go ahead with the hearing' (Tr. p. 2). We find that the respondent was sufficiently informed of his right to be represented at the hearing.

Counsel next alleges that the immigration judge did not `attempt to ascertain whether the respondent was competent to make the waiver' of counsel (Respondent's Brief, p. 5). The right to counsel outlined in 8 C.F.R. 242.10 may be waived by the alien. Millan-Garcia v. INS, 343 F. 2d 825 (9 Cir. 1965); Dentico v. INS, 280 F.2d 71 (2 Cir. 1960); see Appleman, I., `Right to Counsel in Deportation Proceedings,' 14 San Diego L.R. 130 (1976). However, since the right to counsel is an important right often essential to the fundamental fairness of a hearing, meticulous care must be exercised to insure that a waiver of this right is competently and understandingly made. De Souza v. Barber, 263 F.2d 470 (9 Cir.), cert. denied 359 U.S. 989 (1959); Bridges v. Wixon, 326 U.S. 135 (1945). It is the duty of the immigration judge to insure that a waiver of the right to counsel is competently and understandingly made. Kovac v. INS, 407 F.2d 102 (9 Cir. 1969); U.S. ex rel. Castro-Louzan v. Zimmerman, 94 F.Supp. 22 (E. D. Pa. 1950). The criteria for determining whether the right to counsel has been competently waived are identical to those employed to determine the competency of a confession. Murgia-Melendrez v. INS, supra. Therefore, in assessing the competency of a waiver of the right to counsel, the respondent's age, intelligence, education and ability to comprehend must be considered. Murgia-Melendrez v. INS, supra.

We have reviewed the record transcript, and find no evidence that the respondent lacked a clear understanding of his right to be represented, the availability of Legal Aid counsel free of charge, or the consequences of proceeding without counsel. The respondent is 28 years old and has lived and worked in the United States for four years. Although he has had only four years of education, the hearing was conducted in the respondent's native Spanish, and the respondent's statements reveal no confusion about or misunderstanding of the nature of the proceedings or of his right to be represented. The immigration judge is not required to state for the record that he finds the respondent competent to waive counsel. Our review of the record satisfies us that the respondent's waiver of counsel was knowingly, intelligently and competently made. Burquez v. INS, 513 F.2d 751 (10 Cir. 1975). We therefore find that the respondent's second contention is without merit.

Counsel's last contention, that the immigration judge's failure to appoint counsel at the Government's expense, is also without merit in this forum. While the validity of the rule in Section 292 of the Act that counsel in a deportation hearing shall be at no expense to the Government has been recently questioned. Aguilera-Enriquez v. INS, 516 F.2d 565 (6 Cir. 1975); Barthold v. INS, supra; Rosales-Caballero v. INS, 472 F.2d 1158 (5 Cir. 1973); Henriques v. INS, 465 F.2d 119 (2 Cir. 1972), we are precluded from entertaining constitutional challenges to the Act itself. Moreover, the respondent's effective and competent waiver of any right he might have had to counsel renders any such claim insubstantial in this case. In Barthold v. INS, supra, the court, in a case involving similar facts, stated: `Lack of counsel in this case does not constitute a denial of due process because (the respondent) was offered an opportunity to obtain counsel he could afford... W hatever the scope of an alien's right to counsel (the respondent) by his actions effectively waived such right.' 517 F.2d at 691-692. We find that the respondent's waiver of his right to counsel negates any claim of a denial of due process through lack of appointed counel at the deportation hearing. Our review of the record satisfies us that the hearing was fair, that deportability was established by clear, convincing, and unequivocal evidence, and that the respondent's waiver of his right to counsel was knowingly, intelligently, and competently made. We therefore shall dismiss the appeal.

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Matter of L-V-K-, Respondent
File: N/A
Board of Immigration Appeals
20 Immig. Rptr. B1-273; Interim Decision No. 3409
August 10, 1999

**Editorial information: index**

Index: Appeal (waiver of); Motions (remand, reopen)

**Editorial information: summary**

### SUMMARY OF ISSUES

WAIVER OF APPEAL; MOTION TO REMAND: 8 C.F.R. § 3.2(c)(2); Immigration Judge's order of deportation became a final administrative decision upon alien's   waiver of the right to appeal; the Board of Immigration Appeals lacks jurisdiction to   adjudicate the motion because it is time-barred by 8 C.F.R. § 3.2(c)(2) (1999).

**Editorial information: syllabus**

### BIA SYLLABUS

(1) An Immigration Judge's order of deportation becomes a final administrative decision upon an alien's   waiver of the right to appeal.

(2) Where an alien files a motion to remand during the pendency of an appeal from an Immigration Judge's   denial of a motion to reopen a final administrative decision and more than 90 days have passed since   entry of that final administrative decision, the Board of Immigration Appeals lacks jurisdiction to adjudicate the motion because it is time-barred by 8 C.F.R. § 3.2(c)(2) (1999).

**Editorial information: cross-ref**

### CROSS-REFERENCES

Immigration Law and Procedure chap. 3.

**Counsel**

Peter Popov, Esquire, Beverly Hills, California, for respondent.

**Judges**

Before: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE,   MATHON, JONES, GRANT, and SCIALABBA, Board Members. Dissenting Opinion: VILLAGELIU, Board   Member, joined by SCHMIDT, Chairman; ROSENBERG, GUENDELSBERGER, and MOSCATO, Board Members. Board Member Neil P. Miller did not participate in the decision in this case.

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**Opinion**


**Opinion by**

MATHON, Board Member:

**Opinion**

The respondent has filed a motion requesting that we reconsider our January 16, 1998, decision in which   we denied her motion to remand the record of proceedings to the Immigration Judge to allow her to seek   adjustment of status under section 245(a) of the Immigration and Nationality Act, 8 U.S.C. § 1255 (a) (1994). The motion to reconsider will be granted. Upon reconsideration, the motion to remand will be dismissed for lack of jurisdiction.

I. ISSUE

The issue now before us is whether the Board has jurisdiction to entertain a motion to remand, filed more   than 90 days after the entry of a final administrative order, when that motion is filed while an appeal from   an Immigration Judge's denial of a previous motion to reopen is pending.

II. PROCEDURAL HISTORY

The respondent is a native and citizen of Bulgaria who entered the United States on July 22, 1991, as a   nonimmigrant visitor. On December 16, 1991, she applied for asylum under section 208(a) of the Act, 8 U.S.C. § 1158(a) (1988), and withholding of deportation under section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1) (Supp. II 1990). On March 1, 1994, the Immigration and Naturalization Service denied that application, and the respondent was issued an Order to Show Cause and Notice of Hearing (Form I-221) on September 27, 1995.

At her deportation hearing on March 22, 1996, the respondent withdrew her application for asylum and   withholding of deportation  and waived appeal. She was granted voluntary departure until January 23, 1997, with an alternate order of deportation to Bulgaria.

On February 27, 1997, nearly a year after the Immigration Judge's decision became final, the respondent   filed with the Immigration Judge a motion to reopen and stay deportation based on changed circumstances in Bulgaria. 8 C.F.R. § 3.2(c)(3)(ii) (1997). On April 11, 1997, the Immigration Judge denied the respondent's motion to reopen, finding that she failed to establish prima facie eligibility for asylum and withholding of deportation. On May 9, 1997, the respondent filed a timely appeal from the Immigration Judge's decision denying her motion to reopen, asserting that the Immigration Judge incorrectly gave an expansive reading to the phrase ``changed circumstances.''

On November 3, 1997, while her appeal to the Board was still pending, the respondent filed a motion to   remand for adjustment of status. She submitted evidence of an approved employment-based visa petition   with a current priority date, but indicated that she would submit an Application to Register Permanent   Residence or Adjust Status (Form I-485) to the Immigration Judge after the remand was granted.

On January 16, 1998, we dismissed the respondent's appeal, finding that her motion to reopen to request   asylum and withholding of deportation was properly denied by the Immigration Judge. We also denied the   respondent's motion to remand because she had failed to submit the formal adjustment application as   required by regulation. 8 C.F.R. § 3.2(c)(1).

On February 17, 1998, the respondent filed this timely motion to reconsider the Board's denial of

her   motion to remand. She also requested a stay of deportation, which we need not address in light of our decision on the motion to remand. In support of her motion, she submitted a completed application for adjustment of status.

## III. DEFINITION OF FINAL ADMINISTRATIVE DECISION

The question of when an order of deportation becomes ``final'' has been settled by the Board in the interest of promoting finality in deportation proceedings. In *Matter of Lok,* 18 I. & N. Dec. 101 (BIA 1981), *aff'd,* 681 F.2d 107 (2d Cir. 1982), we determined that an administrative order is final when the Board renders its decision in a case on appeal or certification or, where no appeal is taken, when the time allotted for appeal has expired or the right to appeal is waived. *Id.* at 105; *see also* 8 C.F.R. § 3.39 (1999). In the case before us, the Immigration Judge's decision became final at the point in the   respondent's deportation hearing when she waived her right to appeal. *See Matter of Shih,* 20 I. & N.   Dec. 697, 699 (BIA 1993). Thus, the final administrative decision was reached on March 22, 1996, when   the Immigration Judge granted the respondent voluntary departure with an alternate order of deportation    and the respondent waived appeal.

## IV. REGULATORY TIME LIMITS FOR MOTIONS TO REOPEN

Pursuant to 8 C.F.R. § 3.2(c)(2) (1999), only one motion to reopen is permitted. In addition, such motion   must be filed with the Immigration Judge or the Board no later than 90 days after the date on which the   final administrative decision was rendered in the proceeding sought to be reopened, or on or before   September 30, 1996, whichever is later. *Id.* An exception to the time and numerical limitations exists for   motions to reopen to apply or reapply for asylum or withholding of deportation based on changed   circumstances arising in the country of nationality, if such evidence is material and was not available and could not have been discovered or presented at the former hearing. 8 C.F.R. § 3.2(c)(3)(ii). The motion must state the new facts to be proved and must be supported by evidentiary material. 8 C.F.R. § 3.2(c)(1).

A motion to reopen that is filed during the pendency of an appeal may be styled as a motion to remand. 8 C.F.R. § 3.2(c)(4). In substance, however, it remains a motion to reopen.

As the final administrative decision in the instant case was rendered on March 22, 1996, the respondent's   motion to reopen was due on or before September 30, 1996. The respondent did not file her motion to   reopen until February 27, 1997. The respondent's motion to reopen before the Immigration Judge was not   time-barred, however, because it was based on alleged changed circumstances in Bulgaria and   consequently fit within the regulatory exception. 8 C.F.R. § 3.2(c)(3)(ii). The Immigration Judge   nevertheless found that the respondent had failed to establish changed circumstances and denied her   motion to reopen.

In our January 16, 1998, decision, we affirmed the Immigration Judge's denial of the motion to reopen  based on changed circumstances. We agreed with the Immigration Judge that the respondent had not demonstrated changed circumstances. In her subsequent motion to reconsider, the respondent does not challenge our decision to dismiss her appeal of the denial of her motion to reopen. She focuses instead on our refusal to remand her case to allow her to apply for adjustment of status.

## V. MOTION TO REMAND

On November 3, 1997, while the respondent's appeal was pending before the Board, the respondent filed    a motion to remand for consideration of an application for adjustment of status. We denied the motion    based on the respondent's failure to comply with the regulatory requirement that an application for relief    must be submitted with the motion. 8 C.F.R. § 3.2(c)(1). Upon reconsideration, we find that we did not   have jurisdiction to consider the motion to remand, because this motion was, in substance, a motion to   reopen that had been filed more than 90 days after the entry of a final

---

BIA & AAU Precedent Decisions                                                     3

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

administrative order.

As indicated earlier, a motion to reopen or to reconsider a decision rendered by an Immigration Judge that   is filed while an appeal is pending before the Board may be deemed a motion   to remand for further   proceedings before the Immigration Judge from whose decision the appeal was taken. 8 C.F.R. §§ 3.2(b)(1), (c)(4). However, while we have the discretion to entertain such a motion, our jurisdiction to consider the motion is contingent upon the procedural posture of the underlying merits case. 8 C.F.R. § 3.2.

When the respondent filed her motion to remand to apply for adjustment of status, she was still under a   final administrative order of deportation because her motion to reopen had never been granted. The   appeal that was pending before the Board when she filed her motion to remand was not an appeal of an   underlying merits decision, but, rather, an appeal of a denial of that earlier motion to reopen. This differs   substantially from the situation where a motion to remand is filed while a direct appeal from an Immigration Judge's initial order on the merits case is still pending before us. In the latter case, there is   no final administrative order until the Board renders its decision on the appeal. By contrast, where an   appeal is pending from the denial of a motion to reopen by an Immigration Judge at the time a motion to   remand is filed, an underlying final administrative  order still exists.

In the case now before us, the date of the final administrative decision has at no time changed, as the   proceedings have not been reopened. Accordingly, pursuant to the respondent's waiver of appeal at the   merits hearing on March 22, 1996, she remains subject to the final administrative order of deportation that the Immigration Judge rendered on that date. Unless and until such time as the proceedings are reopened, the Board has no jurisdiction to entertain a motion to remand, which is in substance a motion   to reopen, because the 90-day limit for filing a motion to reopen has expired.

Consequently, the respondent's motion to remand must be denied for lack of jurisdiction because the   motion to remand was time-barred at the outset. Although the current motion to reconsider corrects the   defect we originally observed in the remand motion, namely, the omission of a formal adjustment of status   application, it cannot overcome the respondent's failure to file that motion in a timely manner. Accordingly, we find that we lack jurisdiction over the motion to remand, and we hereby modify our January 16, 1998, decision to so reflect.

## VI. SUA SPONTE REOPENING

We note that the Board has discretionary authority to reopen or reconsider cases on its own motion. 8 C.F.R. § 3.2(a). We addressed the limitations on this discretion in our recent decision, *Matter of J-J-*, Interim Decision 3323 (BIA 1997), where we emphasized that the power to reopen on our own motion is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations when enforcing the regulations could result in hardship. The purpose of the 1996 motions and appeals regulations was to bring finality to immigration proceedings, not merely to prevent the filing of dilatory or frivolous motions. *Id.* Only in exceptional situations will the Board reopen proceedings sua sponte. The respondent in the case before us does not present such a situation.

## VII. CONCLUSION

The respondent's motion to reopen was denied by the Immigration Judge, and the Board affirmed that   decision. Consequently, the respondent remains subject to the final administrative order issued by the Immigration Judge on March 22, 1996. The Board therefore lacked jurisdiction to consider her motion to remand for adjustment of status, as her deportation proceedings were never reopened and   the   motion to remand was not timely filed following the Immigration Judge's final administrative order.

Accordingly, upon reconsideration, we will deny the motion to remand for lack of jurisdiction.

ORDER: The motion to reconsider is granted.

---

BIA & AAU Precedent Decisions                                                                4

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

FURTHER ORDER: Upon reconsideration, our decision of January 16, 1998, is modified to reflect that the   respondent's motion to remand is denied for lack of jurisdiction.

**Dissent by**

DISSENTING OPINION: Gustavo D. Villageliu, Board Member, in which Paul W. Schmidt, Chairman; Lory D. Rosenberg, John Guendelsberger, and Anthony C. Moscato, Board Members, joined

**Dissent**

I respectfully dissent from the majority's denial of the respondent's motion to remand in order to have her   application for adjustment of status considered. The majority rules that it does not have jurisdiction. It   does. The majority states that its ruling promotes the finality of immigration proceedings in the   respondent's case. It does not. Finality is not synonymous with deportability.

The respondent is the beneficiary of an approved visa petition. Her case is presently before us on a timely motion to reconsider  an adverse decision in her case. While her motion was pending, her   priority date became current, providing her with visa availability. Consequently, rather than further tax   our scarce administrative resources reviewing her pending motion to reconsider, the respondent, instead,    requests that the case be remanded to consider her application for adjustment of status for which she    appears prima facie eligible.

The regulation at 8 C.F.R. § 3.1(d)(2) (1999) specifies that we can remand any case before us for further   proceedings without reaching a determination. Once a case is remanded, such a remand, unless specifically limited, is for any appropriate purpose. *See Matter of Patel*, 16 I. & N. Dec. 600 (BIA 1978). Moreover, 8 C.F.R. § 3.1(d)(1) specifically provides the Board with the Attorney General's discretionary authority as appropriate and necessary for the resolution of the case.

Congressional intent is always primarily derived from the language of the statute enacted by Congress.   Section 203(b) of the Act, 8 U.S.C. § 1153(b) (1994), provides preference immigration status to the   respondent under the Act and thus indicates a congressional intent to allow the respondent to immigrate to the United States. Moreover, Congress has also enacted grandfather provisions for adjustment   of status applicants seeking the benefits of section 245(i) of the Act, 8 U.S.C. § 1255(i) (1994 & Supp. II 1996), for petitions submitted before January 14, 1997. This recent congressional enactment gives   further support for interpreting our regulations consistent with the congressional directive to provide this   respondent with an adjustment of status forum to have her immigration application considered.

The Attorney General's intent is similarly derived from the regulations she enacted. The regulations at 8 C.F.R. part 245 specifically prescribe the adjustment of status process as the sole procedure for applying   to immigrate while in this country; and 8 C.F.R. § 245.2(a)(2) (1999) specifies that deportation proceedings are the only process prescribed for considering the respondent's application. Consequently, when the majority strains to interpret the regulation to deprive the respondent of a forum for her adjustment application, it does so in contravention of the congressional intent that applicants with a   priority date before January 14, 1997, should be allowed to immigrate through the adjustment of   status process and the Attorney General's directive to prescribe such a process for aliens already in   proceedings.

Denying the respondent's motion does not promote finality in her immigration proceedings. As discussed   above, she is the beneficiary of an approved visa petition. If deported, she will have to pursue her visa   abroad, contrary to congressional intent, and she will also require approval of waivers of inadmissibility   solely as a result of the majority's refusal to provide the prescribed forum for her application. *See* section 212(a)(9) of the Act, 8 U.S.C. § 1182(a)(9) (Supp. II 1996). Promoting deportability is not promoting   finality in immigration determinations when the eventual result prescribed by Congress for this respondent,   who is presently in the United states as an asylum applicant, is her admission into the

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

United States as a   qualified employment-based preference immigrant. Remanding her case to allow her application to be   considered is the appropriate and necessary action required to promote finality in her immigration   proceedings.

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

CHIPDF – www.fastio.com

**Matter of LOK**
**In Deportation Proceedings**
**A-31327663**
**Board of Immigration Appeals**
**18 I. & N. Dec. 101 (BIA 1981); Interim Decision #2878**
**July 31, 1981**

**Editorial information: Annotation**

Order:  The respondent's application for relief from deportation under section 212(c) of the Act is denied.

Board Members Mary P. Maguire and James P. Morris abstained from consideration of this case.


**Editorial information: charges**

Order:  Act of 1952 -- Sec. 241(a)(11) [8 U.S.C. 1251(a)(11)] -- Conviction of violation of law relating to narcotic drugs

**syllabus**

(1) The lawful permanent resident status of an alien terminates within the meaning of section 101(a)(20) of the Immigration and Nationality Act , 8 U.S.C. 1101(a)(20) , with the entry of a final administrative order of deportation, i.e., when the Board renders its decision in the case upon appeal or certification or, where no appeal to the Board is taken, when appeal is waived or the time allotted for appeal has expired.

(2) Once a final administrative order of deportation has been entered, barring a reversal on the merits of the deportability finding by an appellate court or administratively upon a motion for reopening or reconsideration, an alien may not thereafter establish eligibility as a lawful permanent resident for relief under section 212(c) of the Act, 8 U.S.C. 1182(c) , nor may his domicile in this country from then on be considered lawful for purposes of that section.

(3) In order for an alien to establish a domicile in the United States, he must be physically present in this country and have the intention of residing here permanently or indefinitely;  for that domicile to be considered lawful within the meaning of section 212(c) of the Act, the alien's presence in the United States must be lawful within the meaning of this country's immigration laws.

(4) The Immigration and Nationality Act sanctions the continuing presence in this country of but one class of aliens other than those lawfully admitted for permanent residence, namely, nonimmigrants in compliance with the terms and conditions of their admission.

(5) Government action or policy to refrain from instituting deportation proceedings against an alien or enforcing his deportation notwithstanding, an alien in breach of the terms and conditions of his nonimmigrant status remains in the United States at the sufferance of the Government, not under any lawful status accorded him by the Act.

(6) A nonimmigrant Crewman who complied with the conditions of his admission and did not intend to remain in this country beyond the fixed period of his temporary stay may not establish that he was `domiciled' here during the time his stay as a non-immigrant was authorized under our immigration laws; conversely, if the nonimmigrant crewman did intend to make the United States his permanent home and

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

domicile, he was in violation of the conditions of his admission and was not here `lawfully.'

**Counsel**

ON BEHALF OF RESPONDENT:  Stanley H. Wallenstein, Esquire Schiano & Wallenstein 80 Wall Street New York, New York 10005
ON BEHALF OF SERVICE:  Lloyd A. Sherman Trial Attorney

**Judges**

BY:  Milhollan, Chairman;  Maniatis, and Vacca, Board Members

**Opinion**

**Opinion by**

BY:  Milhollan, Chairman;  Maniatis, and Vacca, Board Members

**Opinion**

This case comes to us pursuant to a Stipulation and Order of Remand entered by the United States Court of Appeals for the Second Circuit on June 18, 1980.  Tim Lok v. INS, No. 80-4076 (2 Cir. 1980).  A complex procedural history preceded the court's present order in the case.

The respondent, a native and citizen of China, now 43 years of age, entered the United States as a nonimmigrant crewman in July 1959, and was authorized to remain in this country no longer than 29 days.  He failed to depart within the authorized period.  At a deportation hearing conducted on October 26, 1965, an immigration judge found the respondent deportable under section 241(a)(2) of the Immigration and Nationality Act , 8 U.S.C. 1251(a)(2), granted him the privilege of voluntary departure in lieu of deportation, but ordered him deported from the United States in the event of his failure to depart voluntarily within the period specified by the District Director.  Voluntary departure was ultimately authorized, with extensions, to March 2, 1969, to permit Congressional consideration of private bills introduced in the respondent's behalf.

On February 27, 1968, the respondent married a United States citizen who on February 3, 1969, one month before the respondent's voluntary departure authorization was to expire, filed a visa petition to accord him immediate relative status.  Under existing Service policy, the order of deportation outstanding against the respondent was not enforced pending adjudication of the visa petition.  The visa petition was approved on January 30, 1970, and forwarded to the United States Consulate in Hong Kong where the respondent was to apply for an immigrant visa based upon his marriage. [1] (1)

On October 25, 1971, the respondent left the United States for Hong Kong to obtain his immigrant visa, apparently thus effecting his deportation under the 1965 order of deportation. [2] (2) Section 101(g) of the Act , 8 U.S.C. 1101(g) ; 8 C.F.R. 243.5.  In November 1971, the respondent applied for an received permission from the Attorney General to reapply for admission following deportation and was thereafter issued his immigrant visa by the consul in Hong Kong.  He was admitted to the United States for lawful permanent residence on December 26, 1971.

In early 1973, the respondent was convicted upon his plea of guilty of offenses relating to the possession and distribution of narcotic drugs.  The present deportation proceedings were thereupon instituted by the issuance of an Order to Show Cause charging the respondent with deportability under section 241(a)(11) of the Act, 8 U.S.C. 1251(a)(11), as an alien convicted of a drug-related crime.  At the deportation hearing that ensued, the respondent conceded deportability but contended that he was eligible

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

for relief from deportation through a discretionary waiver under section 212(c) of the Act, 8 U.S.C. 1182(c) , which provides in pertinent part:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of paragraph (1) through (25) and paragraphs (30) and (31) of subsection (a). [3] (3)

The immigration judge found the respondent deportable as charged and rejected his claim of eligibility for section 212(c) relief in a decision dated May 29, 1975. On July 30, 1976, the Board affirmed the immigration judge's decision. With respect to the denial of relief under section 212(c), we relied upon our decision in Matter of S, 5 I& N Dec. 116 (BIA 1953), decided some 24 years earlier, in which we held that in order to comply with the `lawful unrelinquished domicile' requirement of the statute an alien must have maintained a domicile in the United States for 7 consecutive years subsequent to his lawful admission for permanent residence. Matter of Lok, 15 I&N Dec. 720 (BIA 1976). Inasmuch as the respondent had not been admitted as a lawful permanent resident until 1971, we determined that he did not have the requisite 7 years of lawful domicile and was consequently statutorily ineligible for section 212(c) relief. Matter of Lok, id. The respondent filed a petition for review of our decision with the United States Court of Appeals for the Second Circuit.

In Lok v. INS, 548 F.2d 37 (2 Cir. 1977), entered on January 4, 1977, the Second Circuit rejected our long-standing interpretation of the phrase `lawful unrelinquished domicile' and reversed our decision in the case. Finding that he statutory terms `lawfully admitted for permanent residence' and `lawful unrelinquished domicile' could not be equated, the court concluded that it is in fact possible for an alien to possess a `lawful domicile' in this country without having been admitted for permanent residence and that the entire 7 years of lawful domicile need not necessarily be accumulated after the alien acquires permanent resident status. [4] (4) The court remanded the case to the Board for a determination as to whether the respondent's domicile prior to his 1971 admission had been `lawful.'

On January 13, 1978, we remanded the record to the immigration judge for initial consideration of the issue framed by the Second Circuit and ordered that the case be certified back to the Board for review. Matter of Lok, 16 I&N Dec. 441 (BIA 1978). In a decision dated June 14, 1979, the immigration judge again found the respondent statutorily ineligible for the relief sought under section 212(c), holding that no portion of the respondent's domicile prior to his 1971 admission for permanent residence was lawful. Recognizing that more than 7 years by then had elapsed since the respondent's admission for permanent residence in December 1971, the immigration judge further held that the respondent's lawful status, which began with that admission, ended in May 1975 when he was found deportable and ordered deported from the United States. [5] (5) The immigration judge thus concluded that the respondent had satisfied only 3 1/2 years of the requisite 7-year period of lawful domicile.

In considering the case upon certification, we adopted the immigration judge's findings of fact and conclusions of law and affirmed his decision without extended discussion in an unpublished per curiam opinion dated November 8, 1979. [6] (6) The respondent again sought review of our decision in the Second Circuit.

Bringing the case to its present posture, the court, pursuant to stipulation between the parties, entered its June 18, 1980, order remanding the case to the Board for reexamination of the following `remanded question:'

> Whether the immigration judge erred in concluding that his 1975 deportability finding terminated the respondent's lawful domicile under section 212(c) and in holding that, as a result, the respondent was ineligible in 1979 for relief under that provision.

---

BIA & AAU Precedent Decisions                                                                                           3
Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

The court's order further instructs the Board to set forth the reasons for its conclusion in a written opinion in the event the decision on remand is adverse to the respondent.

We note at the outset that while the immigration judge and the court in its remand order couched the question in terms of whether the respondent's `lawful domicile' came to an end with the immigration judge's May 1975 finding of deportability, the precise legal issue before us is whether the respondent's status as an alien `lawfully admitted for permanent residence' was then terminated. [7] (7) The loss of lawful permanent resident status is a necessary corollary to the loss of lawful domicile since it is illogical to conclude that the domicile of one who retains his lawful permanent resident status could be anything but lawful. The question confronting us, then, is: At what point in the deportation proceedings does the status of an alien lawfully admitted for permanent residence come to an end?

Termination of Lawful Permanent Resident Status

The term `lawfully admitted for permanent residence' within section 212(c) is a defined term whose definition is set forth in section 101(a)(20) of the Act , 8 U.S.C. 1101(a)(20) , as follows:

The term `lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. (Emphasis added.)

The pivotal underlined language was not, however, defined by Congress.

We have carefully examined the various stages within the deportation process at which the status of an alien `lawfully admitted for permanent residence' may be considered to have changed within the meaning of section 101(a)(20) of the Act :  (1) upon the immigration judge's initial determination of deportability, (2) when the immigration judge's order becomes administratively final, (3) when a United States Court of Appeals acts upon a petition for review of the Board's order or the time allowed for filing such petition expires, or (4) only upon the execution of the deportation order by the alien's departure, voluntary or enforced, from this country.  Upon reconsideration, we conclude that the policies of the Act would best be served by deeming the lawful permanent resident status of an alien to end with the entry of a final administrative order of deportation -- generally, when the Board renders its decision in the case upon appeal or certification or, where no appeal to the Board is taken, when appeal is waived or the time allotted for appeal has expired. 8 C.F.R. 3.1(d)(2) ; 8 C.F.R. 242.20; 8 C.F.R. 243.1.

Thus, we hold that the respondent's lawful permanent resident status terminated on July 30, 1976, with the Board's affirmance of the immigration judge's determination of deportability.  Barring a reversal on the merits of that deportability finding by an appellate court or administratively upon a motion for reopening or reconsideration, the respondent could not thereafter establish eligibility as a lawful permanent resident for section 212(c) relief nor could his domicile in this country from then on be considered lawful.

It is established that the mere occurrence of an act or event which provides a basis for an alien's deportation does not in itself cause the alien's status as a lawful permanent resident to change within the contemplation of section 101(a)(20). Matter of Salmon, 16 I&N Dec. 734 (BIA 1978); Matter of S, 6 I&N Dec. 392 (BIA 1954; A.G. 1955). Cf. Matter of Hinojosa, supra. At the other end of the spectrum, we have held that the lawful permanent resident status of an alien is terminated when he departs the United States after having been ordered deported, thereby executing the outstanding order of deportation. Matter of Mosqueda, 14 I&N Dec. 55 (R.C. 1972). See also Matter of Kane, 15 I&N Dec. 258 (BIA 1975);  Matter of Guiot, 14 I&N Dec. 393 (D.  D. 1973). Cf. Matter of Iqal, 10 I&N Dec. 460 (BIA 1964).

While it is settled than an alien who departs the United States under an order of deportation thereby loses his lawful permanent resident status (see Matter of Mosqueda, supra), it by no means follows that the alien retains that status, with all the rights that attach thereto, until such departure.  We find the proposition that an alien under a final order of deportation may remain a lawful permanent resident inherently incongruous.  Were that the case, for example, a clearly deportable alien who has exhausted all

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

of his administrative and judicial appeal rights but whose departure cannot for some reason be enforced (e.g., for lack of a country that will accept him into its territory) may continue to accord designated relatives visa preference so long as he remains in this country. We decline to adopt a position that could produce such anomalous result.

On the other hand, we are satisfied upon reconsideration of our November 1979, decision that termination of lawful permanent resident status upon the immigration judge's initial adjudication of deportability is premature. An alien is entitled as of right to appeal to the Board from an immigration judge's finding of deportability, the final administrative recourse available to him. 8 C.F.R. 3.1(b)(2) ; 8 C.F.R. 242.21. The Board is not bound by the immigration judge's conclusions but rather has plenary power to review the record de novo and to make its own independent determinations on questions of law and fact. Matter of Becerra-Miranda, 12 I&N Dec. 358 (BIA 1967); Matter of Vilanova-Gonzalez, 13 I&N Dec. 399 (BIA 1969), and the cases cited therein. Under the circumstances, we believe that where a timely appeal to the Board is taken or the Board considers the case upon certification as provided in 8 C.F.R. 3.1(c) , the time the Board renders its decision, rather than some earlier point in time, ought to govern when the status of an alien lawfully admitted for permanent residence changes within the meaning of section 101(a)(20) of the Act  on account of his being adjudged deportable. [8] (8)

We further conclude that lawful permanent resident status ought not be considered to continue beyond the entry of a final administrative order of deportation through the judicial appellate process. Authority to adjudicate an alien's deportability is vested primarily in the Attorney General and his delegates, the immigration judge and the Board. Where an administrative appeal has been taken, the alien is entitled to seek review of an adverse decision of the Board in the United States Circuit Courts of Appeals pursuant to the provisions of section 106 of the Act , 8 U.S.C. 1105a . However, in contrast to the Board's de novo review powers, the appellate courts' scope of review is limited. Assuming no error of law or unfairness in procedure, the court must affirm the administrative order of deportation if the order is supported by reasonable, substantial, and probative evidence of record. Section 106(a)(4) of the Act, 8 U.S.C. 1105a (a)(4).

To hold that an alien under a final administrative order of deportation remains a lawful permanent resident throughout the judicial proceedings would encourage spurious appeals to the courts, made solely for the purpose of accumulating more time toward eligibility for section 212(c) relief. The termination of lawful permanent resident status upon the entry of a final administrative order of deportation, on the other hand, would result in no ultimate prejudice to the alien. In those relatively rare instances where the court determines that the Board erred, as a matter of fact or law, with respect to its deportability finding, reversal of the Board's order of deportation nullifies the order and restores the alien's lawful permanent resident status.

We recognize that certain prior Board decisions, both precedent and unreported, [9] (9) suggest a result contrary to our present holding. See, e.g., Matter of Mosqueda, supra. However, we have never before directly addressed the specific issue here presented. To the extent any conflict exists, our decision in the instant case supersedes our previous decisions.

Lawfulness of Domicile
Prior to
Admission as Lawful Permanent Resident

To hold that the respondent's lawful permanent resident status ended when the order of deportation outstanding against him became administratively final on July 30, 1976, does not end our inquiry in the case. Pursuant to Lok v. INS, 548 F.2d 37 (2 Cir. 1977), which is binding upon us in this and in other cases arising within the Second Circuit, [10] (10) we must also determine whether the respondent's domicile in this country immediately preceding his December 1971, admission for permanent residence was `lawful' and, if so, whether that period of domicile, tacked onto his indisputably lawful domicile following

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

his acquisition of permanent resident status, totaled at least 7 years at the time of our July 1976 decision.

The respondent argues that his domicile in the United States was lawful from the date of his marriage to a United States citizen in February 1968. He points to the fact, uncontroverted by the Government, that he came within the protection of formal Service policy as a consequence of his marriage whereunder he was permitted to remain in this country, notwithstanding the 1965 deportation order outstanding against him, until such time as he was eligible to apply for an immigrant visa. Thus, the respondent insists, his lawful domicile, having begun on February 27, 1968, totaled more than 7 years by the time the immigration judge rendered his May 1975 decision. We agree with the immigration judge that no portion of the respondent's domicile prior to his admission for permanent residence in December 1971 was lawful.

In order for an alien to establish a domicile in the United States, he must be physically present in this country and have the intention of residing here permanently or indefinitely. Anwo v. INS, 607 F.2d 435 (D.C. Cir. 1979); Matter of Sanchez, 17 I&N Dec. 218 (BIA 1980), and the cases cited therein. For that domicile to be considered 'lawful,' however, the alien's presence here must be lawful within the meaning of this country's immigration laws. Cf. Kan Kam Lin v. Rinaldi, 361 F. Supp. 177 (D.N.J. 1973), aff'd mem., 493 F.2d 1229 (3 Cir. 1974); Ming v. Marks, 367 F.Supp. 673 (S.D.N.Y. 1973), aff'd, 505 F.2d 1170 (2 Cir. 1974); Matter of Dunar, 14 I&N Dec. 310 (BIA 1973). The Immigration and Nationality Act sanctions the continuing presence in this country of but one class of aliens other than those lawfully admitted for permanent residence, namely, nonimmigrants in compliance with the terms and conditions of their admission. See generally Kan Kam Lin v. Rinaldi, supra; Ming v. Marks, supra; Matter of Dunar, supra.

An alien in breach of his nonimmigrant status, such as the respondent in the instant case, has no claim of right under the Act to remain in this country. The fact that the Government refrains, in an individual case or as a matter of general policy, from instituting deportation proceedings against an alien or enforcing his deportation does not legalize the status of the beneficiary of the Government's forebearance. He remains in the United States at the sufferance of the Government, not under any lawful status accorded him by the Act. [11] (11)

The respondent's reliance upon the Second Circuit's decision in Holley v. Lavine, 553 F.2d 845 (2 Cir. 1977), is misplaced. At issue in that case was whether an alien with six United States citizen children who had been given official assurance that the Service did not presently intend to enforce her departure from this country was eligible under a federal regulation which assured financial aid to qualified aliens residing permanently in the United States 'under color of law.' The court held in favor of the alien, who had entered the country with a nonimmigrant student visa, long since expired. Noting that the phrase 'under color of law' obviously included situations not covered by specific authorization of law, the court left no doubt that the alien in question was 'unlawfully residing in the United States.' Id. at 849. (Emphasis added.)

Furthermore, the respondent may not establish that he had a lawful domicile in the United States even during the brief period his stay in this country was authorized under our immigration laws. In order to qualify as a nonimmigrant crewman, an alien must be one who 'intends to land temporarily and solely in pursuit of his calling as a crewman....' Section 101(a)(15)(D) of the Act , 8 U.S.C. 1101(a)(15)(D) . An alien crewman may be granted authorization to land in this country for a period not exceeding 29 days. Section 252 of the Act , 8 U.S.C. 1282 ; 8 C.F.R. 252.1(d) .

In Elkins v. Moreno, 435 U.S. 647 (1978), the Supreme Court recognized that the intent to form a domicile in the United States is incompatible with the terms and conditions of an alien's admission as a nonimmigrant in the case of many of the nonimmigrant categories set forth in section 101(a)(15) of the Act , including the nonimmigrant crewman classification. Id. at 665. If the respondent complied with the terms of his admission and did not intend to remain in the United States beyond the fixed period of his temporary stay, then he was not 'domiciled' in this country. Conversely, if he did intend to make the United States his permanent home and domicile, he violated the conditions of his admission and was not here 'lawfully.' See generally Elkins v. Moreno, supra; Anwo v. INS, supra; Castillo-Felix v. INS, 601 F.2d 459 (9 Cir. 1979);

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Matter of Anwo, 16 I&N Dec. 293 (BIA 1977).

On the basis of the foregoing discussion, we conclude that the respondent's lawful domicile began with his admission for lawful permanent residence on December 26, 1971, and ended with the termination of his lawful permanent resident status on July 30, 1976, when the order of deportation outstanding against him became administratively final. We thus hold that the respondent is statutorily ineligible for the relief he seeks under section 212(c) of the Act. The following order will be enter ed.

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

## Endnotes

**1 (Popup)**

1.

Section 245 of the Act , 8 U.S.C. 1255 , which permits adjustment of status in this country, does not apply to aliens who entered as crewmen.

**2 (Popup)**

2.

The Second Circuit appears to have concluded that the respondent left the country while still in voluntary departure status. Lok v. INS, 548 F.2d 37, 38 (2 Cir. 1977). We find no indication in the record that the voluntary departure period granted the respondent was extended beyond March 3, 1969. Resolution of the question is not, however, necessary to a disposition of the case.

**3 (Popup)**

3.

Although section 212(c) by its terms applies only to excludable aliens seeking admission to the United States, we have held, following the Second Circuit's decision in Francis v. INS, 532 F.2d 268 (2 Cir. 1976), that section 212(c) relief is available in deportation proceedings notwithstanding the fact that the respondent had not departed from this country since the act or event that rendered him excludable and deportable. Matter of Silva, 16 I&N Dec. 26 (BIA 1976).

**4 (Popup)**

4.

We declined to apply the decision in Lok v. INS, 548 F.2d 37 (2 Cir. 1977), in cases arising outside the Second Circuit. Matter of Anwo, 16 I&N Dec. 293 (BIA 1977).

**5 (Popup)**

5.

The immigration judge additionally concluded that the respondent was barred by his deportation in October 1971 from establishing eligibility for section 212(c) relief. The foregoing theory is not presently advanced by the Government as a basis for denying the relief sought and we need not and do not address its merits.

**6 (Popup)**

6.

In affirming the immigration judge's June 1979 holding that the respondent's lawful status ended when he was initially found deportable in May 1975, we referred to dictum in our earlier decision in Matter of Hinojosa, 17 I&N Dec. 34 (BIA 1979), to the effect that an `adjudication' of deportability terminates an alien's `lawful status.' See also Matter of Hinojosa, 17 I&N Dec. 322 (BIA 1980).

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**7 (Popup)**

7.

 The distinction is subtle but not entirely inconsequential in light of certain privileges that attach to lawful permanent resident status.  (See discussion, infra.)

**8 (Popup)**

8.

 Other circumstances under which lawful permanent resident status may change include:  through rescission of adjustment of status under section 246 of the Act , 8 U.S.C. 1256 (see Matter of Guiot, 14 I&N Dec. 393 (D.D. 1973);  through adjustment to nonimmigrant status pursuant to section 247 of the Act , 8 U.S.C. 1257 (see Matter of S, 6 I & N Dec. 392 (BIA 1954;  A.G. 1955);  when an alien departs the United States under an order of deportation (Matter of Mosqueda, 14 I&N Dec. 55 (R.C. 1972)) or under an order of exclusion and deportation (Matter of Iqal, 10 I & N Dec. 460 (BIA 1964);  and when he relinquishes such status, intentionally (Matter of Montero, 14 I&N Dec. 399 (BIA 1973)) or unintentionally (Matter of Kane, 15 I&N Dec. 258 (BIA 1975)).

**9 (Popup)**

9.

 Board decisions not selected as precedents are not binding in subsequent proceedings.  See generally 8 C.F.R. 3.1(g) .

**10 (Popup)**

10.

 But see Matter of Anwo, supra.

**11 (Popup)**

11.

 We find nothing in Parco v. Morris, 462 F.Supp. 976 (E.D. Pa. 1977), a case commended to us by the respondent concerning a different aspect of the Service policy here involved, which would lead us to conclude that the respondent's domicile in this country prior to December 1971 was lawful.  In any event, as the Service points out, Noel v. Chapman, 508 F.2d 1023 (2 Cir. 1975), not Parco v. Morris, supra, governs in the Second Circuit.

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Matter of Sandra Carolina MENDOZA-SANDINO et al., Respondents The case of the respondent whose alien number is A28 343 048 has been separated from the instant case.
Files A92 026 109 et al.-Miami
Board of Immigration Appeals
21 Immig. Rptr. B1-85; Interim Decision No. 3426
February 23, 2000

**Editorial information: index**

Index: Suspension of deportation (continuous physical presence: generally)

**Editorial information: summary**

## SUMMARY OF ISSUES

SUSPENSION OF DEPORTATION; CONTINUOUS PHYSICAL PRESENCE: 8 U.S.C. § 1229b(d)(1) (Supp. II 1996); Alien may not accrue the requisite 7 years of continuous physical presence for suspension of   deportation after the service of the Order to Show Cause and Notice of Hearing (Form I-221).

**Editorial information: syllabus**

## BIA SYLLABUS

Pursuant to section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), an alien may not accrue the requisite 7 years of continuous physical presence for suspension of   deportation after the service of the Order to Show Cause and Notice of Hearing (Form I-221), as service   of the Order to Show Cause ends continuous physical presence.

**Editorial information: cross-ref**

## CROSS-REFERENCES

Immigration Law and Procedure chaps. 64, 74.

**Counsel**

Pro se. 2 (1)
Carlos Lopez, Assistant District Counsel, for the Immigration and Naturalization Service.

**Judges**

Before: Board En Banc: DUNNE, Vice Chairman; SCIALABBA, Vice Chairman; VACCA, HEILMAN, HOLMES,   HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, MOSCATO, and MILLER, Board Members. Dissenting   Opinions: GUENDELSBERGER, Board Member; VILLAGELIU, Board Member; SCHMIDT, Chairman;   ROSENBERG, Board Member.

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**Opinion**

**Opinion by**

JONES, Board Member:

**Opinion**

In a decision dated October 24, 1996, an Immigration Judge granted the respondents' applications for   suspension of deportation. The Immigration and Naturalization Service timely   appealed.

On June 22, 1998, while the instant appeal was pending, we remanded the respondents' case to the   Immigration Judge in light of *section 202 of the Nicaraguan Adjustment and Central American Relief Act,   Pub. L. No. 105-100, tit. II, 111 Stat. 2193, 2193 (1997)*, *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) (``NACARA''), to provide the respondents an opportunity to apply for adjustment of status. Our order included an accompanying notice of hearing, which advised each respondent as follows:

If you fail to appear at your scheduled hearing, your case will be returned to the Board of Immigration Appeals. The Board of Immigration Appeals will issue a decision on your appeal and/or motion to reopen. You may not file an application for adjustment of status under section 202 of the NACARA with the INS while your appeal is pending.

The record reflects that the respondents were notified by certified mail that they were scheduled to appear for a master calendar hearing before an Immigration Judge on December 17, 1998. The respondents failed to appear for the hearing. On December 17, 1998, the Immigration Judge entered a decision noting that the respondents had failed   to appear and certified the case to the Board to    consider the Service's previously pending appeal. *See* 8 C.F.R. § 245.13(d)(2) (1999). Therefore, we will adjudicate the underlying appeal. The appeal will be sustained and the decision of the Immigration Judge will be vacated.

## I. PROCEDURAL HISTORY

The respondents in the instant case are natives and citizens of Nicaragua. Two of the respondents entered the United States on February 28, 1986, and each was served with an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) on March 2, 1986. The other three respondents entered the United States on June 1, 1986, and each was served with an Order to Show Cause on June 2, 1986. After their respective charging documents were issued, the respondents filed applications for asylum and withholding of deportation and motions to change venue. The respondents listed an address in Miami, Florida, in their motions to change venue, which were denied.

The respondents were scheduled to appear for hearings on their applications for asylum and withholding    of deportation. The notices of hearing were mailed to the respondents' counsel, who appeared for the   scheduled hearings. The respondents failed to appear, however, and counsel indicated that they   had not replied to his written or telephonic communications. All of the respondents were deemed to have   abandoned their applications for asylum and withholding of deportation. Two of them were granted   voluntary departure and the others were ordered deported in absentia.

On April 15, 1996, the respondents filed motions to reopen to apply for suspension of deportation. The   Service opposed the motions arguing that the respondents had not shown reasonable cause for their failure to appear at the scheduled hearings. On May 22, 1996, an Immigration Judge granted the respondents' motions. The Service did not appeal the Immigration Judge's decision granting the motions

to reopen.

Following a hearing on October 24, 1996, on the respondents' applications for suspension of deportation,   the Immigration Judge granted their requests for relief. The Immigration Judge determined that section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), did not apply   to the respondents, as they were issued Orders to Show Cause and placed in deportation proceedings, rather than being in removal proceedings after the issuance of a notice to appear.

## II. ISSUE

On appeal, the Service argues that the Immigration Judge erred in considering the respondents' request   for discretionary relief, as they were statutorily ineligible for suspension of deportation. According to the   Service, the respondents were unable to establish the requisite 7 years of continuous physical presence   before the service of the Orders to Show Cause because they were subject to section 240A(d)(1) of the   Act and section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,   Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627 (effective Apr. 1, 1997) (``IIRIRA''),   amended by NACARA § 203(a), 111 Stat. at 2196. The issue raised by the Service in this case was   resolved by our decision in Matter of Nolasco, Interim Decision 3385 (BIA 1999), which was issued   subsequent to the Immigration Judge's decision. However, the dissent addresses an issue that was not   raised on appeal by either the respondents or the Service.

The issue before us, therefore, is whether an applicant for suspension of deportation who has not accrued 7 years of continuous physical presence prior to the service of an Order to Show Cause   may accrue the requisite continuous physical presence subsequent to its service.

## III. RECENT DEVELOPMENTS

Since the time of the respondents' deportation hearing, there have been many changes in the law regarding suspension of deportation. On September 30, 1996, Congress enacted the IIRIRA, which eliminated the relief of suspension of deportation and substituted a similar remedy, cancellation of removal, at section 240A of the Act. See IIRIRA §§ 304(a)(3), (a)(7), 110 Stat. at 3009-594, 3009-615. The IIRIRA's transitional rules regarding suspension of deportation provided that the period of continuous physical presence stops upon the service on the alien of a charging document, which is referred to as a notice to appear. See section 240A(d)(1) of the Act. This ``stop time'' rule applies to notices to appear issued before, on, or after the IIRIRA's enactment date. See IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

Subsequently, the NACARA revised certain sections of the IIRIRA, including the transitional provisions for   suspension of deportation. See NACARA § 203(a), 111 Stat. at 2196. It provided that the stop   time rule in section 240A(d)(1) of the Act applies to Orders to Show Cause issued before, on, or after   the   IIRIRA's enactment date. Id.

In Matter of Nolasco, supra, we found that section 309(c)(5)(A) of the IIRIRA, as amended by section 203(a)(1) of the NACARA, [3] [(2)] applies to aliens seeking suspension of deportation. We found that service   of the Order to Show Cause ends the period during which an alien may accrue the 7 years of continuous   physical presence required for suspension eligibility. Id.

## IV. STATUTORY ELIGIBILITY FOR SUSPENSION OF DEPORTATION

In the instant case, the respondents clearly did not have the requisite 7 years of continuous physical presence prior to service of the Orders to Show Cause. The respondents' eligibility for suspension of deportation therefore hinges on whether an alien may accrue 7 years of continuous physical presence after the alien has been served with an Order to Show Cause, as suggested by the dissent. Based on the language of section 240A(d)(1) of the Act and the legislative history of the IIRIRA, we find that the continuous physical presence clock does not start anew after the service of an Order to Show Cause so as to allow an alien to accrue the time required to establish eligibility for suspension of deportation

---

BIA & AAU Precedent Decisions                                                                            3

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

subsequent to the service of an Order to Show Cause.

### A. Language of Section 240A(d) of the Act

Section 240A(d) of the Act is entitled ``Special Rules Relating to Continuous Residence or Physical Presence.'' Section 240A(d)(1) specifically relates to events that terminate an alien's continuous residence or continuous physical presence, providing as follows:

> TERMINATION OF CONTINUOUS PERIOD. -- For purposes of this section, any period of continuous residence or continuous physical presence in the United States *shall be deemed to end* when the  alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

Section 240A(d)(1) of the Act (emphasis added). This provision clearly states that the continuous  physical presence or continuous residence ``ends'' upon the occurrence of one of the specified events,  whichever is earliest. The title of section 240A(d)(1) further indicates that Congress intended the accrual  of qualifying time to terminate, or permanently stop, upon the first occurrence of either of the referenced  actions.

An analysis of section 240A(d)(2), which relates to the treatment of certain *breaks* in presence, further  supports our finding that the clock cannot be reset so that an alien accrues continuous physical presence  or continuous residence after the service of an Order to Show Cause or the commission of a specified  crime. Section 240A(d)(2) specifies what periods of absence interrupting an alien's stay in this country  will be deemed to break continuous physical  presence, providing as follows:

> TREATMENT OF CERTAIN BREAKS IN PRESENCE. -- An alien shall be considered to have failed to maintain continuous physical presence in the United States under subsections (b)(1) and (b)(2) [relating to cancellation of removal for nonpermanent residents] if the alien has departed from the United States for any period in excess of 90 days or for any periods in the aggregate exceeding 180 days.

The language of section 240A(d) makes it clear that Congress appreciated the difference between a  ``break" in continuous physical presence and the ``end" of continuous physical presence. Congress has distinguished between certain actions that ``end" continuous physical presence, i.e., service of a charging document or commission of a specified crime, and certain departures from the country that only temporarily ``break" that presence. Service of an Order to Show Cause or a notice to appear is not included as an interruptive event under section 240A(d)(2), which merely breaks continuous physical presence. Rather, under section 240A(d)(1), such service is deemed to end an alien's presence completely. Therefore, a reading of section 240A(d)(1) that would allow an alien  to accrue a new  period of continuous physical presence after the service of a charging document is not supported by the language of either section 240A(d)(1) or (2). 4 (3)

Unlike the dissent, we do not find that the language of section 240A(d)(1) relating to ``any period" of  continuous residence or continuous physical presence suggests that the clock for acquiring physical presence starts again after an Order to Show Cause  or a notice to appear is served and that a  new ``period" of continuous physical presence begins. Section 240A of the Act encompasses three  variations of cancellation of removal. Each of the three types of relief under sections 240A(a), 240A(b)(1), and 240A(b)(2) of the Act requires a different ``period" of continuous physical presence or  residence. To be eligible for section 240A(a) cancellation of removal, an alien'must demonstrate, inter  alia, 7 years of continuous residence after having been admitted to this country in any status. For   section 240A(b)(1) cancellation of removal, 10 years of continuous physical presence is required. An alien   applying for relief pursuant to section 240A(b)(2), however, need only show 3 years of continuous  physical presence. We find that the words ``*any period* of continuous residence or continuous physical  presence" in section 240A(d)(1) refer to these specific ``periods" of time that are required to establish  eligibility for relief under

---

BIA & AAU Precedent Decisions                                                                          4

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

sections 240A(a), 240A(b)(1), or 240A(b)(2) of the Act. These words do not   suggest, as the dissent asserts, that another period of continuous physical presence can begin after an   alien's presence has been terminated   by the service of a charging document or the commission of   a crime.

Finally, the ``whichever is earliest'' clause of section 240A(d)(1) of the Act also militates against any restarting of the clock, as it focuses on the first of two events, the service of the charging document or   the commission of a designated crime. Were we to interpret that clause as permitting the clock to start   again subsequent to the service of a charging document, we would be compelled to ignore any specified   crimes committed after that time. It would be absurd to construe the ``whichever is earliest'' language of   the statute in such a way as to allow an alien who has remained in the United States for 10 years after   service of the charging document, but who thereafter committed a disqualifying crime, to have accrued a sufficient period of continuous physical presence for cancellation of removal or suspension of deportation, because the statute makes both events absolute bars to the acquisition of qualifying time. Such a construction would render the ``whichever is earliest'' clause superfluous.

Therefore, we find that the language of sections 240A(d)(1) and (2) of the Act reflects that service of a   notice to appear or an Order to Show Cause is not simply an interruptive event that resets the continuous physical presence clock, but is a terminating event, after which continuous physical presence can no longer accrue.

### B. Legislative History

Our reading of section 240A(d)(1) of the Act is also consistent with legislative history. The House Report   on the Activities indicates that details on the background, specific provisions, and legislative history of   the IIRIRA may be found in the following reports relating to the Immigration in the National Interest Act of 1995: [5] [4] Report of the Committee on the Judiciary, House of Representatives, on H.R. 2202 (H.R. Rep.   No. 104-469) (``House Report''), and Conference Report: Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (H.R. Rep. No. 104-828) (``Conference Report''). *See* H.R. Rep. No. 104-879 (1996). The Conference Report's Joint Explanatory Statement of the Committee of Conference on H.R. 2202 (``Joint Explanatory Statement'') contains a section-by-section explanation of the IIRIRA. *See* H.R. Rep. No. 104-828 (1996); 142 Cong. Rec. H10841 (1996). The relevant portion of the Joint Explanatory Statement states:

> Section 240A(d)   provides that the period of continuous residence or physical presence *ends* when an alien is served a notice to appear under section 239(a) (for the commencement of removal proceedings under section 240), or when the alien is convicted of an offense that renders the alien deportable from the United States, whichever is earliest. A period of continuous physical presence under section 240A(b) is *broken* if the alien has departed from the United States for any period of 90 days, or for any periods in the aggregate exceeding 180 days. The continuous physical presence requirement does not apply to an alien who has served 24 months in active-duty status in the United States armed forces, was in the United States at the time of enlistment or induction, and was honorably discharged.

*Id.* (emphasis added); *see also* H.R. Rep. No. 104-469 (1996). [6] [5] The Joint Explanatory Statement reflects that the legislators understood that a break in continuous physical presence differs from the termination of continuous physical presence. The Joint Explanatory Statement distinguishes between events that merely break continuous physical presence, such that the clock may be reset for a new  period of continuous physical presence to begin, and events that cause continuous physical   presence to terminate forever.

Our reading of section 240A(d)(1) is also consistent with the House Report. In the section of the House   Report entitled ``Background and Need for the Legislation,'' the House noted areas of concern and   problems that it sought to correct. Specifically, the House expressed concern about the ways in which aliens extended their stays in this country to accrue time to gain immigration benefits. The House stated

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

the following:

> Each of these forms of relief may be exploited by illegal aliens to extend their stay in the United States. Voluntary departure is subject to abuse because there is very little assurance that aliens actually leave the United States, and very little incentive for them to do so.
>
> ....
>
> Asylum is often claimed by persons who have not suffered persecution, but who know that delays in adjudication (particularly in the affirmative asylum system) will allow them to remain in the United States indefinitely, meanwhile accruing time so that they will be eligible for suspension of deportation if they are ever placed in deportation proceedings.
>
> Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued. This includes aliens who failed to appear for their deportation proceedings and were ordered deported in absentia, and then seek to re-open proceedings once the requisite time has passed. Such tactics are possible because some Federal courts permit aliens to continue to accrue time toward the seven year threshold even after they have been placed in deportation proceedings. Similar delay strategies are adopted by aliens in section 212(c) cases, where persons who have been in the United States for a number of years, but have only been lawful permanent residents for a short period of time, seek and obtain this form of relief.

H.R. Rep. No. 104-469. The House and Conference Reports make it clear that the legislators intended to remove the incentive for aliens to prolong their cases in the hope of remaining in the United States long enough to be eligible for relief from deportation. *Id.* Therefore, reading section 240A(d)(1) to allow an alien to accrue a new period of continuous physical presence after the issuance of a charging document would be contrary to the intent of Congress as expressed in the legislative history of the IIRIRA.

V. CONCLUSION

The respondents were served with Orders to Show Cause before they acquired the 7 years of continuous physical presence necessary to establish their statutory eligibility for suspension of deportation. [7] [(6)] *See* IIRIRA § 309(c)(5), *amended by* NACARA § 203(a)(1); *Matter of Nolasco, supra.* Furthermore, the respondents' presence in this country after the service of the Orders to Show Cause cannot be counted toward accrual of the required 7 years of continuous physical presence. Therefore, we conclude that the respondents are not statutorily eligible for the requested relief. Accordingly, the Service's appeal will be sustained and the decision of the Immigration Judge granting the respondents suspension of deportation will be vacated. [8] [(7)]

ORDER: The appeal of the Immigration and Naturalization Service is sustained and the Immigration Judge's decision is vacated.

FURTHER ORDER: The respondents are ordered deported from the United States.

**Dissent by**

DISSENTING OPINION: John Guendelsberger, Board Member

**Dissent**

I respectfully dissent. [1] [(8)] On October 24, 1996, the Immigration Judge granted suspension of deportation to the respondents in this case. The Immigration and Naturalization Service has appealed, claiming that the respondents have not demonstrated 7 years of continuous physical presence as required by former section 244(a) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a) (1994). The

---

BIA & AAU Precedent Decisions                                                                              6

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Service has not   appealed the Immigration Judge's determinations that  the respondents have demonstrated that   deportation would cause them extreme hardship and that they meet the good moral character   requirement of section 244(a).

The majority holds that, under section 240A(d)(1) of the Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996),   service of an Order to Show Cause and Notice of Hearing (Form I-221) not only terminates the period of   physical presence acquired up to that point (if less than 7 years), but also precludes the accrual of a   subsequent period of physical presence for suspension eligibility. Such a broad reading of section 240A(d)(1) is not supported by either the wording or the legislative history of that provision.

In *Matter of Nolasco,* Interim Decision 3385 (BIA 1999), we held that, in determining eligibility for suspension of deportation, service of the Order to Show Cause ends the period of continuous physical presence. In that case, the respondent had entered the United States  in May of 1989. The Order   to Show Cause was served in March of 1996. Based on section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627 (``IIRIRA''), as it was amended by the Nicaraguan Adjustment and Central American Relief Act,   Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) (``NACARA''), and section 240A(d) of the Act, 8 U.S.C. 1229b(d) (Supp. II 1996), we found that   service of the Order to Show Cause on the respondent terminated his period of continuous physical   presence. Because the respondent in *Nolasco* had not acquired 7 years of residence subsequent to   service of the Order to Show Cause, we did not have occasion there to consider whether physical   presence after service of the Order to Show Cause could count toward eligibility for suspension of   deportation.

In this case, each of the respondents accrued well over 7 years of physical presence *after* service of the   Order to Show Cause. Two of the respondents entered the United States on February 28, 1986, and were   served with Orders to Show Cause on March 1, 1986. The other three respondents entered the United States on June 1, 1986, and were served with Orders to Show Cause on June 2, 1986. All five respondents applied for suspension of deportation in 1996, and all have now resided in the United States for over 13 years since the service of an Order to Show Cause. The issue here is whether the period of physical presence after service of the Order to Show Cause may be considered for purposes of section 244(a) suspension eligibility.

Resolution of this issue turns upon whether the physical presence ``clock,'' once interrupted, falls silent   forever or commences a new period of continuous physical presence. The starting point in resolving this   issue is the language of section 240A(d)(1) of the Act, which states:

TERMINATION OF CONTINUOUS PERIOD.-- For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

Notably, the core statement that ``*any period* of continuous physical presence... shall be deemed to   end'' strongly suggests that there may be more than one period to be considered. Although section 240A(d) clearly cuts off the accrual of a period of time *prior to* a specified event, it does not speak to periods of time *after* the event in question. The reference to ending ``any period'' of physical presence suggests that another period of physical presence ensues. *See Arrozal v. INS,* 159 F.3d 429, 434 n.2 (9th Cir. 1998) (recognizing that under section 240A(d)(1) a respondent ``might satisfy the continuous physical presence requirement by virtue of the fact that she has accrued twelve years of continuous physical presence *since* the INS issued her an order to show cause'').

Calculation of continuous physical presence under former section 244(a) depends upon the grounds of   deportability charged. Respondents deportable under most noncriminal grounds must

demonstrate 7 years of continuous physical presence ``immediately preceding the date of [the suspension] application.'' Section 244(a)(1) of the Act. Respondents deportable under most criminal grounds, however, must demonstrate 10 years of physical presence ``immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation.'' Section 244(a)(2) of the Act; *see also, e.g., Leon-Hernandez v. INS,* 926 F.2d 902 (9th Cir. 1991); *Brown v. INS,* 856 F.2d 728 (5th Cir. 1988).

Under these distinct approaches to calculating physical presence, an alien who had entered without inspection and had begun to acquire time that would count toward eligibility for suspension of deportation under former section 244(a)(1), would, upon the commission of an act or assumption of a status constituting a ground for deportation listed under former section 244(a)(2), lose any credit for such physical presence and would have to restart the physical presence clock from the time of the section 244(a)(2) event. The physical presence clock under section 244(a)(2) would also stop and begin again upon the occurrence of a subsequent section 244(a)(2) event. *See Matter of Bufalino,* 11 I. & N. Dec. 351 (BIA 1965) (finding that a respondent who is deportable under several grounds, one of which is listed in section 244(a)(2), is ineligible for relief under section 244(a)(1) and must establish eligibility under section 244(a)(2) of the Act from the date of the commission of the last deportable act); *Matter of V-R-,* 9 I. & N. Dec. 340, 342 (BIA 1961) (stating that when there is more than one section 244(a)(2) event, the 10-year period of physical presence for suspension is computed from the date of the last such event.) The interplay between eligibility for suspension under the physical presence requirements of section 244(a)(1) and (2) has always involved the potential for the ending of one period of physical presence and the start of another. These provisions of section 244(a)(1) and (2) remain intact and applicable to respondents in proceedings prior to the effective date of the IIRIRA. Thus the resetting of the physical presence clock upon the occurrence of particular events has been and remains inherent in the eligibility provisions for suspension of deportation.

The majority's reading of section 240A(d)(1) of the Act to end all periods of continuous physical presence upon the occurrence of a section 240A(d)(1) event sweeps far too broadly. Under such a reading, no applicant for suspension could ever qualify for relief under section 244(a)(2), because a period of physical presence would end with commission of the crime and a respondent would be barred from relying upon a subsequent period of 10 years of physical presence following the conviction for the crime. Section 244(a)(2), however, requires only that the respondent show 10 years of continuous physical presence after the conviction for a crime included in former section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2) (1994). A second period of continuous physical presence has always been required in any suspension case under section 244(a)(2). After the IIRIRA, service of an Order to Show Cause or commission of another offense listed in section 240A(d)(1) will terminate this second period of physical presence, but until such an event occurs, the clock runs under section 244(a)(2) from the time of conviction for the crime. *Matter of Lozada,* 19 I. & N. Dec. 637 (BIA) (holding that the relevant date for calculating continuous physical presence under section 244(a)(2) is the date of *conviction* rather than the date of commission of the section 241(a)(2) offense for which deportation is sought), *aff'd,* 857 F.2d 10 (1st Cir. 1988); *cf. Matter of Perez,* Interim Decision 3389 (BIA 1999) (finding that under section 240A(d)(1) physical presence ends upon the commission of a qualifying criminal offense).

Had Congress intended the occurrence of a section 240A(d)(1) event to bar all future eligibility for relief and to preclude the possibility of accruing time toward continuous physical presence, it would have clearly stated that the occurrence of such an event prior to the accrual of 7 years of continuous physical presence renders a respondent ineligible for suspension of deportation. *See, e.g.,* section 240A(c) of the Act (setting forth categories of aliens ineligible for relief). Instead, the ``special rules'' relating to continuous physical presence are set forth in a separate provision. This arrangement suggests that while the occurrence of an event specified in section 240A(d) breaks continuity of physical presence, it does not preclude the applicant from ever again accruing the required years of continuous physical presence. *See Arrozal v. INS, supra.*

Notably, former section 244(a)(1) of the Act and its replacement provision for cancellation of

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

removal   enacted by the IIRIRA, section 240A(b)(1)(a), require that the alien be physically present in the United States for a continuous period of time (not less than 7 years for suspension of deportation and 10 years for cancellation of removal) ``*immediately preceding* the date of [the] application'' for suspension of deportation or cancellation of removal. (Emphasis added.) This statutory focus on the time period immediately preceding the application is consistent with a reading of the statute which recognizes that 7 years of continuous physical presence might be acquired after service of an Order to Show Cause. The rules of statutory construction presume that words of a statute repeated in subsequent legislation for the same purpose have the same meaning, because Congress is aware of the prior construction. 1A Norman J.   Singer, *Sutherland Statutory Construction* §§ 22.33, 22.35, at 288, 296 (4th ed. 1985); *Lorillard v. Pons,* 434 U.S. 575, 581 (1978); *Matter of K-,* 20 I. & N. Dec. 418, 423 (BIA 1991). Had Congress intended the   reading of section 240A(d)(1) adopted by the majority, it would not have included the ``immediately preceding'' clause in the eligibility requirements for cancellation of removal.

Comparison   of the wording used in section 240A(d)(2) also suggests that a second period of continuous physical presence may occur under section 240A(d)(1). Section 240A(d)(2) provides a bright-line rule for determining whether continuity of physical presence is broken by trips outside the United States. It states that one who departs for over 90 days ``shall be considered to have *failed to maintain* continuous physical presence.'' Section 240A(d)(2) of the Act (emphasis added). The ``failed to maintain'' language is just as final and conclusive as the words ``terminated'' and ``deemed to end'' in section 240A(d)(1). The physical presence that ends with too long a departure, however, begins anew upon return to the United States. Similarly, the termination of a period of physical presence under section 240A(d)(1) does not necessarily preclude a subsequent period of physical presence.

Section 240A(d)(1) does not clearly preclude the accrual of physical presence after the occurrence of an   event that has terminated a prior period of physical presence. Nor does our holding in *Matter of Nolasco,   supra.* Our role in such a situation is to resolve doubts in favor of affording relief from deportation.   *See INS v. Errico,* 385 U.S. 214, 225 (1966) (stating that doubts as to the correct construction of a   statute should be resolved in the alien's favor when interpreting provisions related to relief from deportation). We resolve doubts in favor of the more narrow construction because deportation is a   drastic measure and at times the equivalent of banishment or exile. *Delgadillo v. Carmichael,* 332 U.S. 388, 391 (1947); *see also INS v. Cardoza-Fonseca,* 480 U.S. 421, 449 (1987); *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10 (1948). In the absence of a clear legislative directive that physical presence after service   of an Order to Show Cause may not be considered, we should not read such a restriction into section 240A(d)(1). We should not assume, without more, that Congress meant to restrict eligibility beyond that   required by the narrower version of reasonable interpretations of the words used.

The legislative history referred to by the majority provides scant support for the proposition that Congress intended the most restrictive of the possible readings of the statutory language. When 7 years of continuous physical presence has not been acquired by the time of service of the Order to   Show Cause, requiring a new period of 7 years of physical presence after the start of proceedings largely accomplishes the goals of Congress. Delay in reaching a final order in proceedings beyond 7 years is not always attributable to the alien. In those rare cases in which 7 years have gone by since the start of proceedings, and the alien is primarily at fault, whether suspension should be granted remains subject to the exercise of administrative discretion.

In the instant case, the respondents accrued more than the requisite 7 years of continuous physical presence after service of the Orders to Show Cause and before they filed their applications for suspension. Because the Immigration Judge correctly determined that they were eligible for suspension of deportation, I would affirm the Immigration Judge's order granting relief to each of the respondents in this case.

DISSENTING OPINION: Gustavo D. Villageliu, Board Member

The question before us is what should be deemed to end upon service of an Order to Show Cause.

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Is it   only a period of continuous physical presence that began before such service, or also other periods of continuous physical presence that had not already   started when the Order to Show Cause was   served? In short, does the statute end all further continuous physical presence or only the continuity of   the period of physical presence that had already begun, as the court suggests in *Arrozal v. INS,* 159 F.3d 429, 434 n.2 (9th Cir. 1998)? [1] [9]

The respondents have, in fact, been continuously present in the United States for the requisite 7 years,   because they entered in 1986. Moreover, subsequent to the service of their Orders to Show Cause in 1986, they also have accrued a period of continuous physical presence that exceeds the minimum 7 years   immediately preceding their October 24, 1996, applications for relief. The majority rules that neither period of continuous physical presence suffices, however, because once the original period of   continuous physical presence is deemed to end, no other period of continuous physical presence may   begin. This conclusion is not supported by either logic or any specific language in the statute.

Because of the drastic consequences of deportation, the rules of statutory interpretation relating to immigration statutes require that all remaining ambiguities be construed in the favor of the alien. *See INS v. Errico,* 385 U.S. 214 (1966); *Barber v. Gonzales,* 347 U.S. 637 (1954); *Fong Haw Tan v. Phelan,* 333 U.S. 6 (1948). Notwithstanding, the majority broadly rules that neither of these continuous periods of physical presence in the United States can qualify as the ``seven years immediately preceding the date of such application'' that are required under former section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), for suspension of deportation. *See Landgraf v. U.S.I. Film Products,* 511 U.S. 244, 269 (1994); *accord Reno v. American-Arab Anti-Discrimination Committee,* 525 U.S. 471 (1999) (reading narrowly the limitations on relief from deportation   and judicial review prescribed by AEDPA   § 440(d) and the transitional rules provisions of IIRIRA § 306, respectively); *Lindh v. Murphy,* 521 U.S. 320 (1997); *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939 (1997); *cf. Shah v. Reno,* 184 F.3d 719 (8th Cir. 1999); *Sandoval v. Reno,* 166 F.3d 225 (3d Cir. 1999); *Henderson v. INS,* 157 F.3d 106 (2d Cir. 1998) *Goncalves v. Reno,* 144 F.3d 110 (1st Cir. 1998), *cert. denied,* 119 S.Ct. 1140 (1999).   For these reasons, we should instead look closely at the actual language of section 240A(d)(1) of the   Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), before adopting a broad rule retroactively reversing a 1996 grant of suspension of deportation. [2] [10] Section 240A(d)(1) of the Act provides as follows:

> TERMINATION OF CONTINUOUS PERIOD.--*For purposes of this section, any period* of *continuous residence* or *continuous physical presence* in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2)   or removable from the United States under section 237(a)(2) or 237(a)(4), *whichever is earliest.* (Emphasis added.)

### I. THE MAJORITY'S CONCLUSION BEGS THE QUESTION

The majority concludes that upon service of an Order to Show Cause all possible periods of continuous   physical presence or continuous residence required for relief under sections 240A(a), 240A(b)(1), or 240A(b)(2) of the Act must end. It then applies this rule by analogy to relief under former section 244(a)(1)   of the Act, citing *Matter of Nolasco,* Interim Decision 3385 (BIA 1999), as authority. However, the majority's reasoning is faulty and begs the ultimate question. It assumes as unquestionable the premises that section 240A(d)(1) indicates that ``the continuous physical presence or continuous residence 'ends' upon the occurrence of one of the specified events'' such as the service of a notice to appear or the commission of a criminal offense and that ``the statute makes both events absolute bars to the acquisition of qualifying time.'' *Matter of Mendoza-Sandino,* Interim Decision 3426, at 6, 7-8 (BIA 2000).

Starting from such premises, the majority understandably reaches an identical conclusion. However, what the statute actually says is that ``any period'' of continuous residence or continuous physical presence in   the United States is ``deemed to end.'' It does not say that any other periods of continuous physical   presence or residence are barred. We need to consider what the words ``any period''

---

BIA & AAU Precedent Decisions                                                                    10
Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

mean as they relate   to ``continuous residence or continuous physical presence,'' without first assuming as a premise that all   ``continuous residence or continuous physical presence'' ends.

It is well  settled that no provision of law should be construed so as to render a word or clause surplusage. *Kungys v. United States,* 485 U.S. 759 (1988); *Colautti v. Franklin,* 439 U.S. 379 (1979). Moreover, a relevant intrinsic aid for statutory interpretation is the principle of noscitur a sociis, which states that words in a statute take their meaning based on their context or their association with other words in the statute. *See United States v. Limehouse,* 285 U.S. 424, 426 (1932). By treating the words ``any period'' as mere surplusage, the majority obscures the fact that what the language of the statute deems ended de jure is only the continuity of a de facto period of time, not all future periods of   continuous physical presence or residence in the United States.

Focus first on the assertion that no further continuous residence may accrue because the period of continuous residence in the United States is deemed ended by section 240A(d)(1) of the Act. That is clearly incorrect. It is a well-settled principle of immigration law that the period of lawful residence does not end when a charging document seeking to remove a lawful permanent resident from the United States is served  pursuant to 8 C.F.R. § 3.13 (1999) or filed commencing proceedings pursuant to 8 C.F.R.   § 3.14 (1999). A lawful permanent resident who commits a removable or deportable offense remains a lawful permanent resident until an administratively final order of removal or deportation deprives him of that status. *See Matter of Ayala,* Interim Decision 3371 (BIA 1998); *Matter of Lok,* 18 I. & N. Dec. 101 (BIA 1981), *aff'd,* 681 F.2d 107 (2d Cir. 1982); 8 C.F.R. § 1.1(p) (1999).

Because such a respondent's residence has not ended, there is clearly, both de facto and de jure, a   period of lawful permanent residence between the time the Order to Show Cause is issued and the time an administratively final deportation order depriving him of his residence is issued. In fact, both section 240A(a) of the Act and its predecessor, former section 212(c) of the Act, 8 U.S.C. § 1182(c) (1994), require that the respondent be in status as a lawful permanent resident in order to apply for these forms of relief. *See Matter of Duarte,* 18 I. & N. Dec. 329 (BIA 1982), and cases cited therein; *cf.* 8 C.F.R. § 212.3(f) (1999). Consequently, because an alien's residence does not end de jure upon either  the commission of a crime or service of the Order to Show Cause, the only thing logically left to deem ended de jure under section 240A(d) (1), for purposes of relief, is the continuity of his actual period of   residence.

Moreover, the majority's reliance on the words ``whichever is earliest'' in section 240A(d) (1) is unconvincing. It also assumes as a premise that what the statute ends is residence or physical presence, treating as surplusage the words ``any period'' and ``continuous'' by asserting that ``the statute makes both events absolute bars to the acquisition of qualifying time.'' *Matter of Mendoza-Sandino; supra,* at 7-8. It   is entirely consistent with both logic and the statute for consecutive periods of time to exist, and to have  a period of time end upon commission of a crime and a subsequent period of time end when an alien is served with a charging document seeking his removal from the United States. [3 (11)]

In any event, the language ``whichever is earliest'' clearly relates to when the period of continuous physical presence is deemed to end because of a crime that renders an alien inadmissible or removable. It specifically addresses our ruling in *Matter of Bufalino,* 11 I. & N. Dec. 351 (BIA 1965), that the requisite 10-year period of continuous physical presence required for criminals seeking suspension of deportation under former section 244(a) (2) runs from the last deportable act. *Accord Matter of V-R-,* 9 I. & N. Dec. 340 (BIA 1961). Because it specifically addresses another form of suspension relief, it has questionable relevance to the issue of continuous periods of physical presence accrued by noncriminal aliens for section 244(a) (1) suspension of deportation purposes.

Similarly, referring to a general legislative intent in 1996 to end exploitation of suspension relief by aliens   who are residing in the United States unlawfully does not relieve us from closely examining the statute   under the applicable rules of statutory interpretation. This 1996 general intent must be viewed in context   with the 1997 NACARA amendments, which prescribed a more discrete application of the   IIRIRA § 309(c)(5) transitional rules, and the general purpose of the suspension statute, which was to provide

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

relief to aliens who had resided in the United States, albeit illegally, for a long time.

The respondents in this case are Nicaraguans who were allowed to remain in the United States from 1987 to 1995 under the Attorney General's Nicaraguan Review Program. *See Matter of L-O-G-,* 21 I. & N. Dec. 413, 421 (1995). Indeed, the NACARA afforded this specific class of aliens the opportunity to apply for   the substantially greater relief of adjustment of status. To interpret section 240A(d) (1) so broadly as to   preclude suspension relief based on general legislative intent, without taking into account the subsequent   NACARA clarification of such intent, ignores that a similarly broad interpretation of the statute was   vacated by the Attorney General in *Matter of N-J-B-,* Interim Decision 3415 (BIA 1997; A.G. 1997, 1999), and led to the enactment of the NACARA.

### III. NOT ALL PROCEEDINGS RESULT IN DEPORTATION ORDERS

A major shortcoming in the majority's reasoning is its failure to address the possibility that the outcome of   the proceedings may be favorable to the alien. It mistakenly  assumes that every proceeding to   remove an alien from the United States results in an order of deportation or removal. However, that is not   necessarily the case.

The proceedings may result in a finding that the respondent is not deportable or removable, or the Service may move to terminate the proceedings as improvidently begun, pursuant to 8 C.F.R. § 239.2 (1999). Also, relief from deportation or removal may be granted to the respondent during these proceedings. Under the majority's reasoning, all future periods of continuous residence or physical presence would be ended by the initiation of proceedings, even if the respondent obtains or retains lawful permanent resident status after such proceedings are completed. Consequently, no alien whose status is adjusted pursuant to section 245 of the Act, 8 U.S.C. § 1255 (1994 & Supp. II 1996), after being placed   in proceedings would acquire continuous residence or continuous physical presence, despite having   already been granted lawful permanent resident status. This makes no sense.

It is absurd to conclude that an alien whose proceedings are terminated because he is not deportable or   removable can no longer accrue continuous residence  or physical presence for purposes of any   future application for relief from deportation simply because an Order to Show Cause was issued in his   case. Yet that is the inevitable result of precluding further continuous physical presence for purposes of   relief after the service of an Order to Show Cause.

In addition, the majority's reasoning renders surplusage another provision of the Act, which precludes   aliens granted some forms of relief from deportation, but not recipients of other relief, from cancellation of   removal. *See* section 240A(c)(6) of the Act. Because no statute should be interpreted so as to render   another portion of the statute mere surplusage, we should look for a more reasonable interpretation of   the statute that makes more sense.

### IV. THE LANGUAGE OF THE STATUTE DOES NOT PRECLUDE ANOTHER PERIOD OF CONTINUOUS PHYSICAL PRESENCE

The majority concludes that nothing in the language of the statute suggests that another period of continuous physical presence can occur subsequent to service of an Order to Show Cause. As discussed above, there clearly exist other subsequent continuous periods of time while proceedings are pending, or if proceedings are terminated. More  importantly, the majority asks the wrong question. Because   the alien has, in fact, been here continuously for the requisite 7 years ``immediately preceding the   application,'' the question should be whether the statute requires otherwise, precluding de jure what   exists de facto. It does not.

A statute should be strictly construed if it purports to repeal previous law. *See United States v. Noce,* 268 U.S. 613 (1925); *Frost v. Wenie,* 157 U.S. 46 (1895); *cf.* 2A Norman J. Singer, *Sutherland Statutory   Construction* § 58.03, at 711 (4th ed. 1984). As one court explained, ``Where an act purports to overturn   long-standing legal precedent and completely change the construction placed on a statute by

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

the courts, ... it [must] be done in unmistakable language." *State ex rel. Hous, Auth. of Plant City v. Kirk,* 231 So. 2d 522, 524 (Fla. 1970); 2A Singer, *supra* § 58.03, at 711. As discussed below, the well-settled precedents interpreting ``continuous physical presence'' for purposes of suspension of deportation contemplate successive periods of continuous physical presence. The language ``any period of continuous physical presence shall be deemed to end'' does not necessarily mean   that all periods, including   those that have not started, must end.

The word ``any'' in section 240A(d) (1) does not mean ``all'' or ``every.'' ``All'' means the whole number,   amount or quantity, the total extent, the whole possible. *Webster's II New Riverside University Dictionary* 93 (1984) [hereinafter *Webster's*]. ``Every'' means ``all,'' without exception. *Id.* at 448. ``Any'' instead   merely means ``one or some, regardless of sort, quantity or number, one or another selected at random.''   *Id.* at 115. We cannot infer that the word ``any'' means ``all'' or ``every,'' in context with the phrase ``period   of continuous physical presence shall be deemed to end,'' without violating the principle of noscitur a   sociis discussed above.

It is an axiom of statutory construction that words in a statute should be given their ordinary meaning   whenever possible. 2A Singer, *supra* §§ 46.01, 46.04, at 73, 86. The word ``period'' means ``an interval of   time.'' *Webster's, supra,* at 874. Putting the words ``any period'' in context with the words ``continuous   physical presence'' cannot logically refer to a period of time whose continuity would be ended before the   period of time even begins because, logically,   continuity would not transcend its own ending.   That is simply not the ordinary meaning of the word ``period'' as it relates to continuity.

The word ``end'' is a boundary, a point at which an act, event, or phenomenon ceases or is completed.   *Webster's, supra,* at 430-31. Periods of time are discrete units with a beginning and an end, consistent   with an event that terminates continuity of an interval of time but does not affect other periods of time   as to their continuity. Once the period of continuous physical presence is deemed to end, nothing in the   statute prevents another continuous period of physical presence from beginning, consistent with reality   and the normal meaning of the words ``continuous period.'' That is the normal reading of a statute that   mandates the ending of a period of time upon the occurrence of a specified event.

The statute does not say that all periods of time shall be deemed to end. It also does not say that any   continuous physical presence shall be deemed to end. Either of these alternatives may conceivably be   read to require ending a period of time that had not yet begun, assuming arguendo that the rule prescribing   that ambiguities in deportation statutes   be interpreted in the favor of the alien is   inapplicable to this task.

In addition, because Congress was already clarifying in the NACARA what that specific language meant   for purposes of suspension of deportation, there is no basis for our further interpretive gloss. After all, if   Congress intended the statute to provide that no further time would accrue for purposes of relief, it could   say so clearly and directly, in accordance with the long-settled principles of statutory interpretation that   are required when a legislature purports to repeal previous law. Instead, what the statute mandates is the end of an interval of time. It states that ``any period of continuous physical presence... shall be deemed to end,'' necessarily implying a reference to discrete periods of time already existing and ending when the specified event, service of a notice to appear, takes place.

This is how the Supreme Court used the words ``period of time'' as recently as 1993 in *Reno v. Catholic   Social Services, Inc.,* 509 U.S. 43, 46-50 (1993), when discussing periods of time during which applications for legalization under the 1986 ``IRCA'' statute could be submitted. *See* Immigration Reform and Control   Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359. It meant a time interval during   which applications for legalization could be submitted. That is also how we interpreted the legal   significance of the ending of a period of continuous physical presence for purposes of suspension of   deportation in *Matter of Sipus,* 14 I. & N. Dec. 229, 230 (BIA 1972), where we specifically ruled that,   after a period of continuous physical presence ended because of a departure from the United States,   another period began that met the 7-year minimum required for suspension of deportation. It is another   axiom of statutory

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

interpretation that Congress is presumed to be aware of how identical statutory   language has been interpreted in the past. 1A Norman J. Singer, *Sutherland Statutory Construction* §§ 22.33, 22.35, at 288, 296 (4th ed. 1985); *Lorillard v. Pons,* 434 U.S. 575, 581 (1978); *Matter of K-,* 20 I.   & N. Dec. 418, 423 (BIA 1991); *Matter of Rodriguez-Coto,* 19 I. & N. Dec. 208 (BIA 1985). [4] [12]

The majority's reference to section 240A(d) (2) as evidence of a different intent, because it refers to failing ``to maintain continuous physical presence,'' is misplaced. This alternative phrasing was clearly aimed at amending the language of section 244(b) (2) of the Act, which had a separate legislative   history. *See supra* note 4. The words ``failed to maintain'' have consistently been used as a synonym for   ``ending'' by Congress and the courts. *See Security Services, Inc. v. K Mart Corp.,* 511 U.S. 431, 446 (1994); *United States v. Gaubert,* 499 U.S. 315, 326 (1991); *Lassiter v. Department of Social Servs.,* 452 U.S. 18, 20 (1981). Consequently, because both sections 240A(d) (1) and (2) preclude eligibility for relief   in a similar manner, the language of section 240A(d) (2) is evidence that Congress used the phrases   ``deemed to end'' and ``failed to maintain'' interchangeably.

In determining whether an applicant for suspension of deportation has the requisite 7 years of continuous   physical presence in the United States ``immediately preceding'' the suspension of deportation application,   we should focus on the time period ``immediately preceding the application'' in accordance with   the   language of the statute. If no event that ``deemed to end'' its continuity took place during that period of   time, the respondents are eligible to apply for suspension of deportation because they have ``been   physically present in the United States for a continuous period of not less than seven years immediately   preceding the date of such application.'' Section 244(a) (1) of the Act; *see also Matter of Dilla, supra;   Matter of Sipus, supra.* I therefore dissent from the majority's ruling and agree with the dissenting   opinions of Chairman Schmidt and Board Member Guendelsberger.

DISSENTING OPINION: Paul W. Schmidt, Chairman

I agree with the dissenting opinions filed by Board Members Guendelsberger and Villageliu.

Their respective opinions correctly point out that a narrow construction of the ``stop time'' disqualification   clause is consistent with the statutory language and with the principles of statutory interpretation that   should be applied in immigration cases.

The consequences of the majority's construction of the stop time rule will be harshest for a group of aliens where the Immigration Judge granted suspension of deportation, the Immigration and Naturalization Service appealed, and the case has been pending on appeal for many years. Those cases will now   be subject to mandatory denial without regard to the underlying merits.

In such cases, the delays are not caused by the applicants, who did not invoke the appellate process   and have no practical control over the timing of such adjudications. The Service cannot be faulted for   exercising its regulatory right to appeal. Nor can we, as a body responsible for fairly completing more than 23,000 appellate adjudications in each of the past 3 years, reasonably be expected to make everyone's   case a ``priority.'' Expansion of our membership and the recently enacted regulatory framework for   streamlined appellate adjudications offer hope for the future. *See* Streamlining: Final Rule, 64 Fed. Reg. 56,135 (1999). Nevertheless, lengthy delays in some nondetained case appeals are simply an unfortunate   fact of life in our current system.

By denying us the opportunity to exercise our discretion in a reasoned manner, the majority's construction of the stop time rule is likely to lead to miscarriages of justice, which no reasonable   legislator could have foreseen or intended.

For the foregoing reasons, I join   my colleagues in respectfully dissenting.

DISSENTING OPINION: Lory Diana Rosenberg, Board Member

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

I respectfully dissent, and join the dissents of Chairman Schmidt and Board Members Guendelsberger and   Villageliu.

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

# Endnotes

**1 (Popup)**
2.
The record reflects that the respondents were represented in the proceedings below. The motion to   withdraw as counsel by the respondents' attorney is granted. A courtesy copy of our decision will be   sent to former counsel.

**2 (Popup)**
3.
The amended section 309(c)(5)(A) of the IIRIRA states:
IN GENERAL.-- Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause... issued before, on, or after the date of the enactment of this Act.

**3 (Popup)**
4.
We do not find *Matter of Sipus,* 14 I. & N. Dec. 229 (BIA 1972), *Matter of Bufalino,* 11 I. & N. Dec. 351 (BIA 1965), or *Matter of V-R-,* 9 I. & N. Dec. 340 (BIA 1961), to be controlling on the issue of whether a   new period of continuous physical presence can begin following the termination of an alien's presence.   These cases were decided before the changes brought about by the IIRIRA and the NACARA, so there   was at that time no legislation outlining what events broke or terminated continuous physical presence.

**4 (Popup)**
5.
The Immigration in the National Interest Act of 1995 was originally introduced as H.R. 1915, and reintroduced as H.R. 2202. H.R. 2202 was passed by the House on March 21, 1996. On May 2, 1996, the   Senate passed H.R. 2202. On September 26, 1996, the Immigration in the National Interest Act, H.R. 2202, was renamed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

**5 (Popup)**
6.
In its summary of Title III of the Immigration in the National Interest Act of 1995, the House stated   that ``the time period for continuous physical presence terminates on the date a person is served a notice   to appear for a removal proceeding or if the alien is absent from the United States for an aggregate   period in excess of 180 days.'' H.R. Rep. No. 104-469. However, in the section-by-section analysis of S. 2202, the House explained as follows:
Subsection 240A(d) provides that the period of continuous residence or physical presence *ends* when an alien is served a notice to appear under section 239(a) (for the commencement of

---

BIA & AAU Precedent Decisions                                          16

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Case 1:00-cv-00058   Document 18   Filed in TXSD on 05/04/2001   Page 43 of 51

removal proceedings under section 240). A period of continuous physical presence is *broken* if the alien has departed from the United States for any periods in the aggregate exceeding 180 days, unless for emergent reasons the return could not be accomplished in that time.
*Id.* (emphasis added).

### 6 (Popup)

7.

We find *Matter of Pena-Diaz,* 20 I. & N. Dec. 841 (BIA 1994), to be inapposite. In *Matter of Pena-Diaz,* we stated that the Service's intentional lack of enforcement of a final order of deportation could be   considered in deciding whether to grant reopening as a matter of discretion. Here, the issue is whether   the respondents are statutorily eligible for suspension of deportation. *See Matter of Pena-Diaz, supra,* at 846 (stating that ``before a motion or any form of discretionary relief may be granted, an alien must first   establish statutory eligibility... [because] only then does the issue of the proper exercise of discretion   present itself'').

### 7 (Popup)

8.

We note that an alien who is subject to a final order of exclusion, deportation, or removal, and who   has not been denied adjustment of status under section 202 of the NACARA by an Immigration Judge or   the Board of Immigration Appeals, may apply to the Service for adjustment of status under that section   of the NACARA. 8 C.F.R. § 245. 13(d)(4).

### 8 (Popup)

1.

I also agree with the dissenting opinions of Chairman Schmidt and Board Member Villageliu.

### 9 (Popup)

1.

Although I entirely agree with the dissenting opinions of Chairman Paul W. Schmidt and Board Member   John Guendelsberger, I also respectfully dissent separately in order to specifically refute some of the   majority's assertions, which cannot be adequately covered in those dissenting opinions without detracting   from their clarity.

### 10 (Popup)

2.

The effective date of the amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (``IIRIRA''), is April 1, 1997. However,   the transitional rule § 309(c)(5) of the IIRIRA, 110 Stat. at 3009-627, applies section 240A(d)(1) to   pending cases. This transitional rule was further amended by the Nicaraguan Adjustment and Central   American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) (``NACARA'').

### 11 (Popup)

3.

This is particularly pertinent because we have recently ruled that some crimes that were not previously deportable offenses became so retroactively as a result of the IIRIRA, and aliens are

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

now    placed in proceedings for crimes committed long ago, at a time when a conviction for such crimes did not    impose deportability. *See Matter of Truong,* Interim Decision 3416 (BIA 1999). This period of lawful    residence subsequent to the commission of a crime that later became a removable offense is also a    continuous period of residence that would be deemed to end upon service of a notice to appear, in a    narrower, more logical reading of section 240A(d) (1). A legislative intent to discourage aliens who are    residing here unlawfully from prolonging their illegal stay clearly does not apply to lawfully residing aliens    who previously were not even deportable.

**12 (Popup)**
4.

The phrase ``continuous physical presence'' is a well-developed concept in immigration law for purposes    of relief from deportation, both through case law and relatively recent legislation. *See Matter of Dilla,* 19 I. & N. Dec. 54 (BIA 1984) (adopting the Supreme Court's strict interpretation of the term ``continuous    physical presence''); former section 244(b) (2) of the Act (abrogating the Supreme Court's strict    interpretation); section 245A(a) (3) (B) of the Act, 8 U.S.C. § 1255a(a) (3) (B) (1994) (prescribing the    more liberal ``brief, casual, and innocent'' test for legalization purposes). We recognized that each period    of continuous physical presence was a separate period that may or may not be deemed continuous for    purposes of suspension of deportation, depending on the applicable statute. *Matter of Dilla, supra,* at 55;    *cf. De Gurules v. INS,* 833 F 2d 861 (9th Cir. 1987).

---

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

Matter of Jesus RODARTE-Espinoza, Respondent
A37 733 276 --El Centro
Board of Immigration Appeals
15 Immig. Rptr. B1-52; 21 I & N Dec. 150 ;(I.D. 3260; BIA 1995)
December 4, 1995

**Editorial information: index**

Index: Waiver of inadmissibility (Returning residents --section 212(c): Adjustment applicant, eligibility of)

**Editorial information: summary**

## SUMMARY OF ISSUES

ADMINISTRATIVE LAW AND PROCEDURE : INA § § 212(c), 245; 8 C.F.R. § 245.1(f); Alien may file concurrent applications for § 212(c) and § 245 relief.

**Editorial information: syllabus**

Sitting en banc, the BIA sustained the appeal, granted the motion to reopen, and remanded the case to the IJ so that the alien could apply for adjustment of status under INA § 245 and reapply for a waiver under INA § 212(c). The Board held that 8 C.F.R. § 245.1(f) permits concurrent 212(c) and 245 applications even where the alien is seeking further consideration of this § 212(c) application.

**Editorial information: cross-ref**

Immigration Law and  Procedure § § 51.01 [2] [b] [ii], 51.03 [3], 51.06 [2] [b].

ON BEHALF OF RESPONDENT:
Mathew L. Millen, Esquire
Los Angeles, California

ON BEHALF OF SERVICE:
Wayne P. Cantero
General Attorney

**Judges**

Before:  Board En Banc: SCHMIDT, Chairman; DUNNE, Vice-Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, COLE, MATHON, ROSENBERG, and GUENDELSBERGER, Board Members

**Opinion**

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**Opinion by**

DUNNE, Vice-Chairman:

**Opinion**

This case was last before us on June 15, 1994, when we affirmed the oral decision of an Immigration Judge dated December 5, 1990. In his decision, the Immigration Judge found the respondent deportable as charged under section 241(a)(11) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(11) (1988); denied his application for a waiver of inadmissibility under section 212(c) of the Act, 8 U.S.C. § 1182(c) (1988); and ordered him deported from the United States to Mexico.

The respondent has now filed a motion to reopen. In his motion, the respondent indicates that he wishes to have his proceedings reopened and his case remanded to the Immigration Judge so that he may apply for adjustment of status under section 245 of the Act, 8 U.S.C. § 1255 (1994). The respondent is now the beneficiary of an approved immediate relative visa petition filed by his United States citizen wife. The respondent states that he intends to reapply for a section 212(c) waiver in conjunction with his adjustment of status application, pursuant to *Matter of Gabryelsky* ; Interim Decision 3213 (BIA 1993).

The Immigration and Naturalization Service opposes the motion to reopen.

The respondent's motion will be granted and the case will be remanded to the Immigration Judge for a hearing on the respondent's applications for adjustment of status and for a section 212(c) waiver.

The respondent last appeared before an Immigration Judge in 1990. At that time, the Immigration Judge denied the respondent's application for a section 212(c) waiver in the exercise of discretion, a decision which this Board subsequently upheld. In our prior decision, we found that under *Matter of Buscemi* , 19 I. & N. Dec. 628 (BIA 1988), the respondent was required to show that he had unusual or outstanding equities in order to possibly overcome the adverse factors of record. We concluded that he had not shown such equities.

Since the time of his last hearing, the respondent has married a United States citizen. As indicated above, an immediate relative visa petition filed on his behalf has been approved. A child was born to the respondent and his wife on July 23, 1993, and another child was expected at the end of July 1995. The respondent has four lawful permanent resident siblings. In addition, the respondent successfully completed his period of probation on March 24, 1992, and on March 14, 1995, a certificate of rehabilitation was issued by a judge of the Superior Court of the State of California. Letters submitted with the motion to reopen indicate that the respondent has been steadily employed for a number of years and is the sole support of his family.

In its opposition to the motion, the Service does not address the issue of whether the requirements of *Matter of Buscemi, supra* , have now been satisfied. We find that the strong family ties the respondent now has in this country, as well as his long residence here (the respondent became a lawful permanent resident in 1982, but apparently cam here as a teenager and lived with his brothers for some years prior to that) constitute the unusual or outstanding equities necessary in this case.

In opposing reopening the Service argues first that our decision in *Matter of Gabryelsky* ; Interim Decision 3213 (BIA 1993), does not permit the respondent in this case to apply concurrently for relief under sections 212(c) and 245. In *Gabryelsky* , the respondent had been charged with deportability on two grounds, as an alien convicted of a firearms violation under section 241(a)(2)(C) of the Act, 8 U.S.C. § 1251(a)(2)(C) (Supp. V 1993), and as one convicted of a controlled substance violation under section 241(a)(2)(B)(i) of the Act. We held that even though the firearms conviction could not be waived under section 212(c), the respondent could apply for that relief in conjunction with his adjustment application, since he was also deportable for his drug conviction, which was waivable. However, the Service argues that

---

BIA & AAU Precedent Decisions

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

2

*Gabryelsky* should not apply to this case because the respondent here has already applied for and been denied section 212(c) relief.

We disagree with the Service position. As noted in *Matter of Gabryelsky, supra* , the regulations (currently at 8 C.F.R. § 245.1(f) (1995)) permit concurrent applications for section 212(c) and section 245 relief. We find nothing in the regulations or elsewhere which would limit the application of 8 C.F.R. § 245.1(f) in the manner urged by the Service. The fact that the respondent is now seeking further consideration of his section 212(c) application, as opposed to initial consideration of that application, does not mean that 8 C.F.R. § 245.1(f) does not apply.

The Service next argues that *reopening* should be denied because there is little likelihood that the respondent will succeed on the merits of his applications, and because there is insufficient new, previously unavailable, and material evidence presented in support of the motion. Alternatively, it is argued that reopening, and the underlying relief sought, should in any event be denied on discretionary grounds even if all the requirements for reopening are met.

As we indicated above, much has happened to the respondent since 1990. He has acquired substantial equities in the form of a citizen wife and citizen children. He has offered additional evidence of rehabilitation, including the facts that he has apparently kept a clean record since his last conviction, which occurred in March of 1989, and he has worked steadily to support himself and his family. Evidence has been submitted in support of the motion which addresses the potential hardship that could befall the respondent's family upon his deportation. Given all these considerations, we find that the result in this case may well be changed upon reopening. *See Matter of Coelho* ; Interim Decision 3172 (BIA 1992). We further find that the new equities presented, including the 5 years since his last hearing, fulfill the new evidence requirement for reopening. Moreover, we find no sufficient basis for denying reopening in the exercise of discretion.

Finally, the Service argues, citing *Avila-Murrieta v. INS* , 762 F.2d 733 (9th Cir. 1985), that the respondent is no longer eligible for section 212(c) relief because his lawful domicile terminated when we issued our administratively final order of deportation. This is a misreading of the applicable law in the Ninth Circuit, where this case arises. Since the respondent acquired the 7 years lawful unrelinquished domicile required for section 212(c) relief prior to our order, he may seek to reopen his proceedings to apply or reapply for that relief. *See Foroughi v. INS* , 60 F.3d 570 (9th Cir. 1995); *Butros v. INS* , 990 F.2d 1142 (9th Cir. 1993).

For these reasons, we will grant the respondent's motion.

ORDER: The motion to reopen is granted, the proceedings are reopened, and the record is remanded to the Immigration Judge for further proceedings consistent with the foregoing decision.

--------

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

**Matter of WONG**
**In Deportation Proceedings**
**A-12588659**
**Board of Immigration Appeals**
**13 I. & N. Dec. 427 (BIA 1969); Interim Decision #2014**
**November 28, 1969**

**Editorial information: Annotation**

    Order:  The appeal is dismissed.

**Editorial information: charges**

Order:  Act of 1952 -- Section 241(a)(2) 8 U.S.C. 125(a)(2) Remained longer -- crewman.
Lodged:  Act of 1952 -- Section 241(a)(5) 8 U.S.C. 1251(a)(5) -- Failed to furnish notification of address in violation of section 265 of the Act  ( 8 U.S.C. 1305 ).

**syllabus**

    When more than one ground of deportation exists and one ground arises later than the other, the period of continuous physical presence required to establish statutory eligibility for suspension of deportation under section 244(a) of the Immigration and Nationality Act , as amended, will be measured from the date of the later deportable violation.

**Counsel**

    ON BEHALF OF RESPONDENT:  Joseph S. Hertogs, Esquire Jackson and Hertogs 580 Washington Street San Francisco, California 94111 (Brief filed)
ON BEHALF OF SERVICE:  R. A. Vielhaber Appellate Trial Attorney

**Opinion**

**Opinion by**

**Opinion**

    Respondent appeals from the special inquiry officer's ruling that he is ineligible for discretionary relief.

    The main question is whether the physical presence in the United States needed for suspension of deportation is to be reckoned from the first event which made respondent deportable or the last.  We hold it is the last.  The appeal will be dismissed.

    Respondent, a 46-year-old male, a native and citizen of China, admitted in 1960 as a nonimmigrant crewman for a period not to exceed 29 days, remained without authority.  On June 19, 1962, a special inquiry officer ordered him deported on the charge stated in the order to show cause.  There was

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

no other charge at this hearing. Respondent did not appeal.

In the summer of 1965, respondent failed to report as ordered for deportation. He could not be located (Exs. 5, 6). He left his employment and he moved. He did not notify the Service of his address. He did not file address reports for 1966 and 1967 because he feared he would be located and deported. The Service arrested him on August 21, 1967 (Ex. 7).

On September 20, 1967, respondent moved for reopening of deportation proceedings so that he could apply for suspension of deportation. On September 29, 1967, the special inquiry officer denied the motion because respondent lacked the seven years residence required for such relief. Respondent appealed to the Board. By this time seven years had passed. The Board reopened the proceedings. At the reopened hearing, the respondent applied for suspension of deportation. He admitted that he failed to report for deportation because he did not want to leave the United States, that he hid from the Service, and that he failed to file his annual address report because he was afraid to let the Service know where he was (pp. 9-10). The Service lodged the charge based on his failure to furnish his address (Ex. 9). The special inquiry officer sustained the original charge and the lodged charge.

An applicant for suspension of deportation who is deportable on a section 241(a)(5) charge must establish that he has been physically present in the United States `F or a continuous period of not less than 10 years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation....' Section 244(a)(2) of the Act , 8 U.S.C. 1254(a)(2) . In Matter of V R, 9 I. & N. Dec. 340 (BIA, 1961), we held the period of physical presence required for suspension of deportation is measured from the time the alien last became deportable. Relying on this rule, the special inquiry officer denied respondent's application for suspension of deportation. He held that the act which last made respondent deportable was the failure to file an address report in January 1967, and since it had not been followed by the passage of ten years, respondent was not eligible for the relief.

The difficulty which confronts us arises from the fact that there are conflicting judicial views on the issue. In Louie King Fong v. INS, 308 F.2d 191 (9 Cir., 1962), the court rejected our view and held that the ten-year period of physical presence starts with the commission of the first act. We felt constrained to follow the ruling of the court. In Matter of Bagai, 10 I. & N. Dec. 683 (BIA, 1964), we overruled Matter of V R, supra, and adopted the rule in Louie King Fong, supra. After we did this, the issue was reviewed in the Eighth Circuit. The court considered Louie King Fong, supra, and Matter of V R, supra. The court refused to follow Louie King Fong, supra, and held that the ten-year period ran from the commission of the last deportable act. Patsis v. INS, 337 F.2d 733 (1964), cert. denied 380 U.S. 952 1965).

In the following year, both Louie King Fong, supra, and Patsis, supra, were considered in the Second Circuit. Rejecting Louie King Fong, supra, the court followed Patsis, supra, and held that the ten-year period ran from the commission of the last deportable act. Gagliano v. INS, 353 F.2d 922 (1965), cert. denied 384 U.S. 945 (1966).

The issue was also considered in several cases decided before Louie King Fong, supra. These cases were not the subject of comment in the cases we have already discussed. In the Sixth Circuit, a court held that an alien could not, in 1958, establish he had the necessary ten years of physical presence when he had been a subversive from 1932 to 1949. See Williams v. Sahli, 271 F.2d 228 (1959), cert. denied 361 U. S. 966. In an unreported district court case in the Sixth Circuit, a court stated by way of dicta that the ten-year period of physical presence runs from the time of the last failure to furnish an address report. Krug v. Pederson, C 62-376, N.D. Ohio, E.D. (June 24, 1964). In the Third Circuit, a court held that an alien who was deportable on two grounds arising out of an entry in 1956, and who in 1956 and 1957 failed to report his address, was ineligible for suspension of deportation because he could not establish ten years of physical presence immediately following the commission of such acts. Bufalino v. Holland, 277 F.2d 270, 280 (1960), cert. denied 364 U.S. 863 (semble); Matter of Bufalino, 11 I. & N. Dec. 351 , 357-358 (BIA, 1965).

Counsel seeks to establish that Patsis and Gagliano are consistent with Louis King Fong. We

---

BIA & AAU Precedent Decisions            2

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

must dismiss the contention. Counsel seeks to reconcile the cases. He believes they stand for the proposition that when there is more than one deportable ground, the period of physical presence runs from the time the more serious ground arose. To support his contention, counsel relies chiefly upon the fact that in Gagliano, the court said that Gagliano committed a more serious offense in entering the United States as a stowaway who had been previously deported than Fong committed by failing to register as required by law -- a dereliction Fong had termed `a minor infraction.' Gagliano v. INS, supra, at 929.

The language in Gagliano, supra, relied upon by counsel must be considered with other language there. When so considered, it is clear that Gagliano, supra, does not rest on the attempted distinction. The court went on to say:

> The Eighth Circuit in Pitsis v. Immigration and Naturalization Service, 337 F.2d 733 (1964), cert. den. 380 U.S. 952, 85 S.Ct. 1085, 13 L.Ed.2d 970 (1965), reached the opposite conclusion, reasoning that an alien who has committed a deportable act of any kind within ten years of his application for suspension should not be allowed to apply for such relief for it was this ten-year probationary period with which Congress was concerned. `We would have regarded it as a matter of common sense interpretation,' said the court, `not to wring good fortune for an alien out of the statute because of a deportable offense committed more than ten years previously when he continues to commit other deportable offenses in the interim.' Id. at 740. We agree, and hold that Gagliano's reentry as a stowaway within the ten-year period bars his request for discretionary relief (at 929; emphasis added).

Thus, it is clear that Gagliano followed Patsis and that it regarded Patsis and Fong as inconsistent with each other.

Furthermore, Patsis shows that the court rejected the contention that one charge was to be weighed against another as to which was the most reprehensible. The court stated that `I t is not for the courts to measure whether failure to file an address card does or does not equate with subversion and immorality. Congress has said in so many words, and clearly, that it does' (Patsis, supra, at 741). Patsis expressed disagreement with the result in Fong and its characterization of the filing requirement as ``only a minor infraction of law" (at 742).

Thus, we have authority in the Second, Sixth and Eighth, and possibly the Third Circuits holding one way, and authority in the Ninth holding the other. This creates a dilemma. We are bound by decisions of circuit courts, but we are concerned with a federal law which we must give a uniform interpretation in each part of the United States. To follow the majority view in jurisdictions where it has been adopted or where the courts have not spoken on the issue, and to follow the minority view in the Ninth Circuit, is hardly a satisfactory way to achieve a consistent administrative position. In an attempt to achieve uniformity, and to afford the Ninth Circuit an opportunity to review its Fong decision in light of decisions in the other circuits, we shall, with due deference to the Ninth Circuit, uniformly follow the rule that when more than one ground of deportation exists and one arises later than the other, the period of physical presence required for suspension of deportation will be measured from the later violation rather than from the earlier. See Matter of Amado; Interim Decision No. 1951 (BIA, 1969); Matter of Lim; Interim Decision No. 1947 (BIA, 1969).

Counsel contends that the Service is inconsistent in that it will in one case use a charge under section 241(a)(5) foreclosing the alien from suspension of deportation, while in other cases with similar facts the charge is not used. In two cases cited, Matter of Lok, A10 824 448, and Matter of Chung, A10 824 951, alleged to be similar to the instant case, counsel states that suspension of deportation was granted. The cases are not part of our records for they are not cases in which the Board acted. The charge to be used in a deportation case is a determination to be made by the Service. Our concern is with whether or not a charge should be sustained.

Counsel sees an inconsistency in the fact that Patsis, although ineligible for suspension of deportation, was held eligible for voluntary departure, but the special inquiry officer here held respondent ineligible for voluntary departure. There is no inconsistency. The ground of deportation in Patsis was not a

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies

ground which precluded the grant of voluntary departure:  one of the grounds here, section 241(a)(5) of the Act  does make a person ineligible for voluntary departure unless he is eligible for suspension of deportation, section 244(e)  of the Act.  We have seen that respondent is not eligible for suspension of deportation.

Copyright 2000 Matthew Bender & Company, Inc., one of the LEXIS Publishing companies